**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 1:26-cr-00001-AHA** |
| | : | |
| **BRIAN J. COLE, JR.,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR**
**REVOCATION OF PRETRIAL DETENTION ORDER**

The government opposes defendant Brian J. Cole, Jr.'s motion to revoke the pretrial detention order in this case.   The defendant is charged with traveling to the District of Columbia and attempting to bomb the national headquarters of the country's two major political parties, an extraordinary act of political violence.   The defendant then, by his own admission, destroyed direct evidence of these crimes before experimenting with a new explosive compound and accumulating still more bombmaking components, many of which were in his possession at the time of his arrest in 2025, more than four years after the attempted bombing.   A magistrate judge received extensive briefing and held a lengthy hearing on the government's request for pretrial detention.   The magistrate judge's decision to detain the defendant pending trial, reflected in a thorough and comprehensive opinion, is correct and should not be disturbed.   The facts and circumstances in this case, together with Congress's judgment that those who maliciously use explosives should ordinarily be detained pending trial, establish that detention is warranted here.

**BACKGROUND**

On December 4, 2025, the defendant was arrested, and a complaint was unsealed charging him with violations of 18 U.S.C. §§ 844(d) and 844(i), ECF No. 1—offenses for which the defendant has since been indicted, ECF No. 39.   The defendant made his initial appearance on

December 5, 2025, and he was held pending a detention hearing.    On December 28, 2025, the government filed a memorandum in support of its oral motion for pretrial detention, ECF No. 17, and the defendant submitted a memorandum and various exhibits in opposition, ECF No. 23.    On December 30, 2025, the magistrate judge held a nearly two-hour detention hearing, after which he indicated that he would issue a written opinion on the matter.    Three days later, on January 2, 2026, the magistrate judge issued a nineteen-page memorandum opinion analyzing the parties' submissions and arguments, considering in detail each statutory detention factor, and concluding that the record established clear and convincing evidence that "there are no conditions of release the Court can fashion to reasonably assure the safety of others and the community in this case." ECF No. 28 ("Detention Order") at 6, 18.    The magistrate judge ordered the defendant to be detained pending trial.

On January 16, 2026, the defendant moved to revoke the magistrate judge's pretrial detention order, arguing that the defendant "was in fact incapable" of constructing a viable explosive, that there is "not a scintilla of evidence" from any point in time indicating that the defendant "ever engaged in any activity similar to" the charged conduct, and that his lack of criminal history and other favorable circumstances "were brushed aside" by the magistrate judge. ECF No. 48 ("Def.'s Mot.") at 3, 11–12.    For the reasons set forth below, based on the record before the magistrate judge and now before this Court, the defendant's arguments fail, and his motion should be denied.

*January 5, 2021*

The charges against the defendant arise from his manufacturing, transporting across state lines, and planting of two improvised explosive devices—so-called "pipe bombs"—in downtown

Washington, D.C. on January 5, 2021.    The defendant planted the first bomb at approximately 7:54 p.m. in the immediate vicinity of the DNC headquarters located at 430 South Capitol Street, Southeast.    He planted the second bomb at approximately 8:16 p.m. in the immediate vicinity of the RNC headquarters at 310 First Street, Southeast.    The two locations are approximately 0.2 miles apart.

Earlier that evening, at approximately 7:10 p.m., the defendant, driving his 2017 Nissan Sentra, took the South Capitol Street exit from Interstate 395 South, passing a license plate reader that recorded his vehicle and tag information.    Approximately 24 minutes later, at about 7:34 p.m., surveillance video first captured the defendant walking approximately one-half mile from the South Capitol Street exit, near the intersection of First Street and North Carolina Avenue, Southeast.    As captured on video, and shown below, the defendant was holding a backpack in his hand by the top strap and wearing dark pants, a grey hooded sweatshirt, dark gloves, Nike Air Max Speed Turf shoes, and a facemask and hood that obscured his face.



The footage also showed the defendant—who investigators from the Federal Bureau of Investigation (FBI), based on a height analysis of the video, estimated to stand 5 feet 7 inches tall from the ground to the top of his clothing, with an error rate of +/- 1.1 inches—putting on a pair of eyeglasses and scanning the area, as depicted below.    The defendant is approximately 5 feet 6 inches tall and wears corrective eyeglasses.



At approximately 7:39:27 p.m., about five minutes after the defendant was first captured on surveillance video, his cellphone interacted with two cell towers consistent with him being in the area of the intersection of D Street and South Capitol Street, Southeast.[1]    Surveillance video

---

[1]  Records obtained from the relevant cellular provider listed the relevant sector of one of these towers as facing north as of February 2021.    However, the provider updated its records in April 2021 to reflect that the tower sector in fact faced east, an orientation that would provide coverage to the intersection of D Street and South Capitol Street, Southeast.    The eastward orientation was consistent with FBI drive tests conducted in January and February 2021.    Based on the information available, the FBI assesses that the provider record listing the relevant tower sector as facing north in February 2021 was an error that was corrected in April 2021, and that on January 5, 2021, that tower sector faced east.

showed that at approximately 7:39:32 p.m., the defendant walked westbound on D Street, Southeast then turned southbound on South Capitol Street, Southeast.    About five minutes later, at approximately 7:44:36 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area of Ivy Street, Southeast, a one-block road bounded by Canal Street, Southeast and New Jersey Avenue, Southeast.    Surveillance video showed that at approximately 7:44:36 p.m., the defendant walked east on Ivy Street, Southeast.

About fifteen minutes later, at approximately 7:59:36 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area of the intersection of New Jersey Avenue, Southeast and E Street, Southeast.    Surveillance video showed that at approximately 7:59:38 p.m., the defendant walked southbound on New Jersey Avenue, Southeast then turned eastbound on E Street, Southeast.    This intersection is approximately 0.1 miles from the immediate vicinity of the DNC headquarters, where the defendant placed the first pipe bomb beneath a public bench, as shown below, at approximately 7:54 p.m.



About twenty minutes later, at approximately 8:14:36 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area of Rumsey Court, Southeast, a single-block alley within the area bounded by 1st Street and 2nd Street, Southeast and C Street and D Street, Southeast.    Surveillance video showed that at approximately 8:14:15 p.m., the defendant exited Rumsey Court and walked westbound through an alley between the Capitol Hill Club and the RNC then walked northbound onto First Street, Southeast.    Surveillance video showed that the defendant then returned to Rumsey Court.    The video last affirmatively captured the defendant walking eastbound on Rumsey Court at 8:18 p.m.    Based on the video, the defendant placed the second bomb near the RNC at approximately 8:16 p.m., planting it next to a trash can, as shown below.



Finally, at approximately 8:23:59 p.m. and 8:24:06 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area east of Rumsey Court, where he was last captured on video about six minutes earlier. The graphic below illustrates the defendant's interactions with nearby cell towers in relation to his paths of travel around the RNC and DNC headquarters where he placed the bombs.



***The Pipe Bombs and the Defendant's Purchasing History***

The pipe bombs that the defendant planted near the RNC and DNC did not explode as intended and were not discovered until approximately 1:00 p.m. on January 6, 2021, after which time multiple buildings in the area were evacuated. The Hazardous Devices Section of the United States Capitol Police (USCP) responded and performed a render safe procedure on both devices, which resulted in the devices being broken apart with their component parts scattered around the areas where they were disrupted. Subsequently, the FBI assessed that the two devices were both

improvised explosive devices which contained a main explosive charge, a fuzing system,[2] and a container. The FBI also assessed that the devices used a hard metal container (metal pipe nipples and end caps), which showed that weapon characteristics were present. The FBI recovered the components of the disrupted devices. These components were processed as evidence and submitted to the FBI Laboratory for analysis. The FBI Laboratory issued a report regarding the two devices, opining that the submitted items consisted of two disrupted destructive devices and that the use of a hard metal container showed that weapon characteristics were present. The FBI explosives examiner assessed that the pipe bombs were constructed using all the components necessary to explode and that they were viable explosive devices.

Both pipe bombs were manufactured using a collection of component parts and a main explosive charge. The component parts included a 1-inch by 8-inch pipe nipple, end caps affixed to the pipe, 14-gauge electrical wire in red and black, alligator clips to connect the wires, a nine-volt (9v) battery, a nine-volt (9v) battery connector, a white kitchen timer, paper clips, steel wool, and homemade black powder. The general construction of the pipe bomb components is illustrated below.

---

[2] A "fuze" or "fuse" refers "to a device that initiates an explosion after a delay." *United States v. Sheehan*, 838 F.3d 109, 117 n.5 (2d Cir. 2016).



Each device contained an electrical fuzing system consisting of a power source (battery), wires, a switch (timer), and an ignitor (steel wool).   The electrical fuzing systems were each connected to a 9v battery and designed, upon completion of the electrical circuit by the switch, to deliver electricity and heat to the steel wool inside the metal pipe.   The steel wool would then begin to burn and ignite the black powder, filling the metal pipe with gas until it exploded.   The FBI explosives examiner confirmed that when connected to a 9v battery, the steel wool in each device in fact glowed and burned, indicating that the fuzing systems, when appropriately assembled, were capable of generating heat to initiate an explosion after a delay.   The disrupted components of each electrical fuzing system are shown below.

**Device 1 (DNC)**



**Device 2 (RNC)**



The FBI obtained records for the defendant's checking account and three of his credit cards for the time period January 2018 to January 2021.    Records for three additional credit cards were obtained for the period of January 2018 to November 2025.    The FBI reviewed the transaction history for all of these accounts.

Between 2018 and 2020, the defendant purchased numerous components that he used to manufacture the pipe bombs placed at the RNC and DNC.    The defendant purchased these components primarily from physical retail locations in northern Virginia, as listed below.

| Component | Picture | Quantity | Purchase Date | Store |
|---|---|---|---|---|
| 9V Battery Connector | | 5 | 11/12/2019 12/28/2019 | Micro Center |
| Timer | | 2 | 6/3/2020 | Walmart |
| 1"x8" Pipe Nipple | | 6 | 6/1/2020 6/8/2020 11/16/2020 | Home Depot |
| Black Iron End Cap | | 12 | 10/22/2019 6/20/2020 7/8/2020 11/16/2020 | Home Depot |
| Galvanized End Cap | | 2 | 3/10/2020 | Home Depot |
| 14 Gauge Red Wire | | 350 ft | 5/23/2019 10/22/2019 9/27/2020 10/7/2020 | Home Depot |
| 14 Gauge Black Wire | | 150 ft | 9/27/2020 10/7/2020 | Home Depot |
| 14 Gauge Red Wire | | 100 ft | 11/24/2020 | Lowes |
| 14 Gauge Black Wire | | 100 ft | 11/24/2020 | Lowes |
| Steel Wool | | 1 | 12/4/2020 | Home Depot |
| Sulfur | | 1 lb | 1/14/2018 | Amazon |

Notably, the sulfur that the defendant purchased was Lilly Miller brand sulfur dust.

In addition to purchasing each type of component used to make the pipe bombs, the defendant purchased equipment consistent with manufacturing pipe bombs. Such items included:

- Safety glasses on or about July 8, 2020;

- A wire stripping tool on or about November 14, 2020;

13

- Wire nuts, which are used to join wires together, on or about November 14, 2020;

- Sandpaper on or about November 21, 2020;

- A machinist's file, a tool for shaping and smoothing metal parts, on or about November 21, 2020; and

- Protective gloves and disinfecting wipes on or about November 24, 2020.

After planting the pipe bombs on January 5, 2021, the defendant continued to use his personal credit and debit cards to purchase bombmaking components, as illustrated below.   The last identified purchase occurred on August 13, 2022.

| Component | Picture | Quantity | Purchase Date | Store |
|---|---|---|---|---|
| Timer | | 1 | 1/21/2021 | Walmart |
| 1"x8" Pipe Nipple | | 8 | 1/22/2021<br>3/20/2021<br>10/6/2021<br>8/10/2022 | Home Depot |
| Black Iron End Cap | | 11 | 4/4/2021<br>6/1/2021<br>6/8/2021<br>6/26/2021<br>10/11/2021<br>8/13/2022 | Home Depot |
| Galvanized End Cap | | 8 | 3/20/2021<br>3/21/2021<br>8/13/2022 | Home Depot |
| 14 Gauge Red Wire | | 50 ft | 6/1/2021 | Home Depot |
| 14 Gauge Black Wire | | 50 ft | 6/1/2021 | Home Depot |
| Steel Wool | | 1 | 1/22/2021 | Home Depot |
| Alligator Clips | | 2 | 1/23/2021 | Home Depot |

14

In addition to purchasing the types of components used in the pipe bombs that the defendant planted on January 5, 2021, the defendant also used his credit and debit cards to purchase:

- Four alarm clocks and duct tape on March 28, 2020;

- A pressure cooker on July 25, 2020;

- Three analog wrist watches in separate purchases on November 25, 2020, December 23, 2020, and January 21, 2021;

- A funnel and canning jar on January 28, 2021;

- Nails on February 10, 2021, and June 26, 2021;

- A 2-inch by 2-foot PVC pipe on March 20, 2021;

- A 1-inch by 10-inch galvanized pipe nipple, a 2-inch PVC plug, and a PVC pipe adapter on March 21, 2021; and

- A drill bit set on June 10, 2021.[3]

### The Defendant's Arrest and Confession

On December 4, 2025, law enforcement executed an arrest warrant for the defendant and took him into custody.    Search warrants were executed on the defendant's person, his home in Woodbridge, Virginia, his Nissan Sentra, and his workplace in Fairfax, Virginia.

A Samsung cellular device was seized from the defendant's person at the time of his arrest. A forensic review of the device's contents showed that between December 2020 and December

---

[3] These purchases were not included in the government's original factual proffer and thus not relied on by the magistrate judge in his decision to detain the defendant.    The government supplements its proffer of facts with this information.

2025, the device recorded 943 events identified as a "factory reset" or "wipe," including a "wipe" event approximately three hours before the defendant's arrest on December 4, 2025.[4]

Inside the defendant's home, law enforcement recovered, among other evidence, (1) a Home Depot shopping bag containing three black iron end caps, one galvanized end cap, two 1-inch by 8-inch pipe nipples, and a Home Depot receipt dated November 16, 2020, for two 1-inch by 8-inch pipe nipples, three black iron end caps, and gloves located inside a closet accessible only through the defendant's bathroom; (2) a Lowes shopping bag containing two galvanized end caps located inside the same closet; and (3) 14-gauge red wire and wire strippers located inside the garage.    Inside the defendant's vehicle, law enforcement recovered, among other evidence, (1) a Home Depot receipt dated August 10, 2022, for hand sanitizer, two 1-inch by 8-inch pipe nipples, and work gloves; (2) a Home Depot shopping bag containing two 1-inch by 8-inch pipe nipples; (3) a Home Depot shopping bag containing two black iron end caps and two galvanized end caps; and (4) a nine-volt (9v) battery.

Following his arrest, the defendant was transported from Woodbridge, Virginia to the FBI's Washington Field Office, where he executed a written waiver of his *Miranda* rights and was interviewed by investigators for multiple hours.    An image of the defendant during the interview is shown below.

---

[4] The first "factory reset" or "wipe" events took place on December 15 and 21, 2020.    The next such event did not occur until July 15, 2022.    From that date, the "factory reset" or "wipe" events occurred at least once a week.    On some days, the device appears to have been wiped multiple times in the same day.



During the interview, which was video-recorded, [5] the defendant initially denied manufacturing, transporting, and planting the pipe bombs.   When asked about his whereabouts on January 5, 2021, the defendant stated that he drove his Nissan Sentra to Washington, D.C. by himself that evening to attend a protest concerning the outcome of the 2020 election.   The defendant explained: "I didn't agree with what people were doing, like just telling half the country that they – that their – that they just need to ignore it. I didn't think that was a good idea, so I went to the protest."   The defendant "has never really been an openly political person" and does not

---

[5] The government provided multiple video and audio-recorded versions of the defendant's custodial interview to the defense on December 8, 2025.   In its memorandum in support of pretrial detention, the government summarized that interview in substantially the same terms as it is summarized in this pleading.   *See* ECF No. 17.   On January 12, 2026, counsel for the defendant gave a media interview in which he reportedly said that "the statements that are in the government's filing" about the defendant's interview "are missing context, and at some point, the government is making affirmative false statements," and that "[s]ome of the representations that the government made, in our opinion, are false."   *See* FOX 5 Washington DC, *DC pipe bomb suspect voted for Trump twice, attorney says*, available at https://www.fox5dc.com/news/dc-pipe-bomb-suspect-voted-trump-twice-qualifies-pardon-like-other-j6-defendants-lawyer-says.   The defendant does not repeat these claims in his motion for relief from this Court.

discuss politics often with his family to avoid conflict.   According to the defendant, "no one knows" his political views, including his family.   The defendant stated that he does not align politically with his family members and did not tell them that he "was going to a protest in support of [then President] Trump."

Later in the interview, the defendant explained that after the 2020 election, "when it first seemed like something was wrong" and "stuff started happening," he began following the issue closely on YouTube and Reddit and felt "bewildered."   In the defendant's view, if people "feel that, you know, something as important as voting in the federal election is being tampered with, is being, you know, being – you know, relegated null and void, then, like, someone needs to speak up, right?   Someone up top.   You know, just to, just to at the very least calm things down."   The defendant felt that "the people up top," including "people on both sides, public figures," should not "ignore[e] people's grievances" or call them "conspiracy theorists," "bad people," "Nazis," or "fascists."   Instead, "if people feel that their votes are like just being thrown away, then . . . at the very least someone should address it."

As the interview continued, the defendant maintained that he did not plant the pipe bombs. However, when the defendant was shown a picture of a Nike Air Max Speed Turf shoe, he admitted that he "used to have a pair" and stated that he "threw them away" because "they were old and they were coming apart."   After approximately two hours, during which the defendant maintained that he had not placed the bombs, one of the interviewing agents asked the defendant if he wanted to end the interview.   The defendant responded that "everything is just blank" and "a little too much to process."   The interviewing agents then suggested that the defendant look at video footage from the night of January 5, 2021.   When the defendant was shown the still image below

of himself on surveillance video close in time to the planting of the bombs, he stated that he did not recognize the person and had not previously seen the video.



The interviewing agents reminded the defendant that lying to them was an additional criminal offense and asked the defendant again whether he was the individual on the surveillance video. This time, the defendant paused for approximately fifteen seconds, placed his head face down on the table, and answered, "yes."

After the defendant's admission, the interviewing agents explained to him that they could either continue to discuss his actions on January 5, 2021, or they could stop the interview and transport the defendant to court for his initial appearance.     The agents explained what an initial appearance is and that if the defendant continued with the interview, he would appear in court the following day.     The defendant asked for time to process things, and the agents stepped out of the interview room for approximately twenty minutes.     When they returned, the defendant expressed

his interest in continuing the interview and executed a written waiver to delay his presentment in court to the next day.

Over the next approximately one and one-half hours, the defendant walked the interviewing agents in detail through his construction, transportation, and planting of the pipe bombs. The defendant explained that he made the black powder in the devices using charcoal, Lilly Miller sulfur dust, and potassium nitrate that he purchased from Lowes. The defendant mixed these ingredients in a Pyrex bowel and used a spoon or measuring cup to pour the black powder into the devices. According to the defendant, he learned to make the black powder from a video game that listed the ingredients, and he also viewed various science-related videos on YouTube to assist him in creating the devices. Regarding the construction of the devices, the defendant explained that he used a hand drill and bit to drill the end caps on the devices, used pliers to crimp the alligator clips, and used kitchen timers rather than alarm clock timers because the kitchen timers were easier to use. When asked where he kept the bombmaking materials, the defendant explained that he hid them in a closet inside his home so they would not be found by a family member. The defendant stated that he assembled the devices in the hours before he drove to Washington, D.C. on January 5, 2021, and that he cleaned the devices with disinfectant wipes. Eventually, the defendant admitted that he did not go to Washington, D.C. to attend a protest but in fact traveled there to plant the devices.

The defendant stated that he transported the devices to Washington, D.C. on January 5, 2021, inside a shoe box in the back seat of his Nissan Sentra. He wore a mask and hood that evening to avoid identification, and he wore gloves to avoid leaving fingerprints. When the defendant arrived in the city, he parked his car on D Street, Southeast, between 2nd Street and 3rd

Street and Folger and Providence Parks.    The defendant placed one of the devices in his backpack, exited his car, and walked toward the DNC.    He set the timer on the first device to the maximum duration (60 minutes) and planted the device near the DNC.    The defendant then returned to his car, retrieved the second device and placed it in his backpack, and walked to the RNC, where he set the timer for 60 minutes and planted the device.[6]    The defendant explained that he had used Google Maps to look up these locations in advance.    After planting the devices, the defendant returned to his car, left the city, picked up food from a restaurant in Virginia, and returned home.

According to the defendant, he was not really thinking about how people would react when the bombs exploded, although he hoped there would be news about it.    The defendant stated that he had not tested the devices before planting them.    He claimed that when he learned that the devices did not explode, he was "pretty relieved," and asserted that he placed the devices at night because he did not want to kill people.    After seeing himself on the news, the defendant stated that he discarded all the bombmaking materials he had at a nearby dump.    The defendant stated that he did not tell anyone about the pipe bombs before planting them or in the years since. Although the defendant denied building additional explosive devices, he admitted that sometime after he built the pipe bombs used in this case, he used beaker sets to conduct another science

---

[6] During the interview, the defendant indicated that he may have purchased the backpack he used to transport the pipe bombs from Target, and that he did not recall where he had purchased the grey hooded sweatshirt.    The defendant's purchase history reflected purchases from Target throughout 2020.    Records obtained from Target showed that two the of the specific items that the defendant purchased in 2020 were identified as "Men's Dome Backpack - Goodfellow & Co™ Olive Green" and "Men's Sherpa Lined Hooded Fleece Jacket - Goodfellow & Co™ Gray L." Based on a visual comparison, the purchased items appear to be consistent in shape and size with the backpack and sweatshirt seen on surveillance video.

experiment to create potassium chlorate, which he claimed was unrelated to bombmaking. Potassium chlorate is an oxidizing agent commonly used in explosives.[7]

When the interviewing agents returned to the defendant's motive, he explained that "something just snapped" after "watching everything, just everything getting worse." The defendant wanted to do something "to the parties" because "they were in charge." When asked why he placed the devices at the RNC and DNC, the defendant responded, "I really don't like either party at this point." The defendant also explained that the idea to use pipe bombs came from his interest in history, specifically the Troubles in Ireland. The defendant denied that his actions were directed toward Congress or related to the proceedings scheduled to take place on January 6.

## ARGUMENT

On January 5, 2021, the defendant traveled to downtown Washington, D.C and attempted to bomb the national headquarters of the country's two major political parties. He did so to intimidate political leaders and public officials. Upon realizing that his conduct had generated significant public attention, the defendant, by his own admission, destroyed direct evidence of his criminal conduct. He nevertheless continued to pursue his interest in bombmaking, experimenting with a new and more reactive explosive compound (potassium chlorate) and purchasing additional components for constructing pipe bombs, many of which were in his car and home when he was arrested in December 2025.

---

[7] *See, e.g.*, Masahiro Tagawa et al., *Effects of composition on the explosive properties of potassium chlorate and oils*, 10 FORENSIC SCIS. RSCH. 1 (2025).

The defendant has been indicted with transporting explosives across state lines intending to use them to intimidate and damage or destroy property in violation of 18 U.S.C. § 844(d), and with maliciously attempting to use those explosives to damage or destroy property in violation of 18 U.S.C. § 844(i).   The latter offense is listed as a federal crime of terrorism in § 2332b(g)(5)(B) and carries a maximum term of imprisonment of 20 years.   *See* 18 U.S.C. § 3142(f)(1)(A).

As the magistrate judge found, the record in this case establishes "ample" probable cause that the defendant maliciously attempted to use explosives in violation of § 844(i), giving rise to a rebuttable presumption that no combination of conditions exist that would reasonably assure the community's safety if the defendant were released.   *See* Detention Order at 8; 18 U.S.C. § 3142(e)(3)(C).   Even assuming the defendant rebutted this statutory presumption of detention,[8] "the presumption does not disappear entirely but remains a factor to be considered among those weighed by the district court." *United States v. Thomas*, 456 F. Supp. 3d 69, 71 (D.D.C. 2020); *United States v. Gamble*, 810 F. App'x 7, 8 (D.C. Cir. 2020) ("[T]he statutory presumption does not disappear like a 'bursting bubble' once a defendant offers some evidence that he is not a danger to the community[.]").   Indeed, even when rebutted, the presumption "is given substantial weight," *United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011), as it is "not simply an evidentiary tool designed for the courts" but also serves as a reflection of "Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial[.]"

---

[8] In his motion, the defendant claims that the magistrate judge "acknowledged that the statutory presumption was rebutted."   Def.'s Mot. at 5–6.   In fact, the magistrate judge made clear no less than four times that even *assuming* the presumption was rebutted, there was clear and convincing evidence that no conditions of release would reasonably assure the community's safety. *See* Detention Order at 1, 6, 8, & 18.

*United States v. Lee*, 195 F. Supp. 3d 120, 125 (D.D.C. 2016) (quoting *United States v. Stone*, 608 F.3d 939, 945–46 (6th Cir. 2010)).

Together with the statutory presumption of detention, the Court must consider: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.    *See* 18 U.S.C. § 3142(g).

The record in this case compels the conclusion that there is no condition or combination of conditions that would reasonably assure the community's safety if the defendant were released pending trial.    Detention is warranted based on the extreme and profoundly serious nature of the defendant's crimes, the overwhelming evidence of his guilt, his continued interest in and pursuit of bombmaking activity, his destruction of evidence and sustained efforts to conceal and obfuscate, and the intolerable risk that he will again resort to violence to express his frustration with the world around him.    The magistrate judge, giving due consideration to each detention factor and the presumption, correctly found that there is clear and convincing evidence on this record that the defendant poses an unacceptable risk of danger to the community if released and appropriately ordered him detained pending trial.    There is no basis to disturb that decision, and the Court should deny the defendant's motion.

## A.  <u>Nature and Circumstances of the Charged Offenses</u>

The nature and circumstances of the defendant's crimes weigh heavily in favor of pretrial detention.    The defendant assembled two bombs, brought them into Washington, D.C., and planted them outside the headquarters of the two major political parties in the United States.    By his own admission, the defendant committed these chilling acts because he was unhappy with the

response of political leaders on both sides of the political aisle to questions raised about the results of the 2020 election, and "something just snapped."    As the magistrate judge observed, the nature of the defendant's crimes is "gravely serious," and "[t]o simply describe them is to demonstrate as much."    Detention Order at 9–11; *see* 18 U.S.C. § 3142(g)(1) (directing courts considering nature and circumstances of offense to specifically "take into account" whether the crimes involved an "explosive" or "destructive device").

While the defendant may have reached a psychological breaking point, his crimes were anything but impulsive.    Indeed, the defendant's pipe bombs—and the fear and terror they instilled in the general public—were the product of weeks of premeditation and planning.    The defendant purchased the components that he used to construct the bombs over a series of months, including before and after the 2020 election.    The defendant acquired the knowledge necessary to assemble the devices, according to him, by watching YouTube science videos and playing video games.    Whatever the precise contours of the defendant's research and preparation, it was sufficiently extensive for him to assemble the two pipe bombs in the hours leading up to his travel to Washington, D.C. to plant them on January 5, 2021.    *See* Detention Order at 16 (emphasizing "the speed with which [the defendant] was able to construct the so-called 'pipe bombs'").    And it was sophisticated enough for him to construct viable explosive devices using all the components necessary to cause an explosion.    The calculated nature of the defendant's criminal conduct over an extended period weighs heavily in favor of pretrial detention.

Perhaps more than anything else, the defendant's choice of targets demonstrates the extreme and deeply dangerous nature of his conduct.    Although the defendant acquired the bombmaking components in the months leading up to January 5, 2021, he chose to plant them at

the headquarters of the DNC and RNC in downtown Washington, D.C., on the eve of the January 6 certification of the electoral college vote.   *See* Detention Order at 10 (emphasizing "the timing and broader context" of the defendant's conduct and "the resulting fear and alarm [that] followed").   In his own words, the defendant did so because he did not "like either party," but "they were in charge" and thus were, in the defendant's mind, an appropriate target for extreme acts of violence.   The defendant's choice of targets risked the lives and safety of innocent pedestrians and office workers who could have been near the bombs at the time they were set to explode, law enforcement and first responders who encountered and disrupted the devices when they were discovered the next day, and anyone who unknowingly came near the bombs between their placement and disruption, including national political leaders, such as the Vice-President-elect and Speaker of the House, who were inside of the respective party headquarters or drove by them on January 6, 2021.[9]   In this sense, the defendant's invocation of the Troubles in Northern Ireland is telling; bombings were used frequently throughout that period to kill officials and civilians for political purposes.[10]   As the magistrate judge appropriately observed, "if the plan had succeeded, the results could have been devasting: creating a greater sense of terror on the eve of a high-security Congressional proceeding, causing serious property damage in the heart of Washington, D.C., grievously injuring DNC or RNC staff and other innocent bystanders, or

---

[9] *See* Staff of H. Subcomm. on Oversight & H. Subcomm. on Admin. State, Reg. Reform, and Antitrust, 119th Cong., *Four Years Later: Examining the State of the Investigation into the RNC and DNC Pipe Bombs* (Jan. 2, 2025) (Interim Report), at 19, 25.

[10] *See, e.g.*, *The Troubles: Northern Ireland History*, Encyc. Britannica, (last visited Dec. 23, 2025), https://www.britannica.com/event/The-Troubles-Northern-Ireland-history.

worse."    Detention Order at 11.    The Court should consider this context and the gravity of the defendant's targets in assessing the nature of the charged offenses.

Ultimately, it was "more a product of fortune than fate" that the defendant failed to explode one or both of his bombs and that no one was killed or maimed due to his actions.    *See United States v. Klein*, 539 F. Supp. 3d 145, 153 (D.D.C. 2021) (rejecting claim that defendant's actions did not precipitate "specific acts of violence or the death or injury of any person" as "more a product of fortune than fate").    Indeed, the defendant admitted that he set both devices to ignite and explode 60 minutes after he planted them.    His failure to accomplish his objectives does not mitigate the profoundly dangerous nature of his crimes.    Appropriately, the defendant now faces criminal charges that carry significant penalties, including a twenty-year maximum sentence and five-year mandatory minimum sentence for malicious use of explosives in violation of 18 U.S.C. §§ 844(i)—"substantial terms of imprisonment [that] reflect Congress' appreciation for the severity of these offenses."    *United States v. Brown*, 538 F. Supp. 3d 154, 167 (D.D.C. 2021); *see also United States v. Wills*, 311 F. Supp. 3d 144, 148 (D.D.C. 2018) (five-year mandatory minimum "reflect[ed] Congress' judgment as to the seriousness of the offense").    The defendant's actions, and the significant potential sentence he now faces, reflect the need for pretrial detention in this case.

According to the defendant, however, the District of Columbia's good fortune that he was not a more skilled bombmaker should weigh in favor of his release into the community while pending trial for attempting to bomb buildings in the nation's capital.    Stated plainly, the defendant's motion minimizes the severity of his conduct.    Although the defendant admitted on video that he manufactured and planted the pipe bombs, set them to explode, and intended that

they would explode to generate news coverage, he now claims that "no credible evidence exists" that he has "ever" made a viable explosive, that he is "incapable" of doing so, and that "there was no possibility" that anyone could have been hurt by his actions because the devices were "harmless." Def.'s Mot. at 3, 7–8. This Court should conclude, as the magistrate judge did, that these efforts to minimize are "decidedly unpersuasive." Detention Order at 10.

The defendant did not plant prop bombs filled with sand or sugar, or constructed with Legos. The defendant assembled two improvised explosive devices, he planted them, and he set each to explode. The evidence need not establish that the defendant exhibited expertise or professionalism in his bombmaking to show his dangerousness. Indeed, the rudimentary and amateurish nature of improvised explosive devices is at least in part what makes them so dangerous.

Nevertheless, the defendant's motion relies heavily on a submission by a defense witness to dispute the likelihood that his bombs would have exploded. *See* ECF No. 48-1 ("Def.'s Mot., Ex. 1"). As an initial matter, even if the Court were to credit the defense witness—and assume, counterfactually, that the FBI explosives examiner who personally assessed the pipe bombs had not opined that each device contained all the components necessary to explode and was viable—the defendant still transported and maliciously attempted to use explosives as charged under 18 U.S.C. § 844. The term "explosive" as defined in § 844(j) includes explosive bombs and similar devices as well as fuzes, gunpowders, and materials containing any oxidizing and combustible units that may cause an explosion upon ignition. *See* 18 U.S.C. §§ 844(j), 232(5). In other

28

words, the defendant committed serious federal criminal offenses regardless of the probability that his bombs would have exploded.[11]

This legal reality notwithstanding, the Court should evaluate critically the defense witness's submission.   For example, the defense witness opined definitively that neither bomb "contain[ed] an explosive filler capable of causing an explosion" before acknowledging, in seeming contradiction to that conclusion, that the black powder recovered from the bomb placed outside the RNC "did produce a flame test 'with positive results.'"   Def.'s Mot., Ex. 1 at 2. Although the defense witness claimed that "no details are given of this positive result," *id.*, in fact, the FBI explosives chemistry examiner who conducted the flame test detailed in his case file that this powder sample, when heated, "sizzled, produced flying burning embers, and sustained a flame."[12]

The defense witness nevertheless went on to opine: "[I]t seems unlikely that this small amount of flame-reactive powder would be capable of causing the bulk of the insufficiently mixed powder to react or burst the steel pipe by itself."   Def.'s Mot., Ex. 1 at 2.   The basis for this

---

[11]  *See also United States v. Musso*, 914 F.3d 26, 30, 32–33 (1st Cir. 2019) (inoperable grenades containing explosive material were "destructive devices" under relevant statute); *United States v. Sheehan*, 838 F.3d 109, 119–20 (2d Cir. 2016) (nonfunctioning homemade bomb containing explosive charge with inoperable fuze was "explosive bomb" under relevant statute). Moreover, the fuzes themselves constitute explosives under § 844.   *See United States v. Guillen*, 995 F.3d 1095, 1101 (10th Cir. 2021) (case charging violation of § 844(i) in which evidence established that "[a] fuse ran through the pressure cooker's release valve and connected to an electric soldering iron, which was plugged into a timer that was plugged into the wall with a power strip" and that "device was designed so that the timer would turn on the soldering iron, which would heat up, ignite the fuse, and cause an explosion").

[12]  The chemistry examiner's case file was produced to the defense on December 23, 2025. It is unclear whether the defense witness was provided the complete case file for review, as the submission lists only the examiner's final reports as "items reviewed for evaluation."   Def.'s Mot., Ex. 1 at 1.

opinion is unstated.    Although the FBI chemistry examiner made clear in his case file that, for each of the powder samples that did not produce positive flame test results, the examiner was "[u]nable to conduct accurate [thermal susceptibility testing] due to small amounts of inhomogeneous powders present," the defense witness apparently assumed that each pipe bomb was filled not with explosive black powder but with the "inhomogeneous powder" (what the defense witness referred to as "insufficiently mixed powder").    Def.'s Mot., Ex. 1 at 2.    The defense witness also apparently assumed that any "insufficiently mixed powder"—which the witness acknowledged consisted of the fuels charcoal and sulfur along with the oxidizer potassium nitrate[13]—would have simply remained inert when exposed to the sustained heat generated by the explosive black powder.    These assumptions are wholly unsupported.    First, the powder samples were collected after the destructive devices were disrupted—*i.e.*, after they had broken into pieces and scattered during the render safe procedures employed by the Hazardous Device Section of the USCP.    Not surprisingly, some of the powder samples collected contained apparent "vegetation or plant material" and other foreign particles.    Notably, however, the black powder sample that produced a sustained flame was recovered along with a piece of steel wool from inside of one of the device end caps, meaning its exposure to foreign particles was limited.    Moreover, even the "inhomogeneous" samples were not inert—one of those samples, when heated, produced "flying burning embers" and "[p]ossible short bursts of sustained flame" but was ultimately too "[d]ifficult

---

[13]    *See* Def.'s Mot., Ex. 1 at 2 (describing these chemicals as "the three classic ingredients used to make Black Powder").    The defense witness claimed that unless these three chemicals are apportioned in the "most widely cited" 75/15/10 ratio, they are not black powder.    *Id.*    However, as explained in one of the reference books on which the defense witness relied, historically "the formulas for black powder" have varied significantly from the modern composition.    *See* TENNY L. DAVIS, *THE CHEMISTRY OF POWDER AND EXPLOSIVES* 39 (1943).

to discern due to [the] small amount of material" tested.    The defense witness does not acknowledge, much less address, these facts, and there is no basis to credit his submission.[14]

Ultimately, the defendant cannot dispute that he taught himself how to make explosive material and created a mixture of sulfur, charcoal, and potassium nitrate—the three ingredients of explosive black powder; that he taught himself how to construct pipe bombs and assembled two such devices; and that each bomb contained his homemade explosive material encased in a capped metal pipe and rigged to ignite and explode using an electrical fuzing system.    The defendant did all of this for the purpose of engaging in an act of political violence, which the D.C. Circuit has recognized places him "in a different category of dangerousness."    *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021); *see id.* at 1285 n.1 (Katsas, J., concurring in part and dissenting in part).    The nature and circumstances of these crimes weigh heavily in favor of pretrial detention.

---

[14] The defense witness also opined unequivocally that "neither device has a functional fuzing and firing system" and that a 9v battery and steel wool could not ignite black powder. Def.'s Mot., Ex. 1 at 2.    The defense witness provided no basis for these opinions, and it is unclear to the government what could support them.    As noted, the fuzing systems in this case were broken into pieces when the pipe bombs were disrupted.    And a cursory review of public source information shows how easily and efficiently steel wool burns simply by touching the terminals of a 9v battery. *See, e.g.*, TKOR, *Steel Wool and Batteries Have a CRAZY Reaction*, https://www.youtube.com/watch?v=dxjE9O0n6YI (starting at 1:36, demonstrating how steel wool ignites and burns immediately upon touching 9v battery).    Indeed, the defense witness's opinion as to the powder samples is the only opinion for which he provided any reasoning that could be subjected to analysis.    Moreover, although the defense witness described as "unavailable for evaluation" the government's "theory of how the two devices could have caused an explosion," Def.'s Mot., Ex. 1 at 1, the FBI explosives examiner's final report, which is attached to the witness's submission, included a "logical construction diagram" and a step-by-step description of how the device components could be assembled to cause an explosion, *see id.* at 10–11.

B.  <u>**Weight of the Evidence Against the Defendant**</u>

The overwhelming weight of the evidence in this case also favors pretrial detention.    The video, location, and purchase history evidence that led to the defendant's arrest and charging is powerful proof of guilt in itself.    That evidence has been corroborated not only by the recovery of consistent bombmaking components from the defendant's home and vehicle, but by the defendant's hours-long videotaped confession, in which he explained his criminal conduct and intent in detail to investigators.    The weight of the evidence against the defendant, and the attendant likelihood of his conviction for serious offenses, heavily support pretrial detention.

The defendant takes issue with the magistrate judge's consideration of this factor, claiming that he viewed it "in a vacuum without consideration of how it relates to an assessment of dangerousness."    Def.'s Mot. at 8–9; *id.* (calling the magistrate judge's purported failure to consider evidence of dangerousness a "slight to due process.").    In fact, the magistrate judge rejected the defendant's legally unsupported position that evidence of guilt was "wholly irrelevant to his bail proceeding" and that the court was required to consider only evidence of dangerousness, ECF No. 23 at 2; Detention Order at 11–12, before considering in detail the evidence of the defendant's dangerousness, Detention Order at 13–18.    In any event, "[i]f the government possesses overwhelming evidence that the defendant is guilty of the crime charged—and the nature of the charged offense involves a danger to the community—then the second factor will help meet the government's burden of persuasion."    *United States v. Taylor*, 289 F.Supp.3d 55, 65–66 (D.D.C. 2018); *see also*, *e.g.*, *United States v. Glasgow*, Case No. 1:20-cr-27-7, 2021 WL 2403136, at *8 n.5 (D.D.C. June 11, 2021) ("Because Glasgow has been charged with an inherently dangerous crime (conspiring to distribute and possess with intent to distribute fentanyl and crack

cocaine), the evidence proffered by the Government in support of the conspiracy charge is probative of his dangerousness.").    The weight of the evidence here establishes decidedly that the defendant attempted to bomb the national headquarters of the DNC and RNC, and that evidence demonstrates his guilt of the charged crimes as well as his dangerousness.    *See* Detention Order at 12.

## C.  The Defendant's History and Characteristics

Although the defendant has not had prior contact with the criminal justice system, his personal history and circumstances demonstrate that conditions less restrictive than detention will not reasonably assure the community's safety while this case proceeds.    After placing two explosives at significant targets on January 5, 2021, the defendant spent the immediate aftermath, and the ensuing years, engaged in a comprehensive effort to avoid apprehension by law enforcement.    By his own admission, the defendant, having disguised himself during the commission of the charged offenses to avoid identification, destroyed direct evidence of his crimes after they were publicized in the media.    Disturbingly, however, the defendant continued to purchase bombmaking components through mid-2022 and used those materials to create, or attempt to create, potassium chlorate.    While the defendant claimed in his interview that this was an innocent science experiment, as discussed further below, potassium chlorate is an oxidizing agent commonly used in the manufacture of improvised explosive devices.

Critically for the Court's consideration, the defendant engaged in all the relevant conduct— developing his motive, purchasing the bombmaking materials, constructing the devices, traveling to D.C. to plant them, and avoiding apprehension for years—while living under the roof of his family's home.    Given the scrutiny of a years-long national investigation into his actions, the

defendant had an understandable incentive to keep those closest to him in the dark.    Indeed, the defendant apparently wiped his personal cellphone nearly one thousand times during this period. The defendant now faces the scrutiny of a federal criminal prosecution.    Under these circumstances, there is simply no reason to expect that the defendant, if released pending trial, will conduct himself differently than he has for the past five years.    Rather, there are substantial grounds to conclude that the defendant would continue to hide and obfuscate his activities and present an intolerable danger to the community.

In his motion, the defendant contends that the magistrate judge simply "brushed aside" his lack of criminal history and other favorable circumstances.    Def.'s Mot. at 3.    In fact, the magistrate judge considered this factor in detail, agreeing that, "on balance," it weighed in the defendant's favor.    Detention Order at 12–13 (specifically noting defendant's lack of criminal history or history of non-compliance, ties to community, familial support, education, employment, and diagnoses proffered by defense).    Thus, on this issue, and others, the defendant's reliance on *Munchel*—in which the reviewing court remanded because the detention determination did not address "substantial countervailing evidence that supported release," 991 F.3d at 1282—is misplaced.

### D.  <u>Nature and Seriousness of the Danger Posed by Release</u>

The defendant has confessed to planting pipe bombs outside the headquarters of the nation's two major political parties in downtown Washington, D.C.    He has confessed to constructing the devices, to filling them with his homemade explosive powder, and to setting their timers to explode.    The evidence gathered in law enforcement's investigation in this case corroborates the defendant's confession.    And it establishes that these explosive devices were

viable weapons.    Put simply, the defendant poses a serious danger to the community if released

pending trial.    By destroying evidence and deceiving those around him, the defendant has for five

years avoided accountability for actions that endangered lives and created a widespread sense of

fear and terror.    The community should not be subjected to the "articulable threat" that the

defendant, now identified and facing a public prosecution, will again resort to violence as his

chosen means to express his dissatisfaction with the world around him.    *See Munchel*, 991 F.3d

at 1283–84; Detention Order at 18 (distinguishing this case from the "unique" circumstances in

*Munchel* because the defendant here apparently acted alone, chose targets accessible to the general

public day or night, and his actions "were not facilitated by the presence of a large crowd gathered

for some distinct purpose").

The magistrate judge carefully analyzed the record evidence supporting the prospective

danger posed by the defendant if released.    *See* Detention Order at 13–18.    In his motion, the

defendant dismisses this analysis, claiming baldly that there is "not a scintilla of evidence" from

any point in time indicating that the defendant "ever engaged in any activity similar to that for

which he now stands accused."    Def.'s Mot. at 11–12.    The magistrate judge, however, engaged

directly with this argument, calling it "reasonably persuasive, at least as far as it goes."    Detention

Order at 14.

But the argument does not go far.    The magistrate judge articulated the circumstances in

this case that "cut against" the defendant's position, including (1) the defendant's documented

purchases of bombmaking components—pipes, end caps, wires, a timer, and more—between late

January 2021 and August 2022, showing that he "engaged in the same activity leading up to the

offense conduct, amassing the same sorts of parts he used to construct the two explosive devices

giving rise to these charges," *id.*; (2) the defendant's admitted effort to create more explosive material after January 5, 2021, *id.* at 15; (3) the "substantial red flags" raised by the recovery in December 2025 of still more bombmaking components from "a closet in Mr. Cole's home and inside his car—two locations essentially within arm's reach of Mr. Cole's daily routine," *id.*; (4) the defendant's "sudden and abrupt motivation" and the speed with which the defendant, by his own admission, assembled the explosives "over a matter of hours," *id.* at 16; and (5) the defendant's "efforts to hide and obfuscate his activities"—including by wiping his cellphone hundreds of times—which are indicative of "efforts to conceal and destroy information about his personal communications and online activity" and "would hamper the ability of even the most well-intentioned custodian to effectively monitor him," *id.* at 17.    All of this, the magistrate judge concluded, "temper[ed] the notion that the five-year span between the underlying offense conduct and today mitigates any future risk."    *Id.* at 15.    And for good reason.    As the D.C. Circuit recognized in *Munchel*, when a court assesses the prospective threat posed by a defendant, it should consider both "the nature of the threat" and "the resources and capabilities of the defendant"—*i.e.*, whether the defendant has the "means of continuing to" engage in the same conduct "in the future." 991 F.3d at 1283.

The defendant offers no serious response to the magistrate judge's analysis of prospective danger.    Although he faults the magistrate judge for mistakenly describing the defendant's admitted post-January 2021 experimentation with explosive material as involving more black powder, *see* Def.'s Mot. at 13, the reality is even worse.    As the defendant acknowledges, he told FBI agents that he made potassium chlorate, an even *more* reactive and efficient explosive oxidizer

that is well-known in the world of improvised explosive devices.[15]   Indeed, as the defendant's witness recognized in his submission, "homemade chlorate and perchlorate explosives mixtures are far more commonly encountered by bomb squad personnel."   Def.'s Mot., Ex. 1 at 4.   And although the defendant now claims that his potassium chlorate work occurred before January 5, 2021, he told the interviewing agents that this "happened, like, way after," before agreeing that he had used "a bunch of beaker sets" to create the compound.   *Cf.* Def.'s Mot. at 14 (claiming that "[t]he government made no proffer, nor could it, concerning Cole's purchase of explosive powders, or ingredients to prepare explosive powders at any time after January 5, 2021").

Moreover, while the defendant asserts that "the repeated wiping of his phone was a manifestation of [his] OCD, not an attempt to avoid detection," Def.'s Mot. at 15, he provides no explanation for why this purported symptom happened to manifest starting in the summer of 2022, at approximately the same time that the defendant apparently made his final credit or debit card (*i.e.*, traceable) purchases of bombmaking components.   As the magistrate judge correctly observed, the defendant's "alleged behavior is at least equally suggestive of efforts to conceal and

---

[15]   *See* Tom Vanden Brook, *Afghan Bomb Makers Shifting to New Explosives for IEDs*, USA TODAY (June 25, 2013), https://www.usatoday.com/story/news/world/2013/06/25/ammonium-nitrate-potassium-chlorate-ieds-afghanistan/2442191/ (describing potassium chlorate as "the explosive of choice for insurgents" in Afghanistan "fueling 60% of the IEDs" after the sale of fertilizer, a source of nitrate, was banned). *See generally* "Potassium chlorate," *Wikipedia*, last modified Jan. 20, 2026, https://en.wikipedia.org/wiki/Potassium_chlorate#:~:text=Potassium%20chlorate%2C%20often%20in%20combination,that%20used%20in%20smoke%20grenades.

destroy information about his personal communications and online activity." Detention Order at 17.[16]

The defendant's efforts to conceal support not only his continued, prospective dangerousness, but also the "concrete concerns" that the magistrate judge expressed in "consider[ing] 'whether [the court] believes the defendant will actually abide by its conditions.'" Detention Order at 16 (quoting *Munchel*, 991 F.3d at 1280–81). These concerns are self-evident given the nature of the defendant's post-offense conduct—which includes destroying evidence, apparently deceiving family members, and repeatedly wiping his cellphone—and "portend[ ] real challenges in monitoring [the defendant's] conduct in a home-detention setting," even for "the most well-intentioned custodian." Detention Order at 17. On this point, the Court should be aware that on January 5, 2021, at approximately 4:17 p.m.—about three hours before the defendant arrived in the area of the DNC and RNC—one of the defendant's siblings sent a text message to the defendant's mother stating, "I'm going to dc .. Grams said it may be crazy out there so I was just letting you know." That same sibling had sent a text message to the defendant a few hours earlier, at approximately 12:39 p.m. on January 5. In the three days preceding January 5, 2021, the defendant exchanged text messages only with this sibling and his mother. At the December 30 detention hearing, the defendant identified this sibling as a character witness who would supervise the defendant in his employment if released. And the defendant has offered his

---

[16] The government notes that the defendant has not proffered any information in support of the representation that he "has been diagnosed with Autism Spectrum Disorder, Level 1, and obsessive compulsive disorder ("OCD")." Def.'s Mot. at 4. It is unclear to the government what symptoms the defendant experiences in connection with these purported diagnoses or how they are or could be relevant to an assessment of the defendant's dangerousness.

grandmother as his proposed third-party custodian should the Court grant his motion.    *See* Def.'s Mot. at 15.

At bottom, the offense conduct in this case is extraordinarily serious, there is significant evidence of the defendant's continued interest in bombmaking, and there are concrete reasons to doubt that the defendant will abide by release conditions or that a third-party custodian will effectively monitor him.    On this record, and given the statutory presumption of detention, there is clear and convincing evidence that no combination of conditions will reasonably assure the community's safety if the defendant is released.    The magistrate judge's decision to detain the defendant pending trial was correct and should not be disturbed.

## CONCLUSION

The government respectfully requests that the Court deny the defendant's motion to revoke the pretrial detention order in this case.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    */s/ Charles R. Jones*
CHARLES R. JONES
D.C. Attorney No. 1035541
Assistant United States Attorney
National Security Section
601 D Street N.W.
Washington, D.C. 20530
(202) 252-6976
Charles.Jones3@usdoj.gov