**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:26-cr-00001-AHA** |
| | : | |
| **BRIAN J. COLE, JR.,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION**

The United States respectfully opposes defendant Brian J. Cole, Jr.'s motion to dismiss for lack of jurisdiction, ECF No. 56. The defendant claims that his planting pipe bombs outside the headquarters of the major political parties on the night of January 5, 2021, is conduct for which he was preemptively pardoned under President Trump's January 20, 2025, presidential proclamation concerning the events of January 6, 2021. The defendant ignores that the proclamation expressly limited relief to individuals who had been "convicted of," or had a "pending indictment" for, offenses related to the events at or near the United States Capitol on January 6. On January 20, 2025, the defendant belonged to neither category, and so the proclamation has no bearing on this case. Moreover, the defendant's January 5 offenses were not, as the proclamation required, "related to" events at or near the United States Capitol "on January 6." And even if the proclamation somehow could apply to this case, the Department of Justice's contrary position is entitled to deference as a reasonable interpretation taken by the Executive Branch agency expressly charged with administering the proclamation. Any one of these independent grounds is sufficient to deny the motion. The Court should rely on all three.

## RELEVANT BACKGROUND

The defendant is charged by indictment with planting pipe bombs outside the Republican and Democratic National Committee (RNC and DNC) headquarters in downtown Washington,

D.C. on January 5, 2021, in violation of 18 U.S.C. § 844(d) (interstate transportation of explosives) and 18 U.S.C. § 844(i) (malicious attempt to use explosives).  ECF No. 39.  The bombs, which failed to explode that night, were discovered in the early afternoon on the following day, January 6, 2021.  That afternoon, the United States Congress convened at the United States Capitol building to certify the results of the 2020 election.  Over the ensuing four years, the Department of Justice investigated and prosecuted more than 1,500 people for offenses committed at or near the United States Capitol on January 6, 2021.

On January 20, 2025, President Trump issued a presidential proclamation pardoning or commuting the sentences of all those convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021, and directing the Department of Justice to pursue dismissal with prejudice to the government of all pending indictments charging such crimes.  At that time, law enforcement had not identified the defendant, much less charged or convicted him, and the pipe bombs investigation proceeded unabated.  On December 4, 2025, nearly a full year after the proclamation was issued, the defendant was arrested and charged with planting the bombs at the RNC and DNC on January 5, 2021.

## I.    The Defendant's Criminal Offenses on January 5, 2021.

On January 5, 2021, shortly before 8:00 p.m., the defendant planted the first pipe bomb outside the DNC headquarters.  Approximately twenty minutes later, and about two blocks away, he planted the second bomb near the RNC headquarters.  The devices did not explode as intended on the night of January 5.  They sat idle until they were discovered the next day, January 6, at approximately 1:00 p.m., when a passerby and law enforcement officers found the bombs.  Law enforcement moved immediately to evacuate buildings in the area, and hazardous device specialists responded and rendered the devices safe.  The Federal Bureau of Investigation (FBI)

collected and analyzed the two disrupted devices and determined that each bomb had all the necessary components to explode.

The evidence of the defendant's guilt has been summarized in detail in previous pleadings. *See* Govt.'s Mem. in Supp. of Pretrial Detention, ECF No. 17; Govt.'s Opp'n to Def.'s Mot. for Revocation of Pretrial Detention Order, ECF No. 50. Generally, that evidence includes the following: A license plate reader captured the defendant's vehicle entering the area of the DNC and RNC shortly before he planted the pipe bombs. Surveillance video captured the defendant walking around the area wearing a mask, hood, and gloves, and carrying a backpack by the top strap away from his body. The video showed the defendant planting the first bomb at the DNC at approximately 7:54 p.m., and it captured the defendant at approximately 8:16 p.m. entering and leaving the area where the second bomb was found at the RNC. Provider records associated with the defendant's cellphone number showed that his device interacted on multiple occasions with cell sites near the DNC and RNC at times when the surveillance video showed him walking within the relevant cell site's coverage area. The defendant's credit card and checking account history revealed that between 2018 and 2020, he bought various components and ingredients used to make the devices, including pipes, end caps, wiring, steel wool, and timers.

Concurrent with the arrest of the defendant on December 4, 2025, law enforcement officers executed multiple related search warrants and found pipe bomb components in the defendant's vehicle and in his bathroom closet in the basement area of the home he shared with several family members. Law enforcement also recovered the defendant's cellphone from his person, which revealed that he had "wiped" or "factory reset' the device twice in December 2020 and an additional 941 times between July 15, 2022, and his arrest.

Additionally, and not described in previous pleadings, law enforcement recovered various electronic devices from inside the defendant's home.  A search of the defendant's computer and laptop revealed that the operating systems on each device had been re-installed just a few hours before his arrest; limited content was recovered from those devices.  However, a thumb drive recovered from the basement area where the defendant lived contained artifacts of deleted files, dated in or around 2016, with names including "anarchist-cookbook-william-powell.pdf," "anarchistcookbook2000.pdf," "Chemical Equivalency List.docx," "Is this still the Land of the Free.docx," "Revolutionary Armed Front.docx," and "Revolutionary Handbook.docx."   The Anarchist Cookbook is a well-known book by William Powell from 1971 containing instructions for manufacturing homemade explosives, and the Anarchist Cookbook Version 2000 is a publicly accessible online document containing instructions on the homemade manufacturing of pipe bombs and black powder, among other relevant topics.

Law enforcement also recovered a hard drive from a cabinet in the defendant's mother's bedroom that contained data from multiple computer user profiles in the names of the defendant and his family members.  The user profile named "Brian" contained data from in or around 2012 showing that the user conducted internet searches including "how to make a pipe bomb," "pipe bomb," "wikihow pipe bombs," "manifesto template," and "list of manifestos."  The "Brian" profile's web history also included a visit to a web page titled "Daily Gun Pictures: Instructions: How to Make a Homemade Pipe Bomb."

Finally, in an interview with FBI agents after his arrest, the defendant confessed to manufacturing, transporting, and planting the pipe bombs on January 5, 2021.  The defendant explained when and how he acquired the components and ingredients and assembled the devices. The defendant also described how he transported the bombs from his Virginia home to Washington,

D.C. that night, identified himself in the surveillance video, and walked the agents in detail through his route around the DNC and RNC, including the order in which he planted the devices and how he set the timers on each bomb to explode in 60 minutes.  The defendant stated that he then drove home, and that he later discarded his remaining bombmaking materials at a nearby dump.

Initially during the interview, the defendant denied planting the pipe bombs and claimed that he traveled to Washington, D.C. on January 5 to attend a protest at the United States Capitol related to the 2020 presidential election.  He told agents that it "seemed like something was wrong" with the 2020 election, but that "people on top," "on both sides," were "ignoring people's grievances" and instead labeling them "conspiracy theorists," "bad people," "Nazis," and "fascists."  Later in the interview, however, the defendant admitted his guilt and clarified that, in fact, he did not attend a protest at the United States Capitol on January 5 but rather traveled to D.C. to plant the bombs.[1]  The defendant told the agents that "something just snapped" after "watching everything, just everything getting worse."  The defendant wanted to do something "to the parties" because "they were in charge," and he did not like either party.  The defendant expressly denied that his actions were directed toward the United States Congress or related to the proceedings scheduled to take place on January 6.

## II.    The Presidential Proclamation Concerning Criminal Cases Related to Events at or Near the United States Capitol on January 6, 2021.

On January 20, 2025, nearly one year before the defendant was arrested and charged in this case, President Trump issued a presidential proclamation titled "Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States

---

[1] Before the defendant confessed, one of the interviewing agents told him: "Brian, we know you didn't go to the protest because we know where your phone was and you were at the RNC and DNC. That's not where the protest was. I know exactly what times you were in DC, and I know exactly your location. I know your location. I know where you were that night. We know you were not at the Capitol at a protest. I know that."

Capitol on January 6, 2021." Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 29, 2025). The proclamation's stated purpose was to "end[] a grave national injustice that has been perpetrated upon the American people over the last four years and begin[] a process of national reconciliation." *Id.*

The proclamation defined and addressed two categories of persons who had committed "offenses related to events that occurred at or near the United States Capitol on January 6, 2021." *Id.* First, the proclamation granted "a full, complete and unconditional pardon to . . . individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021." *Id.* The proclamation excluded fourteen named individuals from the pardon's scope and instead commuted their sentences to time served as of the date the proclamation was issued. *Id.* The proclamation delegated to the Attorney General the responsibility to "administer and effectuate the immediate issuance of certificates of pardon" to all persons entitled to the full pardon—*i.e.*, those convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021. *Id.* Second, the proclamation addressed those individuals whose criminal cases were pending, directing the Attorney General "to pursue dismissal with prejudice to the government of all pending indictments against individuals for their conduct related to the events at or near the United States Capitol on January 6, 2021." *Id.*

## ANALYSIS

When President Trump issued the presidential proclamation on January 20, 2025, the defendant had not been convicted of, and did not have a pending indictment for, offenses related to events that occurred at or near the United States Capitol on January 6, 2021. The defendant therefore is categorically excluded from relief under the proclamation's clear and unambiguous text. Moreover, the defendant's crimes were not, as the proclamation required, related to events at or near the United States Capitol on January 6, 2021. The defendant planted the bombs on

6

January 5, thus failing the proclamation's temporal requirement. And his conduct was independent of the January 6 offenses that the proclamation was, by its terms, intended to address and remedy. Moreover, after the proclamation issued, the Department of Justice, which was expressly tasked with implementing the proclamation, continued to actively pursue the pipe bombs investigation after terminating all January 6-related investigations. This interpretation was reasonable and is entitled to deference.

Any one of these grounds independently resolves the defendant's motion to dismiss in the government's favor. The Court should deny the defendant's motion.

## I.    The Defendant is Not a Member of Any Category of Persons Covered by the January 2025 Presidential Proclamation.

The motion to dismiss fails for the simple and straightforward reason that when the presidential proclamation was issued on January 20, 2025, the defendant had not been convicted of an offense related to events that occurred at or near the United States Capitol on January 6, 2021, and he was not facing a pending indictment for any such conduct. The defendant therefore is categorically unentitled to relief under the terms of the proclamation.

The proclamation's categorical clemency is not novel. "Historically, as here, Presidents have issued broad pardons to cover large groups of similarly situated defendants." *United States v. Wilson*, Nos. 25-cv-545 (DLF), 23-cr-427-1 (DLF), 2025 WL 1009047, at *7 (D.D.C. Mar. 13, 2025). In such cases, the issuing document "clearly define[d] the class of individuals and the types of offenses covered by the pardon." *Id.* (citing Amnesty—Power of the President, 20 Op. Att'y Gen. 330, 331–32 (1892) (Taft, William H.) (concluding that the President may issue a broad pardon to a class of defendants "without naming them, but describing them as persons committing, or participating in, the same kind of offenses" so long as the pardon is "sufficiently definite with respect to the beneficiaries by a description other than by name")). Examples of categorical

pardons include President Lincoln's 1863 pardon of most Confederates who swore allegiance to the United States Constitution and the Union, President Truman's 1945 pardon of certain World War II veterans for pre-enrollment crimes, and President Carter's 1977 pardon of all those who evaded the Vietnam War draft. *See id.* at *7 n.4.

As in those historical examples, here the scope of the proclamation's relief was limited to clearly defined categories of persons. The proclamation (1) granted a "full, complete and unconditional pardon to . . . individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021," and (2) directed the dismissal with prejudice of "all pending indictments against individuals for their conduct related to the events at or near the United States Capitol on January 6, 2021." 90 Fed. Reg. at 8331. The proclamation's defined categories are plain, "there is no ambiguity to resolve," and, as such, there "is no justification for taking liberties with unequivocal . . . language." *United States v. Batchelder*, 442 U.S. 114, 121–22 (1979). Rather, "the sole function of the courts is to enforce [the plain language] according to its terms.'" *United States Hite*, 769 F.3d 1154, 1160 (D.C. Cir. 2014) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)); *see also Wilson*, 2025 WL 1009047, at *4 (D.D.C.) ("So long as the language of a pardon is clear and unambiguous, courts interpret the pardon according to its plain and ordinary meaning."); *United States v. Wilson*, No. 25-3041, 2025 WL 999985, at *2 (D.C. Cir. Apr. 2, 2025) ("our decision hinges on the text of the pardon itself").

Applied here, the proclamation's categorical language requires little examination. The proclamation afforded clemency, without exception, only to those who had been convicted of, or had a pending indictment for, offenses or conduct related to events that occurred at or near the United States Capitol on January 6, 2021. When the proclamation issued in January 2025, the defendant had not even been identified by law enforcement, much less convicted of, or under a

8

pending indictment for, planting the pipe bombs on January 5. To be sure, the President could have exercised his power to preemptively pardon (or otherwise benefit) those who had not yet been convicted or indicted for January 6-related crimes. *See, e.g., Ex parte Garland*, 71 U.S. 333, 380 (1866) (pardon power "extends to every offence known to the law, and may be exercised at any time after its commission, either before legal proceedings are taken, or during their pendency, or after conviction and judgment"). Consistent with the proclamation's stated purpose, the President chose instead to limit its scope to those whose prosecution had at least commenced by way of indictment. Because this limiting "language is clear, that is the end of the judicial inquiry." *United States v. Braxtonbrown–Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002) (quoting *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 474 (1992)).

Ignoring this plain language, the defendant attempts to cast this as "the kind of case" involving allegations and conduct "inextricably tethered" to January 6 that the proclamation should "reach." *See* ECF No. 56 ("Def.'s Mot. to Dismiss") at 1, 13–17. These efforts are unavailing. Under its plain terms, the proclamation applied only to those convicted or under a pending indictment for the offenses described. The proclamation simply did not, as the defendant suggests, provide relief based on conduct alone. Tellingly, the defendant does not even attempt to advance a theory as to how, under the proclamation's categorical terms, he could be considered "convicted" or facing a "pending indictment" when the proclamation was issued.[2] That is for good reason.

---

[2] Although not in the motion, counsel for the defendant has advanced such a theory in extrajudicial statements to the media. In an interview published March 20, 2026, defense counsel, when pressed on this apparent flaw in his position, responded that it "doesn't matter" because the defendant is "indicted now" and therefore is facing a "pending indictment," and that the proclamation did not require a "pending indictment at th[e] moment" the proclamation was issued. *See* FOX 5 Washington DC, *Lawyer for alleged J6 pipe bomber says Trump's pardon should apply* (Mar. 20, 2026, at 11:40–12:49, 25:40–27:45), https://www.fox5dc.com/video/fmc-t8iowwvks9p7s1k0. This argument "must be rejected, for it reads '[pending]' out of the" text,

Because the Court is "duty bound to enforce" the proclamation "as written," not as the defendant wishes it to be, *Wilson*, 2025 WL 1009047, at *9 (D.D.C.) (emphasis omitted), the Court should deny the motion to dismiss based on the proclamation's categorical inapplicability to the defendant.

## II.    The Defendant's Crimes Were Not Related to the Events that Occurred at or Near the United States Capitol on January 6, 2021.

The defendant's motion to dismiss fails for the independent reason that his criminal offenses were not, as the proclamation required, "related to" the events that occurred at or near the United States Capitol on January 6, 2021.  *See* 90 Fed. Reg. at 8331.

In the first instance, the phrase "related to" in this context "restricts the scope of the generic term 'offenses' to those 'committed in certain factual circumstances.'"  *Wilson*, 2025 WL 1009047, at *4 (D.D.C.) (quoting *Friedman v. Sebelius*, 686 F.3d 813, 818–23 (D.C. Cir. 2012) (interpreting statutory provision that applies to "[a]ny individual or entity that has been convicted of a criminal offense consisting of a misdemeanor relating to fraud").  The D.C. Circuit has held that "for an offense to fall within [the proclamation's] scope, it must be tethered to a specific time – January 6, 2021 – and place – at or near the U.S. Capitol."  *Wilson*, 2025 WL 999985, at *2 (D.C. Cir.) (quoting district court); *accord United States v. Kelley*, No. 3:22-CR-118-TAV-JEM-1, 2025 WL 757583, at *3 (E.D. Tenn. Mar. 10, 2025) (holding "that the pardon is primarily constrained by temporal and spatial parameters as defined by the date and location of 'events'").

---

*Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 719 (2018), and ignores the proclamation's directive to "pursue dismissal . . . of all pending indictments," *see TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001) ("[A] statute ought . . . to be so construed that . . . no clause, sentence, or word shall be superfluous, void, or insignificant" (internal quotation marks omitted)); *Pending*, Merriam-Webster, https://www.merriam-webster.com/dictionary/pending (defining the adjective "pending" as "not yet decided; being in continuance").

Although important, these limitations are not the sum total of the meaning of the phrase "related to" as used in the proclamation. Generally, a "text must be construed as a whole," and "[c]ontext is a primary determinant of meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012). This general rule is true of pardons. The Court cannot "read the pardon in a vacuum;" it "must also look to the nature and purpose of the pardon." *Robertson v. Gibson*, 759 F.3d 1351, 1358 (Fed. Cir. 2014). And the general rule is true of the phrase "related to," which clearly requires a nexus, but "the kind of relationship required, its nature and strength, [are] informed by context." *Dubin v. United States*, 599 U.S. 110, 119 (2023) (interpreting phrase "in relation to" and looking to statutory context). Here, the relevant context includes the proclamation's stated purpose to "end[] a grave national injustice that has been perpetrated upon the American people over the last four years and begin[] a process of national reconciliation." 90 Fed. Reg. at 8331. In accordance with this remedial purpose, the government has taken the position in other cases that the proclamation's pardon applies to post-January 6 criminal offenses committed within the home that would not have been discovered but for law enforcement's investigation of the events of January 6. *See, e.g.*, *Wilson*, 2025 WL 1009047 (D.D.C.); *United States v. Costianes*, 782 F.Supp.3d 253 (D. Md. 2025).

Considering the proclamation's language in its proper context, the defendant's crimes on January 5 are not "related to" the events of January 6 because (A) they do not satisfy the proclamation's temporal requirement, and (B) the defendant's planting of the pipe bombs was public criminal conduct independent of the events of January 6 that animated the proclamation's purpose.

    A. <u>This Case Fails the Proclamation's Temporal Requirement</u>.

The proclamation's limitation to events occurring "on January 6, 2021," is "precise." *Kelley*, 2025 WL 757583, at *4. "It refers to a single date," and "[t]he ordinary meaning of this

11

date could not be understood to encompass any other, unenumerated dates." *Id.*   Here, the defendant's criminal conduct ended on January 5, 2021.  The government is not aware of evidence that the defendant traveled to the United States Capitol (or Washington, D.C.) on January 6, and he is not suspected of participating in the conduct of those who were at or near the United States Capitol on January 6, 2021.  This alone largely forecloses a nexus between the defendant's crimes and the events at or near the United States Capitol on January 6.  *See id.* at *6–7 (defendant failed to establish "primary connection in time and place" under proclamation, leaving only "secondary forms of relation").[3]

The defendant nevertheless emphasizes (at 15) that he planted the bombs the evening before the electoral vote certification scheduled to take place on January 6, 2021, and that the devices were discovered on January 6, facts that the government has highlighted in explaining the dangerousness of the defendant's actions.  *See* Govt.'s Mem. in Supp. of Pretrial Detention at 19, ECF No. 17.  The defendant, however, expressly disavowed any connection between his crimes and the United States Congress or the January 6 certification of the electoral college vote, and he admitted that he lied about attending a protest at the United States Capitol on January 5.[4]  Rather,

---

[3] The defendant's reliance (at 20–22) on *United States v. Kenneth Harrelson* does not help him.  First, Harrelson was identified by name in the proclamation as receiving a *commutation*, not a pardon.  *See* 90 Fed. Reg. at 8331.  More to the point, Harrelson was prosecuted for conspiring with others to commit offenses, and then personally committing those offenses, *at the United States Capitol on January 6, 2021.  See* Superseding Indictment, *United States v. Harrelson*, No. 1:22-cr-15-APM-3, ECF No. 167.  Each of Harrelson's counts of conviction—obstructing an official proceeding, conspiring to prevent an officer from discharging duties, and tampering with evidence—involved conduct at the United States Capitol on January 6, 2021.  *See id.*  Granted, Harrelson's prosecution for a conspiracy that culminated on January 6 involved overt acts taken in furtherance of that conspiracy before January 6.  Unlike the defendant, however, Harrelson's offenses bore an obvious connection to the events at or near the United States Capitol on January 6.

[4] According to the defendant in his motion (at 2), "[t]he government alleges that Mr. Cole drove into Washington, D.C. 'to attend a protest concerning the outcome of the 2020 election' in support of then-President Trump."  The defendant omits that each time the government has referenced this aspect of the defendant's confession, it has included that the defendant later

he stated that he was frustrated by the response of political leaders to concerns about the 2020

presidential election, and he was motivated to do something "to the parties" because "they were in

charge." Given the defendant's focus on the parties and not the United States Congress, it is hardly

surprising that he chose to target the headquarters of the DNC and RNC and not the United States

Capitol. Moreover, the defendant set the bombs to explode 60 minutes after placing them—*i.e.*,

on the night of January 5, 2021. It was only happenstance that the devices, which did not explode

as intended, sat idle until the next afternoon when the events of January 6 unfolded. And, although

the defendant was clearly motivated by then-recent events, the evidence shows that his interest in

explosives and bombmaking (specifically, pipe bombs) dated back nearly a decade.

In short, the defendant was upset about an issue that also motivated many who were

convicted of offenses related to events that occurred at or near the United States Capitol on

January 6, but he chose a different target, on a different day, and acted through different means

than those to whom the proclamation was directed. The magistrate judge in this case recognized

as much in his order detaining the defendant pending trial. *See* Mem. Op. and Order at 18, ECF

No. 28 (distinguishing defendant's conduct from January 6 conduct and highlighting that

defendant's crimes "were not facilitated by the presence of a large crowd gathered for some distinct

purpose," he is instead "accused of acting alone on the streets of Washington, D.C., choosing

targets accessible to the general public at any time, day or night," and that he "reportedly

disclaimed to law enforcement that his actions were directed at Congress or related to the

Congressional proceedings on January 6"). Thus, while the events of January 6 provide some

relevant factual context to this prosecution, the defendant's crimes on January 5 were not "related

---

recanted this claim and admitted it was false. *See* Govt.'s Mem. in Supp. of Pretrial Detention at 15, ECF No. 17; Govt.'s Opp'n to Def.'s Mot. for Revocation of Pretrial Detention Order at 20, ECF No. 50.

to" the events at or near the United States Capitol on January 6 under the terms of the proclamation.[5]

    B.  <u>The Defendant's Crimes Were Independent of the Events of January 6 and the Resulting Investigations and Prosecutions</u>.

The presidential proclamation's stated purpose of "end[ing] a grave national injustice that has been perpetrated upon the American people over the last four years and begin[ning] a process of national reconciliation," 90 Fed. Reg. at 8331, is plainly a reference to the investigations and prosecutions that produced the convictions and indictments covered by the proclamation. That clear purpose is not furthered where, as here, the charged conduct and the defendant's identity were independent of the events at the United States Capitol on January 6.

The offenses for which the defendant has been charged were separate from the events of January 6. The defendant planted explosive devices in publicly accessible locations near the RNC and DNC headquarters. He did so under cover of darkness on January 5, but because the devices did not explode as intended, they remained in plain view when daylight arrived the next day. In the early afternoon on January 6, the bombs were discovered by a passerby and law enforcement in the area of the RNC and DNC. The events at the United States Capitol that day were only starting to unfold.

The defendant's identity was also independently discovered. The law enforcement team responsible for the pipe bombs investigation scrutinized heavily the evidence of the events at the United States Capitol on January 6. They were unable to identify a material connection between those events and the defendant. Indeed, on January 20, 2025, after more than four years of

---

[5] Contrary to the defendant's view (at 3), statements by Congressional committees, private citizens, and the media can have no bearing on the Court's analysis of the proclamation's text as applied to this case.

continuous investigation, the law enforcement team had not yet identified the defendant as a person of interest.  Only in late 2025, many months after the proclamation issued, did investigators identify the defendant.

The independent provenance of this case demonstrates that it lacks even a secondary relationship to the events of January 6 within the meaning of the proclamation.  Take, for example, *United States v. Wilson* and *United States v. Costianes*, both of which involved criminal conduct committed after January 6, 2021.  *See* Def.'s Mot. to Dismiss at 11–13, 22 (citing these cases).  The defendants in *Wilson* and *Costianes* were initially investigated for their actions at or near the United States Capitol on January 6, 2021.  During those investigations, law enforcement executed search warrants at the defendants' respective homes in Maryland and Kentucky and recovered firearms that the government later alleged were unlawfully possessed.  *See generally Wilson*, 2025 WL 1009047 (D.D.C.); *Costianes*, 782 F.Supp.3d 253.

After the presidential proclamation was issued, the government took the position as to each defendant that the pardon covered their firearm offenses because "the proclamation's remedial purpose will not be achieved if people subjected to January 6-related investigations continue to be prosecuted for certain in-home offenses that would not have been discovered but for those investigations."  Govt.'s Resp. to Briefing Order at 6, *United States v. Costianes*, No. 1:21-cr-00458-JKB, ECF No. 175; *accord* Br. of Appellee at 15, *United States v. Wilson*, No. 25-3041.  In each case, there "was no victim or witness who feasibly would have reported this offense to the authorities, nor any investigation unrelated to the events of January 6, 2021, that might have otherwise uncovered it."  *Id.*  But for the defendants' participation in the events at the United States Capitol on January 6, 2021, their firearm offenses "would not have come to light, let alone been prosecuted."  *Id*.  Although the courts in *Wilson* and *Costianes* ultimately disagreed with the

15

government and declined to hold that the pardon applied, the relationship *vel non* between the investigation of the criminal offenses at issue and the events of January 6 remains a legitimate consideration in analyzing the proclamation's application.

*United States v. Kelley* illustrates this point. The defendant in *Kelley* was convicted in this District in October 2024 of offenses related to the events that occurred at the United States Capitol on January 6, 2021. 2025 WL 757583, at *1. While the case was pending, Kelley was indicted in Tennessee for conspiring in December 2022 to murder federal employees, soliciting a crime of violence, and influencing a federal officer by threat. *Id.* Kelley was convicted of these crimes in November 2024. *Id.* After the proclamation was issued, the government determined that Kelley's D.C. convictions for his January 6 conduct were covered by the proclamation's pardon. *Id.* at *2. The Tennessee convictions, however, did not fall within the pardon's scope because they were "entirely independent" of, and thus "unrelated to," the events at the United States Capitol on January 6, 2021. *Id.* at *9 (quoting government's argument with approval). By threatening federal officers and soliciting others to murder them, the defendant committed offenses with an effect outside the home that were discovered through means unrelated to any investigation into his actions on January 6. *See* Aff. in Supp. of Crim. Compl. and Arrest Warrants at 4, ¶ 11, *United States v. Kelley*, No. 3:22-cr-00118-TAV-JEM, ECF No. 3. In declining to apply the pardon, the court in *Kelley* recognized that the defendant's Tennessee convictions were substantively unrelated to the events of January 6, 2021. *See Kelley*, 2025 WL 757583, at *9; *see also United States v. Taranto*, No. 1:23-cr-00229-CJN (D.D.C.), ECF Nos. 8, 96, 101 (government dismissed January 6 offenses pursuant to proclamation but declined to dismiss joined firearm charges based on June 2023 conduct discovered after the defendant made a public broadcast and was confronted by law enforcement).

For these reasons, the temporal and factual disconnect between this case and the events of January 6 provides an independent basis to hold that the proclamation does not apply. The defendant nevertheless asks the Court to dismiss the charges against him because other people to whom the pardon clearly applied were, in the defendant's view, undeserving of clemency. *See* Def.'s Mot. to Dismiss at 18–22. The defendant argues that, if convicted, "said conviction must be commuted anyways under the precedent set by commuting [Kenneth] Harrelson and other maniacal rioters." *Id.* at 20. In the defendant's view, the "government is wasting our time" in prosecuting his attempt to bomb the headquarters of the RNC and DNC when other violent offenders were pardoned. *Id.* at 22. A pardon, however, is not a legal "precedent" that is "set" in one case and applied in others. *See Andrews v. Warden*, 958 F.3d 1072, 1078 (11th Cir. 2020) ("We can neither enlarge nor cabin the commutation order."); *Wilson*, 2025 WL 1009047, at *7 (D.D.C.) ("[T]he meaning of a pardon cannot change after the pardon issues."). The Court should decline the defendant's invitation to disregard the law and its strictures and conduct a roving survey of the relative fairness of the proclamation's application. That is decidedly not the Court's role.[6]

---

[6] It is unclear whether the audience for these arguments is the Court or the prospective jury pool or some other audience. *See* Def.'s Mot. to Dismiss at 18–20 (discussing January 6 conduct of David Dempsey, asking "readers [t]o truly absorb and wonder how this man, [David] Dempsey, got a pardon," highlighting Dempsey's race, and complaining that "Dempsey could have been listed as a person whose 20-year sentence was commuted" instead of pardoned; also highlighting race of Kenneth Harrelson). In defense counsel's most recent media appearance, he stated, "I don't think the American people are going to agree with th[e] choice" to pardon people who committed serious acts of violence but "go to the mat on this guy [the defendant] who didn't hurt anybody," and "I want the people to really look at who got these pardons." FOX 5 Washington DC, *Lawyer for alleged J6 pipe bomber says Trump's pardon should apply* (Mar. 20, 2026, at 27:30–29:10), https://www.fox5dc.com/video/fmc-t8iowwvks9p7s1k0. Defense counsel then repeatedly suggested that the defendant had not been pardoned because of his race. *Id.* at 36:05–40:20. It should suffice to note that the government pursued this investigation for nearly a year after the proclamation issued without knowing who the defendant was.

### III.    The Executive Branch's Interpretation of the Proclamation As Applied to this Case Is Entitled to Deference.

The defendant asks this Court, in effect, to force the Executive Branch to pardon him under the terms of a presidential proclamation that the Department of Justice—the very agency expressly tasked with implementing the proclamation—has already determined does not apply.    The separation-of-powers implications of such a request are evident on its face—particularly in the pardon context, where, absent an independent constitutional violation, "Congress and the Judiciary have no power to interfere."  *Andrews*, 958 F.3d at 1076; *see Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 276 (1998) ("[P]ardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review.") (cleaned up); *Ex parte Garland*, 71 U.S. at 380.  Exercise of the pardon power "is the President's prerogative . . ., not the Judiciary's," and, where clemency is sought but not received, the latter may not "step into the role of the executive" and rely on inferences to "to fill the gap."  *Rosemond v. Hudgins*, 92 F.4th 518, 530–31 (4th Cir. 2024).  "That separation of powers was intentional, as the clemency power 'operates as a check on the other two branches.'"  *Id.* at 525 (quoting *Andrews*, 958 F.3d at 1076)).

Given the nature of the pardon power, and the President's typical reliance "on the Department of Justice—specifically, the Attorney General and Office of the Pardon Attorney—to administer the pardon process," courts have recognized that it is "sensible" to defer to the Justice Department's interpretation of a pardon so long as the "interpretation is not unreasonable" and "the language of the order bears its construction."  *Andrews*, 958 F.3d at 1078 (quoting *Udall v. Tallman*, 380 U.S. 1, 4 (1965)); *see Kelley*, 2025 WL 757583, at *7 ("because the pardon is not entirely self-executing and instead enlists the implementing and interpretive capacities of the Department of Justice, the Department's position appears relevant, at minimum").

From the outset, the Department of Justice has interpreted the proclamation as inapplicable to this case because, in addition to the categorical limitations discussed above, the defendant's crimes were unrelated to the events of January 6, 2021. The Justice Department's continued pursuit of this matter, including numerous investigative steps and the arrest and public filing of charges against the defendant, clearly demonstrates this continuous and consistent interpretation. Because the interpretation is reasonable, it is entitled to deference. *See Andrews*, 958 F.3d at 1078. Moreover, the Court should have confidence that the government is not simply advancing "a post hoc rationalization . . . to support its ongoing litigating positions." *Wilson*, 2025 WL 1009047, at *6 (D.D.C.). The Department's interpretation long predates this prosecution, and it has been consistently applied.

On January 20, 2025, the same date that the presidential proclamation was issued, the Acting Deputy Attorney General issued a memorandum directed to, among others, the Acting United States Attorney for the District of Columbia and the Acting Director of the FBI with the subject, "Clemency and Dismissals Relating to Events on January 6, 2021." *See* Attachment A. Pursuant to the January 20, 2025 presidential proclamation, the memorandum instructed the United States Attorney's Office for the District of Columbia to, as relevant here, (a) "immediately dismiss with prejudice all pending cases related to events that occurred at or near the United States Capitol on January 6, 2021, including cases that are in pretrial phases as well as cases in which sentencing has not yet occurred," and (b) immediately provide to the Office of the Deputy Attorney General and the Office of the Pardon Attorney the names and case information for "all individuals within the categories of pardons and commutations granted" in the proclamation, which the Office of the Pardon Attorney would "immediately effectuate." *Id.* at 1–2.

Additionally, "based on, among other things, the need to address current crises facing the American people," the memorandum instructed the "Department of Justice, including but not limited to the Federal Bureau of Investigation, [to] terminate all ongoing investigations related to events that occurred at or near the United States Capitol on January 6, 2021." *Id.* at 2. This included all "investigative activities related to those events, including but not limited to issuance of subpoenas or warrants, filing of charges, or any arrests." *Id.* Consistent with the memorandum's directives, the United States Attorney's Office for the District of Columbia and the FBI terminated all ongoing investigations related to events that occurred at or near the United States Capitol on January 6, 2021, and ceased all related investigative activities.

However, the memorandum did not apply to the ongoing investigation of the planting of pipe bombs near the RNC and DNC headquarters on January 5, 2021, as those offenses were not related to events that occurred at or near the United States Capitol on January 6, 2021. At the Department of Justice's direction, the FBI and the United States Attorney's Office for the District of Columbia continued their standalone investigation of the RNC and DNC pipe bombs. From January 20, 2025, to the present, the United States Attorney's Office for the District of Columbia and the FBI have pursued this investigation, including through the issuance of subpoenas and warrants, the filing of charges, and the making of an arrest. This investigative work was supported by the Justice Department's National Security Division, and it was conducted with the knowledge and approval of Justice Department leadership.

Thus, even if the Court somehow found, notwithstanding its text, that the proclamation could apply to this case, the Department of Justice's contrary position is supported by a consistent, reasonable interpretation taken by the Executive Branch agency expressly charged with

administering the proclamation. The Court should defer to that interpretation under the circumstances.

## CONCLUSION

At bottom, the defendant's motion to dismiss fails because he is categorically excluded from relief under the clear and unambiguous terms of the presidential proclamation. The defendant's crimes were also not related to the events of January 6, 2021, as that language is used in the proclamation. And even if the proclamation's text could reach this case, the Department of Justice has reasonably and consistently reached the opposite conclusion, and that interpretation is entitled to deference. For each of these reasons, the Court should deny the defendant's motion to dismiss.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:     */s/ Charles R. Jones*
        CHARLES R. JONES (D.C. Bar No. 1035541)
        JOCELYN BALLANTINE (CA Bar No. 208267)
        Assistant United States Attorneys
        National Security Section
        601 D Street, NW
        Washington, D.C. 20530
        Tel: (202) 252-6976
        Charles.Jones3@usdoj.gov
        Tel: (202) 252-7252
        Jocelyn.Ballantine2@usdoj.gov