**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:26-cr-00001-AHA** |
| | : | |
| **BRIAN J. COLE, JR.,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR EARLY RETURN OF PRETRIAL SUBPOENAS**

The United States respectfully opposes defendant Brian J. Cole, Jr.'s renewed motion for early return of pretrial subpoenas. ECF No. 88. The defendant asks the Court to authorize service of subpoenas *duces tecum* under Federal Rule of Criminal Procedure 17(c) to three individuals to advance his claim that one of these individuals, former U.S. Capitol Police officer Shauni Kerkhoff, committed the crimes for which the defendant has been indicted. Kerkhoff served on duty during the events at the U.S. Capitol on January 6, 2021, and since then has become the target of a malicious online conspiracy theory that she is the real pipe bomber. The FBI investigated this claim, as it did many others, and found it to be baseless. Kerkhoff, in turn, sued the claim's authors for defamation. Unsurprisingly given this background, the defendant's requested subpoenas utterly fail to satisfy the specificity, relevance, and admissibility requirements for authorization under Rule 17(c) and should be rejected. Moreover, several of the defendant's lawyers in this case now represent the authors of the conspiracy theory in their defense against Kerkhoff's defamation suit, raising the unsettling prospect that this criminal matter, and the defendant's pursuit of a defense based on a conspiracy theory, are being used to advance the civil case. Rule 17(c) does not require the Court to become a participant in this gambit. The Court should deny the motion.

## RELEVANT BACKGROUND

The defendant is charged by indictment with planting pipe bombs outside the headquarters of the Republican National Committee (RNC) and Democratic National Committee (DNC) in Washington, D.C. on January 5, 2021. ECF 39. The FBI's investigation of the defendant yielded evidence that his vehicle entered the area of the DNC and RNC shortly before he planted the pipe bombs; his cellphone interacted on multiple occasions with cell sites near the DNC and RNC at times when surveillance video showed him walking within the relevant cell site's coverage area wearing a mask, hood, and gloves, and carrying a backpack; between 2018 and 2020, he bought various components and ingredients used to make the bombs, including pipes, end caps, wiring, steel wool, and timers; he had bomb components in his closet and car when he was arrested in December 2025; he had, in his home, a thumb drive with deleted copies of the Anarchist Cookbook and a removable computer hard drive containing online searches including "how to make a pipe bomb" and "manifesto template"; and he confessed to the crimes during a videorecorded interview, explaining in detail how and why he did it.

The FBI first identified the defendant as a suspect on or about November 5, 2025. Over the course of its nearly five-year investigation, the FBI identified numerous so-called persons of interest—individuals who may have information about, or a connection to, the crime. The investigatory interest in these individuals was predicated on a variety of types of information, and investigators took varying investigative actions as a result.

Shauni Kerkhoff is a former U.S. Capitol Police officer who was on duty during the events at the U.S. Capitol on January 6, 2021. As part of her duties, Kerkhoff fired pepper balls at the gathering crowd. Consequently, Kerkhoff testified in multiple trials stemming from the events at

the U.S. Capitol and was the first government witness at the first such trial. She left the U.S. Capitol Police in the months after January 6 and took a position as a CIA campus security officer.

Stephen Baker was, until recently, employed by an online media publication called *The Blaze*. On November 4, 2025, Baker and his reporting partner at *The Blaze*, Joseph Hanneman, published an online article accusing Kerkhoff of using excessive force in responding to the events of January 6, 2021, and suggesting that she left the U.S. Capitol Police under suspicious circumstances "about six months after Jan. 6," "wiped" her social media presence, and went to "work for a three-letter federal intelligence agency."[1] Four days later, on November 8, 2025, Baker and Hanneman published an online article with *The Blaze* claiming that, according to their investigation, "[a] forensic analysis of a female former U.S. Capitol Police officer's gait is a 94% - 98% match to the unique stride of the long-sought Jan. 6 pipe-bomb suspect."[2] The claim was based on an unidentified "software algorithm" and an anonymous "veteran analyst" who "personally pegged the match at closer to 98%." In the article, Baker and Hanneman identified Kerkhoff by name, included extensive personal information about her and her family, embedded multiple professional and personal pictures of her, and again accused her of using excessive force on January 6. Baker and Hanneman also suggested that the FBI had engaged in a grand conspiracy to cover up Kerkhoff's involvement and concluded that identifying Kerkhoff "could start to unravel the carefully crafted, zealously defended Democrat narrative that massive crowds of

---

[1] Joseph M. Hanneman & Steve Baker, *Capitol Police repeatedly used lethal force on protesters early on Jan. 6, video shows*, THE BLAZE (Nov. 4, 2025), https://www.theblaze.com/news/capitol-police-repeatedly-used-lethal-force-on-protesters-early-on-jan-6-video-shows.

[2] Steve Baker & Joseph M. Hanneman, *Former Capitol Police officer a forensic match for Jan. 6 pipe bomber, sources say,* THE BLAZE (Nov. 8, 2025), *available at* https://web.archive.org/web/20251126151917/https://www.theblaze.com/news/former-capitol-police-officer-a-forensic-match-for-jan-6-pipe-bomber-sources-say.

Trump supporters stormed the Capitol as part of an insurrection to keep Trump in office and deny Joseph R. Biden Jr. the presidency."

Shortly before the November 8 article, the FBI became aware of Baker and Hanneman's claim against Kerkhoff and investigated it. The FBI contacted Kerkhoff at the CIA on November 6, 2025, and Kerkhoff agreed to be interviewed. The interviewing agents observed that Kerkhoff, who was not aware of the nature of the investigation, initially appeared nervous until she was told the investigation related to the pipe bombs, at which point she appeared visibly relieved. During the interview, Kerkhoff answered the FBI's questions, denied placing the pipe bombs, provided a list of former co-workers who could confirm her whereabouts on January 5, and stated that on the evening of January 5 she would have either been at work or at home with her boyfriend, U.S. Capitol Police Sergeant Daniel Dickert, who worked the same shift as Kerkhoff and lived with her. Kerkhoff also proactively offered review of her cellphone, including data from January 2021, and indicated that she was open to the FBI reviewing her financial activity. Kerkhoff also consented to searches of her home and car, which took place upon the completion of the interview, and which lasted multiple hours.

After participating in the interview and being present during the search of her home and car, Kerkhoff also consented to a polygraph examination. The examination was conducted by the FBI; Kerkhoff arrived around 8:45 p.m. that same day (November 6), and the examination concluded after midnight. During the examination, Kerkhoff was asked twice whether she placed the pipe bombs, and she said she did not. During the post-polygraph interview, which took several hours, Kerkhoff was told by the examiner that she had failed the examination.[3] Kerkhoff then

[3] The examiner's actual opinion, as reflected clearly at the top of the report provided to the defendant in discovery, was "Deception Indicated," which reflects the view that the polygraph charts showed physiological responses to the relevant questions that were indicative of deception.

answered all of the examiner's questions about January 5, denied placing the pipe bombs, denied knowing who placed the pipe bombs, and denied ever buying explosives or explosive components. Kerkhoff explained that when she was initially called in by her employer earlier on November 6 to speak to the FBI, she was nervous because she knew that an online article published two days earlier by *The Blaze* had accused her of using excessive force on January 6, and the office that had called her was responsible for revoking badges and access. Kerkhoff was relieved when she learned the interview related to the pipe bombs. Kerkhoff also reported that she felt she was being targeted online based on her involvement in the law enforcement response on January 6, and that her mother had recently died. According to the examiner, when Kerkhoff was told she had failed the polygraph, Kerkhoff exhibited a controlled reaction. Kerkhoff explained that she knew that the investigators were just doing their job, and that there was no reason to become emotional because the evidence would show she did not place the pipe bombs.

The FBI's investigation of Kerkhoff as a person of interest in the pipe bomb case included, in addition to the above, conducting interviews and surveillance, obtaining subscriber records for various electronic accounts associated with Kerkhoff, and submitting footage of Kerkhoff to a podiatrist to compare her gait to that of the pipe bomber (the examiner was unable to reach any conclusion). The FBI's investigative efforts yielded zero evidence connecting Kerkhoff in any way to the construction, transportation, or planting of the pipe bombs. Instead, the investigation established that Kerkhoff was at home in Falls Church, Virginia on the evening of January 5, 2021, with Sergeant Dickert and their dog. As reflected in materials already provided to the defendant in discovery, Kerkhoff's U.S. Capitol Police work records confirmed that she ended her overtime day shift at 5:40 p.m. on January 5; Kerkhoff's cellphone contained text messages including a message to Sergeant Dickert at 5:18:55 p.m. stating "Coming home!" and a message exchange

about Sergeant Dickert getting Kerkhoff a "wrap" a few minutes later; Sergeant Dickert, in addition to confirming Kerkhoff's alibi, provided the FBI with an electronic receipt from Roseina's restaurant (where he purchased the wrap) timestamped 5:39 p.m. on January 5; and Sergeant Dickert's cellphone contained a video from inside their Falls Church home depicting their dog and capturing Kerkhoff's voice timestamped 7:37:48 p.m. on January 5. (The defendant's vehicle is captured entering the area of the DNC and RNC in the Capitol Hill neighborhood of Washington, D.C. at 7:10 p.m. on January 5, the defendant first appears on video in the area at 7:34 p.m., and the defendant confessed to being the person in the video planting the first bomb at the DNC at approximately 7:54 p.m. and the second bomb at the RNC at approximately 8:26 p.m.) After the defendant's December 2025 arrest, *The Blaze* retracted the article accusing Kerkhoff of being the pipe bomber.[4]

As part of this criminal case, the government provided the defendant with extensive information from the FBI's case file concerning persons of interest in the investigation, including but not limited to Kerkhoff. The government did so without regard to whether the investigative interest in the person was based on limited and/or questionable information. Those disclosures included investigative records concerning the steps taken by the FBI to investigate *The Blaze* article's claim. All produced person-of-interest materials were disclosed under the terms of the protective order entered in this case on December 11, 2025, *see* ECF No. 12, and all such materials were expressly designated by the government as "Sensitive" under the order, thus requiring prior government agreement or Court approval before the designated material or information could be filed publicly, *id.* at ¶ 6.

[4] *See* Laura Wagner, *The Blaze retracts report accusing ex-policewoman of pipe bombing*, WASH. POST (Dec. 5, 2025), https://www.washingtonpost.com/business/2025/12/05/jan-6-pipe-bomb-blaze-retraction/

On April 1, 2026, the defense filed on the public docket a motion for early return of three Rule 17(c) subpoenas *duces tecum* directed to Kerkhoff, Sergeant Dickert, and the podiatrist who reviewed footage of Kerkhoff. ECF No. 84 (unsealed version). In a flagrant violation of the protective order, the motion, without authorization, used the FBI records provided in discovery to publicly detail a curated and incomplete summary of the FBI's investigation of *The Blaze* article's claim and to identify Kerkhoff by name and other personal identifying information as the subject of that investigation. The centerpiece of the motion was that Kerkhoff had "failed" her polygraph examination, a misleading and context-free assertion that was promptly amplified online by Baker and Hanneman.[5] The government asked the Court to find defense counsel in contempt for violating the protective order. ECF No. 59.

On April 21, approximately three weeks after the defense publicly detailed information from the FBI's investigation of *The Blaze* article's claim, Kerkhoff sued *The Blaze*, Baker, and Hanneman for defamation in federal court in Virginia. *See generally Kerkhoff v. Blaze Media LLC, et al.*, 1:26-cv-01078-RDA-WEF (E.D. Va.).[6] The next day, the Court held a hearing in this case, during which it denied the defendant's requested subpoenas without prejudice given the government's commitment to provide the defendant with additional materials responsive to the

[5] *See, e.g.*, Steve Baker (@Steve BakerUSA), X.com (Apr. 1, 2026, 10:17 PM) (asking tagged FBI and DOJ officials: "How's that cover up of Shauni Kerkhoff's failed polygraph working for you today?"), https://x.com/SteveBakerUSA/status/2039527711295549577; Steve Baker (@Steve BakerUSA), X.com (Apr. 2, 2026, 9:16 PM), https://x.com/SteveBakerUSA/status/2039874681717629416 ("Drop all charges against Brian Cole and launch a full scale investigation into who at Capitol Police and CIA were behind the J6 pipe bomb scheme."); Joe Hanneman (@HanneReports), X.com (Apr. 1, 2026, 12:45 PM, 12:49 PM) (posting defendant's subpoena motion with header "BOMBSHELL" and adding that polygraph "was administered two days before a Nov. 8 Blaze News article stated Kerkhoff was a forensic match to the hoodie-clad bomb suspect based on gait analysis").

[6] The defamation complaint is available on the docket in this case. *See* ECF No. 69-1.

subpoenas. The government did so on June 30, 2026, providing the defendant with a supplemental production of materials responsive to the subpoena requests while making clear that "[b]y providing this letter and related materials, the government in no way concedes or agrees that the information is relevant or admissible in this case." Exhibit A (letter re: "Discovery Materials Responsive to Proposed Third-Party Subpoenas" dated June 30, 2026). The Court also denied the government's contempt motion without prejudice to ensure that defense counsel would work productively with the government to resolve outstanding issues.

On June 15, 2026, three of the defendant's lawyers in this case (Little, Glover, and Lawson) filed motions to enter appearances defending Baker and Hanneman in Kerkhoff's defamation case. ECF Nos. 37–39, *Kerkhoff v. Blaze Media LLC, et al.*, 1:26-cv-01078-RDA-WEF (E.D. Va.). According to representations made by those lawyers and declarations filed by Baker and Hanneman in the defamation case, the lawyers began negotiating terms with Baker and Hanneman after they were served with the defamation complaint on April 22, and the representation has been "underwrit[ten]" by *The Blaze*. ECF No. 36, 41, 42, *Kerkhoff v. Blaze Media LLC, et al.*, 1:26-cv-01078-RDA-WEF (E.D. Va.).

On August 19, 2026, the defendant in this case filed his renewed motion for early return of subpoenas directed to Kerkhoff, Sergeant Dickert, and the podiatrist. *See* ECF Nos. 88, 88-1–88-3. The requested subpoenas to Kerkhoff and Sergeant Dickert[7] generally concern evidence collected during the FBI's investigation of *The Blaze* article's claim that exonerated Kerkhoff:

- Materials concerning the video of Kerkhoff and Sergeant Dickert's dog capturing Kerkhoff's voice at home at 7:37:50 p.m. on January 5, 2021, along with "any" other

[7] To minimize the issues requiring the Court's involvement, the government directed the FBI to obtain from the podiatrist all materials responsive to the requested subpoena directed to him. ECF No. 88-3. The government has provided those responsive materials to the defendant, thus mooting the defendant's motion as to that requested subpoena.

recording on Kerkhoff's cellphone from January 5 and "[a]ny" recordings of the dog or Kerkhoff's voice from January 5 on Sergeant Dickert's cellphone, "including, but not limited to," "any" video provided to the government (Request 1 in both subpoenas);

- "Documents" that identify Kerkhoff's and Sergeant Dickert's electronic devices and accounts relating to the dog video (Request 2 in both subpoenas);
- "Any" materials provided by Kerkhoff to the government on November 6 and 12, 2025 (Kerkhoff Request 3);
- All surveillance video from Kerkhoff's and Sergeant Dickert's home on January 5 and 6, 2021 (Kerkhoff Request 4; Dickert Request 3);
- All communications between Kerkhoff and Sergeant Dickert between 12:00 a.m. and 4:39 p.m. on January 5, 2021 (Kerkhoff Request 5; Dickert Request 4);
- "Documents" that identify Kerkhoff's electronic devices and accounts from December 15, 2020 to January 8, 2021 (Kerkhoff Request 6);
- "Documents" concerning the timing of Kerkhoff's badge swipes at work on January 5, 2021, "including but not limited to" hypothetical examples of such documents (Kerkhoff Request 7);
- "Documents" that identify "[a]ny" wearable electronic devices and "[a]ll" health and activity data from January 5 and 6, 2021, for Kerkhoff (Kerkhoff Request 8);
- All communications between Kerkhoff and the government or Sergeant Dickert about the investigation, and between Sergeant Dickert and the government about the investigation from November 1, 2025, to present (Kerkhoff Request 9; Dickert Request 5);
- Kerkhoff's and Sergeant Dickert's work phone numbers in January 2021 (Kerkhoff Request 10; Dickert Request 6);

*See* ECF 88-1 at 5–7 (Kerkhoff subpoena); ECF 88-2 at 5–6 (Dickert subpoena).

## ARGUMENT

To authorize service of the requested subpoenas on Kerkhoff and Sergeant Dickert under Rule 17(c), the Court must find that the defendant has "clear[ed] three hurdles: (1) relevancy; (2) admissibility; [and] (3) specificity." *United States v. Nixon*, 418 U.S. 683, 700 (1974). Additionally, the Court must be satisfied that the materials sought "are not otherwise procurable reasonably in advance of trial by exercise of due diligence" and "that the application is made in

good faith and is not intended as a general 'fishing expedition.'" *Id.* at 699–700. Rule 17(c) and the *Nixon* test are far from a rubber stamp. They impose "exacting standards" "on the party requesting the information." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 386 (2004). Indeed, under *Nixon*, the movant must establish each of the specificity, relevancy, and admissibility elements, and "[a] subpoena that fails to satisfy these three requirements will be deemed unreasonable or oppressive and must be either quashed or modified." *United States v. Libby*, 432 F.Supp.2d 26, 30 (D.D.C. 2006); *United States v. Haldeman*, 559 F.2d 31, 75 (D.C. Cir. 1976) (Rule 17(c) "confines a subpoena duces tecum to admissible evidence, [and] authorizes the quashing of the subpoena if it is unreasonable or oppressive"). In evaluating subpoenas requested under Rule 17(c), "[c]ourts must be careful that" the rule "is not turned into a broad discovery device, thereby undercutting [Rule 16's] strict limitation of discovery in criminal cases." *Libby*, 432 F.Supp.2d at 30 (quoting *United States v. Cuthbertson*, 630 F.2d 139, 146 (3d Cir. 1980)).

The requested subpoenas to Kerkhoff and Sergeant Dickert fail the *Nixon* test at every turn. The requests in the subpoenas do not specify relevant and admissible evidence. They identify categories of materials that the defendant seeks to review in the hope that this will turn up something, as yet unknown, that he can use to help his defense by undermining the extensive evidence of Kerkhoff's innocence. More fundamentally, the defendant cannot satisfy *Nixon* because his purported alternative-perpetrator claim against Kerkhoff is baseless; even with the benefit of the FBI's investigative subfile concerning Kerkhoff, the defendant is unable to articulate a nexus between Kerkhoff and the crime as is necessary to establish the relevance and admissibility of alternative-perpetrator evidence. Finally, there is ample reason to conclude that the requested subpoenas are not good faith efforts to secure relevant evidence for trial but rather are, at best, an

attempt to further propagate a baseless conspiracy theory and, at worst, an effort to use this criminal case as a means to develop discovery for the benefit of the defamation defendants.

## I. The Requested Subpoenas Do Not Seek Specific, Relevant, and Admissible Evidence

The requested subpoenas to Kerkhoff and Sergeant Dickert cannot be authorized under Rule 17(c) because the subpoenas fail to identify specific evidence that is relevant to the defendant's case and would be admissible at his trial. Instead, the requested subpoenas seek discovery of categories of materials that the defendant hopes contain unspecified information that he might be able to use to contradict or undermine evidence, not of his own guilt, but of Kerkhoff's innocence. Moreover, and despite the fact that the defendant already possesses a significant volume of materials related to his requests provided by the government in discovery, the requested subpoenas notably fail to specify any evidence that would connect Kerkhoff to the charged crimes. The defendant's sole and express theory of relevance and admissibility—an alternative-perpetrator claim—requires a nexus between Kerkhoff and the crimes that simply does not exist. Put simply, had *The Blaze* not written its now-withdrawn story, Kerkhoff would have never been a person of interest in this investigation, and when investigated, she was exonerated. These flaws are fatal to the defendant's subpoena motion.

### a. The requested subpoenas impermissibly seek discovery in the hope of finding unspecified, unknown information that might advance the defendant's case by undermining evidence exonerating Kerkhoff, without providing any basis to believe such contradictory evidence exists.

A Rule 17(c) subpoena must "be used solely to secure specifically identified evidence for trial that is relevant and admissible." *Libby*, 432 F.Supp.2d at 35. Thus, unlike a subpoena under the civil rules, Rule 17(c) does not "permit the issuance of subpoenas to seek production of documents or other materials which, although not themselves admissible, could lead to admissible evidence." *Id.* at 30 (quoting *United States v. Cherry,* 876 F.Supp. 547, 553 (S.D.N.Y. 1995)).

Rule 17(c) likewise prohibits a defendant from seeking materials "with the hope that they contain information that may be helpful to his defense." *Id.* at 35 (quashing request for reporter's phone records and calendar entries that "may be helpful" to defense because "[t]his is not the proper role Rule 17(c) subpoenas are intended to play in the criminal arena"); *see also United States v. Mendinueta-Ibarro*, 956 F.Supp.2d 511, 513 (S.D.N.Y. 2013) (a "Rule 17(c) subpoena must be able to reasonably specify the information contained or believed to be contained in the documents sought rather than merely hope that something useful will turn up" (internal quotation marks and alterations omitted)). And, importantly, "[t]he relevance prong is not satisfied merely because a defendant can articulate what they hope to find in the subpoenaed evidence." *United States v. Fitzsimons*, 342 F.R.D. 18, 21 (D.D.C. 2022). The defendant must make a sufficient showing that the evidence he seeks through his requested subpoenas is actually relevant and admissible. *Id.* (citing *Nixon*, 418 U.S. at 700 (holding that special prosecutor had made "a sufficient preliminary showing that each of the subpoenaed tapes contains evidence admissible with respect to the offenses charged in the indictment")). Courts will not authorize "subpoenas based on a defendant's mere expectation about what could be recovered without a showing of a sufficient likelihood that the documents actually contained relevant evidence." *Id.* (citing *United States v. Cuthbertson*, 651 F.2d 189, 195 (3d Cir. 1981) ("Neither the government nor the defendants have explained how the CBS materials could be admissible as evidence, unless the interviewees testified and made inconsistent statements.").

The requested subpoenas to Kerkhoff and Sergeant Dickert violate Rule 17(c) by seeking categories of materials that the defendant simply hopes contain something different than that which has already been provided to him in discovery—although he cannot specify what—that he might be able to use to call into question the extensive evidence collected by the FBI establishing that

Kerkhoff was in her Falls Church home with Sergeant Dickert and their dog at the time the defendant was planting the pipe bombs in downtown Washington, D.C. For example, the defendant seeks the video provided to the FBI showing Kerkhoff's dog and capturing her voice on the evening of January 5, 2021, along with, from Kerkhoff, "any" other recordings on her phone from the same day, and from Sergeant Dickert, "any" recordings of Kerkhoff or the dog from January 5 "including, but not limited to any video" shown to the government (Request 1 in both subpoenas). The government has already provided this video, which Sergeant Dickert gave consent to extract from his phone, to the defendant, *see* Exhibit A, rendering it "otherwise procurable" and outside the scope of Rule 17(c). *See Nixon*, 418 U.S. at 699–700. But by also seeking "any" other recordings from January 5, these requests are revealed as a "classic fishing expedition" to find some unknown and unspecified conflict between these other unknown and unspecified recordings, if any exist, and the video that helps to exonerate Kerkhoff. *See Libby*, 432 F.Supp.2d at 35. This is precisely the type of Rule 17(c) fishing expedition that courts refuse to authorize. *See, e.g.*, *United States v. Ellis,* Case No. 19-369, 2021 WL 210489, at *3 (W.D. Pa. Jan. 21, 2021) ("a movant cannot satisfy the *Nixon* test through speculation or hope about what the requested information will reveal[,]" and the use of phrases such as "entire files," "all," "any and all," or "including but not limited to" suggest a "disallowed fishing expedition") (citing authorities); *Mendinueta-Ibarro*, 956 F.Supp.2d at 513 ("Subpoenas seeking 'any and all' materials without mention of 'specific admissible evidence,' justify the inference that the defense is engaging in the type of 'fishing expedition' prohibited by *Nixon*." (quoting *United States v. Louis*, No. 04-CR-203 (LTS), 2005 WL 180885, at *5 (S.D.N.Y. Jan. 27, 2005))).

The subpoena requests for unspecified "documents" concerning Kerkhoff's and Sergeant Dickert's cellphones that stored the dog video (Request 2 in both subpoenas) are likewise

revealing. The defendant plainly hopes to discover *something* he can use to suggest that the video and its metadata are not what they purport to be, or that Kerkhoff or Sergeant Dickert somehow manipulated the evidence to cover something up. But *Nixon* requires the defendant to establish "a real likelihood that" documents concerning Kerkhoff's and Sergeant Dickert's cellphones "contain relevant and admissible evidence." *Libby*, 432 F.Supp.2d at 32–33; *Fitzsimons*, 342 F.R.D. at 21. The defendant makes no effort to do so, offering only a scattershot of conclusory, declarative statements that the requested documents "are all evidentiary and relevant to Mr. Cole's innocence in this case," ECF 84 at 5, and the documents are "of course" relevant because the "government's own investigative record shows that the FBI had sufficient reason to investigate Ms. Kerkhoff," ECF 84-1 at 4. That is simply insufficient under *Nixon*.

The same flaws doom the defendant's requests for all surveillance video from Kerkhoff and Sergeant Dickert's home on January 5 (Kerkhoff Request 4, Dickert Request 3), all communications between Kerkhoff and Sergeant Dickert from 12:00 a.m. to 4:39 p.m. on January 5 (Kerkhoff Request 5, Dickert Request 4),[8] all communications between Kerkhoff and Sergeant Dickert about the investigation from November 1, 2025 to the present (Kerkhoff Request 9), and "any document" concerning the timing of Kerkhoff's badge swipes on January 5, "including but not limited to" hypothetical examples of such documents (Kerkhoff Request 7). For each of these requests, the defendant articulates a category of material but "can only speculate as to what the requested information would have shown." *United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010). The requests are premised on the hope, and nothing more, that there will be some as-yet-unknown information within the broad categories—*something* on a video, *something*

[8] The government has already provided the defense with messages between Kerkhoff and Sergeant Dickert from 4:39 p.m. on January 5, 2021, through 7:46 a.m. on January 6, 2021. *See* Exhibit A.

in a message, *something* in a work record—that the defendant might be able to use to poke a hole in Kerkhoff's alibi. *See* Hr'g Tr. (Apr. 22, 2026) at 38 (defense counsel stating that defendant "need[s] this discovery [under Rule 17(c)] to be able to … rebut potential alibis of that third party"). And each request is made without even attempting to show why the Court should conclude such categories of materials, even if they were not impermissibly broad, actually contain relevant and admissible evidence. A Rule 17(c) subpoena, however, "cannot properly be issued on a 'mere hope.'" *United States v. Hang*, 75 F.3d 1275, 1283 (8th Cir. 1996) (quoting *Cutherbertson*, 630 F.2d at 146). And a defendant cannot use the rule to try to "dredge up anything … in hopes of catching something that might impeach" other evidence. *United States v. Hamaed*, 178 F.4th 281, 301 (6th Cir. 2026).

Judge Walton's opinion in *Libby* is illustrative. There, the defendant sought to subpoena, among other evidence, a third party's appointment calendar and telephone records for the defined time period that included the third party's conversations with the defendant for the purpose of challenging the third party's recollection of the conversations at trial. 432 F.Supp.2d at 32–33. The court rejected this request, explaining that "the defendant has not provided this Court with any basis upon which it can draw a reasonable inference that there is a real likelihood that the telephone records and calendar would contain relevant and admissible evidence." *Id.* at 34. "In essence," the court continued, "the defendant is simply seeking to examine general categories of documents with the hope that they contain information that may be helpful to his defense"—"a classic fishing expedition, which cannot be sanctioned by this Court." *Id.* at 35; *see also Fitzsimons*, 342 F.R.D. at 21 (citing *United States v. Nektalov*, No. S203-cr-828, 2004 WL 1574721, at *3 (S.D.N.Y. July 14, 2004) ("Defendant's anticipation that a comparison of all of Delgado's and Del Star's records to the apparent absence of records relating to defendant might advance his case does not

demonstrate to the Court that the sought after documents are relevant and properly subject to a Rule 17(c) subpoena.")). As in *Libby*, here the defendant cannot reasonably specify what relevant information is within the categories of materials he seeks; "rather, the defendant appears to 'merely hope[ ] that something useful will turn up.'" *See* 432 F.Supp.2d at 39 (quoting *United States v. Noriega,* 764 F.Supp. 1480, 1493 (S.D. Fla. 1991)).

Also illustrative is *United States v. Janbakhsh*, a recent case in which the same defense lawyers representing the defendant in this case sought similar subpoenas under Rule 17(c). Case No. 3:22-cr-00340-1, 2025 WL 1839948, at *5 (M.D. Tenn. July 3, 2025). In *Janbakhsh*, the defendant broadly sought to subpoena materials from various third parties concerning the third parties' electronic devices and digital recordings, communications between the third parties and others, communications between the third parties and the government, documents provided by the third parties to the government, various transactional records, and many other categories of materials. *Id.* at *3. The third parties moved to quash the subpoenas, and the district court agreed. As the court explained, the defendant's requested subpoenas had sought all documents within identified categories of materials concerning various topics without identifying the specific admissible evidence to be subpoenaed. *Id.* at *5. Many of those requests "clearly" indicated that the requested subpoenas sought "to obtain information helpful to the defense by examining large quantities of documents, rather than for its intended purpose—to secure the production for a court proceeding of specific admissible evidence." *Id.* at *6 (quoting *United States v. Menendez*, 2024 WL 2801960, at *2 (S.D.N.Y. May 31, 2024)). Ultimately, the court concluded that the defendant had failed under *Nixon* to "reasonably specify the information contained or believed to be contained in the documents sought" and instead had "merely hope[d] something useful will turn up." *Id.* at *5 (quoting *United States v. Tucker*, 249 F.R.D. 58, 62–63 (S.D.N.Y. 2008)). Indeed,

the requests came "nowhere near satisfying" *Nixon* and were "nothing more than an improper attempt to obtain criminal discovery." *Id*.

Even more salient here, the district court in *Janbakhsh* rejected the defendant's argument that, much like the defendant in this case claims, *e.g.*, ECF No. 84 at 5, the materials sought by the subpoenas were "highly relevant and necessary for Defendant's effort to prove that [a third party] (rather than [the defendant]) actually committed the charged conduct in this case." Case No. 3:22-cr-00340-1, 2025 WL 1839948, at *6. The defendant in *Janbakhsh*, much like the defendant in this case, failed to "provide any additional details for why he believes the documents will actually support this theory," and he could not satisfy the relevance standard "through hope, conjecture, or speculation." *Id.* (internal quotation marks omitted); *see also United States v. Peterson*, Case No. 20-20448, 2022 WL 9914428, at *3 (E.D. Mich. Oct. 17, 2022) (collecting cases and holding that defendant did not satisfy "specificity requirement" because his "requests are based merely on [his] or his counsel's hope or speculation that something useful will turn up"). The *Janbakhsh* court added that many of the requested categories—like requests for communications similar to those made by the defendant here—also would constitute inadmissible hearsay, which again violated *Nixon* because "Rule 17(c) subpoenas cannot be used to obtain documents that would be excluded on hearsay grounds." Case No. 3:22-cr-00340-1, 2025 WL 1839948, at *7 (internal quotation marks omitted). However, given the complete lack of specificity, the court in *Janbakhsh* declined to waste further "judicial resources to spend more time explaining (in dicta)" why the requests also failed to satisfy the relevance and admissibility requirements. *See id.*[9] *Janbakhsh*, like *Libby* and

[9] One week later, the court denied the defendant's motion to reconsider the Rule 17(c) ruling, reiterating that the defendant did not "identify any *specific* documents that he is requesting," emphasizing that general temporal or subject matter limitations do not in themselves satisfy *Nixon*'s specificity requirement, and rejecting the argument that the court should authorize subpoenas for pretrial production because failure to do so "will inevitably slow down trial." *United*

the other foregoing authorities, strongly supports the conclusion that the defendant has failed to specify any relevant and admissible evidence sought by the requested subpoenas.

Finally, broad swaths of the requested subpoenas seek materials for which it is unclear what the defendant might even be hoping to discover, much less how that unspecified information, if it exists, would be relevant or admissible. For example, the defendant seeks records identifying "every mobile phone, SIM, eSIM, telephone number, Apple ID, email account, cellular account, and Apple Watch used by [Kerkhoff] from December 15, 2020 through January 8, 2021" (Kerkhoff Request 6). It is difficult to fathom a more "classic fishing expedition," but the defendant goes further to seek records identifying "[a]ny Apple Watch or other wearable device" that Kerkhoff used during the same time period, along with "[a]ll" health and fitness data recorded on such device(s) on January 5 and 6, 2021 (Kerkhoff Request 8). While the defendant makes no effort whatsoever to explain the basis for these requests, he appears to be hoping to develop evidence of Kerkhoff's location, presumably in an effort to connect her to the crimes with which he is charged. But the defendant is not conducting a grand jury investigation. He is not even seeking Rule 16 discovery. The defendant is seeking a Rule 17(c) subpoena for specific admissible evidence from a third party, and he must satisfy the *Nixon* test to do so. These requests, along with the requests for Kerkhoff and Sergeant Dickert's work phone numbers from January 2021 (Kerkhoff Request

---

*States v. Janbakhsh*, Case No. 3:22-cr-00340-1, 2025 WL 1908434, at *2 (M.D. Tenn. July 10, 2025) (emphasis in original). *See also United States v. Shetty*, Case No. 2:23-cr-00084-TL, 2025 WL 2822121, at *2 (W.D. Wash. Oct. 3, 2025) (granting motion to quash Rule 17(c) subpoena sought by same defense lawyers in this case because defense could not establish nexus between materials sought and relevant issue in case, and defense counsel had failed to request any specific documents from the government before resorting to a Rule 17(c) subpoena).

10, Dickert Request 6), reflect a fundamental misunderstanding of Rule 17(c), and they fall well short of clearing *Nixon*'s specificity, relevance, and admissibility hurdles.[10]

At bottom, the overwhelming weight of authorities in this district and across the country demonstrates that the defendant's requested subpoenas fail to satisfy any of *Nixon*'s three requirements and should not be authorized by this Court. Indeed, where a defendant is "simply … hoping something … will turn up, district courts have an obligation to prevent Rule 17(c) motions from being used by a defendant fishing for evidence that might support his theory, as if he were in the discovery phase of a civil action." *United States v. Snow*, Case No. 3:19-cr-00018, 2022 WL 989252, at *2 n.2 (W.D. Va. Mar. 31, 2022).

**b. There is not and cannot be a cognizable alternative-perpetrator theory of relevance and admissibility as to Kerkhoff.**

There is an additional, fundamental problem with the requested subpoenas: they are premised on a legally and factually baseless alternative-perpetrator theory of relevance and admissibility. "[T]he Supreme Court in *Nixon* has made clear that documents should only be

[10] The defendant also seeks "[a]ny" electronic items provided by Kerkhoff to the government on November 6 or 12, 2025 (Kerkhoff Request 3). These dates refer to the days on which Kerkhoff was interviewed, and the request appears to seek a copy of the image of Kerkhoff's cellphone that Kerkhoff permitted the FBI to make during the investigation. The defendant sought this material from the government in Rule 16 discovery, and the government declined to provide it. This request suffers from the same lack of specificity and absence of any showing of relevance or admissibility as the other requests discussed above; it is simply an attempted end run around Rule 16's limits on criminal discovery. Additionally, the requests for communications about the investigation between Kerkhoff and the government and Sergeant Dickert and the government since November 1, 2025 (Kerkhoff Request 9; Dickert Request 6) fail because the government has already provided such communications, rendering these requests "otherwise procurable" under *Nixon*. Indeed, the *Janbakhsh* court rejected the same Rule 17(c) request on the same ground by the same defense lawyers in this case just last year. Case No. 3:22-cr-00340-1, 2025 WL 1839948, at *6 (holding that requests for "all documents and communications provided to you" and "all documents and communications you provided the Government in this case" sought materials that, "if they exist," "are almost surely in possession of the government and available through Rule 16," thus violating *Nixon*'s "requirement that the materials must not be otherwise procurable reasonably in advance of trial by the exercise of due diligence" (internal quotation marks omitted)).

produced pursuant to Rule 17(c) if they are admissible." *Libby*, 432 F.Supp.2d at 38. Under *Nixon*, the Court must consider the relevance and admissibility elements in the context of the applicable laws of evidence. *See, e.g.*, *id.* at 31 (Rule 17(c) inquiry is "largely governed by the Federal Rules of Evidence"); *Fitzsimons*, 342 F.R.D. at 20–21 (analyzing Rule 17(c) relevance and admissibility of potential impeachment evidence under applicable case law); *United States v. Lindberg*, Case No. 5:19-CR-22-MOC-DSC-1, 2019 WL 7000089, at *3 (W.D.N.C. Dec. 20, 2019) (applying law of entrapment to determine relevance to defendant's state of mind under Rule 17(c)); *United States v. Skelos*, Case No. 15-CR-317 (KMW), 2018 WL 2254538, at *2 (S.D.N.Y. May 17, 2018) (applying hearsay rules to determine whether evidence admissible under Rule 17(c)).

The defendant's sole and expressly stated theory of relevance and admissibility underlying the requested subpoenas is his claim that Kerkhoff is the real pipe bomber. *E.g.*, ECF No. 84 at 5. In the alternative-perpetrator context, relevance and admissibility require a sufficient "nexus between the crime charged and the asserted [third party]" such that the alternative-perpetrator evidence would "tend to prove or disprove a material fact" and not be "too 'speculative or remote.'" *United States v. Moore*, 590 F.Supp.3d 277, 283 (D.D.C. 2022) (first quoting *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998), then quoting *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006)); *see also Holmes*, 547 U.S. at 326–27 (noting that rules regulating admissibility of alternative-perpetrator evidence are "a specific application" of Rule 403 principle). "Courts weighing the probative value of third-party evidence generally require that it evince a clear connection between the alleged third-party perpetrator and the crime charged." *Moore*, 590 F.Supp.3d at 283.

"Evidence that does not 'place[ ] [the third party] anywhere near the ... scene [of the crime] or suggest[ ] that he was otherwise involved' may thus properly be excluded." *Id.* at 284 (quoting

*United States v. Hendricks*, 921 F.3d 320, 331 (2d Cir. 2019) and citing *Winfield v. United States*, 676 A.2d 1, 5 (D.C. 1996) (*en banc*) (adopting rule that excludes alternative-perpetrator evidence that is "too remote in time and place, completely unrelated or irrelevant to the offense charged, or too speculative with respect to the third party's guilt")). Such evidence is too "speculative [in] nature" to be admissible. *Id.* at 286 (quoting *McVeigh*, 153 F.3d at 1191); *see also United States v. Lighty*, 616 F.3d 321, 358–59 (4th Cir. 2010) (approving of exclusion of alternative-perpetrator evidence that "would have caused the jury to rankly speculate"); *United States v. Patrick*, 248 F.3d 11, 21 (1st Cir. 2001) (alternative-perpetrator evidence is relevant if it shows "a connection between the other perpetrator and the crime, and not mere speculation"). Indeed, without a sufficient nexus, "it is the Court's responsibility to exclude such evidence lest it distract the jury from deciding the defendant's guilt or innocence and lead them instead to focus on someone else's." *Moore*, 590 F.Supp.3d at 286 (internal quotation marks omitted).[11]

The defendant does not proffer a nexus linking Kerkhoff to the crime. That is for good reason. The FBI's investigation exonerated her. This is crucial, as the FBI's investigation forms the *entire* basis for the defendant's requested subpoenas to Kerkhoff and Sergeant Dickert. *See* ECF 84, 84-1, 88. At no point does the defendant contend that *The Blaze* article's claim provides a basis for the requested subpoenas; indeed, neither his initial motion nor the renewed motion even

[11] The defendant claims in conclusory fashion that he should not have to proffer any nexus between Kerkhoff and the crime because that is the standard for trial admissibility, not Rule 17(c) admissibility. *See* ECF 84-1 at 5. That position is inconsistent with cases analyzing Rule 17(c) relevance and admissibility by reference to the same rules of evidence and legal principles that govern at trial. Even assuming the Court is not required to apply the same rigor in the Rule 17(c) context that it would apply before making a trial admissibility determination, the standard for relevance and admissibility of alternative-perpetrator evidence—a sufficient nexus between the alternative perpetrator and the crime—is the same regardless of the procedural context. *See supra* at p. 20 (collecting cases analyzing Rule 17(c) relevance and admissibility using same legal principles that govern at trial).

mentions *The Blaze* article. *See* ECF Nos. 84, 88. The defendant relies only on the FBI's investigation of the claim. Put another way, the parties apparently agree that an internet conspiracy theory premised on an anonymous and undisclosed algorithmic gait analysis propagated by individuals who now face a federal defamation lawsuit for making the claim is not a legitimate basis on which to authorize the requested subpoenas.

The defendant attempts to explain the absence of a nexus as the result of a Catch-22: "the government," he says, "is effectively asking the Court to require the defendant to establish the nexus before he can obtain the evidence that he needs to help establish it." ECF 84-1 at 5; *see also* Hr'g Tr. (Apr. 22, 2026) at 38 (defense counsel agreeing that defendant has "to make a showing under circuit case law that we have justified presenting a third-party perpetrator defense" and stating that defendant "would need this discovery [under Rule 17(c)] to be able to do that, to be able to rebut potential alibis of that third party"). This concession is damning, as it confirms the defendant's inability to establish relevance. The defendant's effort to blame the government for this failure is neither novel nor persuasive. Indeed, in *United States v. Tokash*, the Seventh Circuit rejected the defendants' argument that "the trial court's ruling [denying Rule 17(c) subpoenas] created a 'chicken or egg' dilemma—that they could not establish the threshold showing of the required elements of their proposed necessity defense unless they were allowed their fishing expedition through the records of the Bureau of Prisons." 282 F.3d 962, 971 (7th Cir. 2002). As the court explained, "Rule 17(c) is not a discovery device to allow criminal defendants to blindly comb through government records in a futile effort to find a defense to a criminal charge. Instead, it allows only for the gathering of specifically identified documents which a defendant knows to contain relevant evidence to an admissible issue at trial." *Id.* Similarly, in *United States v. Richardson*, the Fourth Circuit upheld the denial of a Rule 17(c) subpoena because the defendant

maintained that "he should be allowed to discover the facts" supporting his purported defense, thus "betray[ing] his intention to misuse the subpoena *duces tecum* as a discovery mechanism to develop" that claim, "as if he were in the discovery phase of a civil action." 607 F.3d 357, 368–69 (4th Cir. 2010). As in *Tokash* and *Richardson*, the defendant here has given away the game by conceding that he needs the Rule 17(c) subpoenas before he can establish the relevance necessary to authorize them.

Rather than proffering a nexus between Kerkhoff and the crime, the defendant asks the Court to authorize the requested subpoenas because (1) the FBI took steps to investigate the *The Blaze* article's claim, and (2) during that investigation Kerkhoff voluntarily submitted to a polygraph examination in which the examiner opined that Kerkhoff's physiological stress responses indicated deception.[12] Once again, the defendant does not come close to clearing *Nixon*'s hurdles.

First, the fact that the FBI, in a high-profile, long-term, and then-unsolved case, investigated Kerkhoff as a person of interest based on *The Blaze* article says nothing of a substantive connection between Kerkhoff and the crime. The defendant mistakenly suggests that the FBI's investigation of the claim means that the FBI pursued a separately predicated investigation and that the Court should interpret this to mean that some evidentiary standard was met as to Kerkhoff's culpability. ECF 84-1 at 4–5. But the FBI had long since opened a full

[12] At times, the defendant also suggests that the government's decision to provide the defense with some of the FBI's files concerning its investigation of *The Blaze* article's claim itself provides a basis for the requested subpoenas. *See* ECF No. 84-1 at 4. However, the government has made clear in providing such material that it "in no way concedes or agrees that the information is relevant or admissible in this case." Exhibit A; *see also* ECF No. 12 at ¶ 14 ("This [Protective] Order does not constitute a ruling on the question of whether any particular material is properly discoverable or admissible and does not constitute any ruling on any potential objection to the discoverability or admissibility of any material.").

investigation of the pipe bombs planted on January 5, 2021, and it therefore required no additional predication to take the steps it took to investigate *The Blaze* article's claim.[13] The FBI was authorized to take such steps regardless of the nature of the support behind the claim, just as it did for dozens of other people during the investigation, including many persons of interest subjected to far more prolonged inquiry than Kerkhoff. The mere fact that the FBI investigated does not weigh in favor of authorizing the requested subpoenas under Rule 17(c).

Second, the polygraph result adds nothing to the calculus. Kerkhoff voluntarily submitted to a polygraph examination after she was unexpectedly called in by her employer for an FBI interview, sat for hours answering the FBI's questions, then watched the FBI search her home, car, and cellphone—all in the same day. The polygraph examination itself took hours and finished after midnight. Given these circumstances, it would be unreasonable to place weight on the examiner's opinion that Kerkhoff's physiological stress responses indicated deception, much less to conclude that this result supports a nexus between Kerkhoff and the planting of the pipe bombs. Indeed, even under ordinary circumstances, a polygraph result is inadmissible as substantive evidence. *See, e.g.*, *United States v. Nelson*, 207 F. App'x 291, 292–93 (4th Cir. 2006) ("It is well-established in this Circuit that polygraph examination results, or even the reference to the fact that a witness has taken a polygraph examination, are not admissible."); *United States v. Johnson,* 446 F.3d 272, 278 (2nd Cir. 2006) ("polygraph tests are inadmissible as evidence"); *United States v. Gardiner*, 463 F.3d 445, 469 (6th Cir. 2006) ("Generally, the results of polygraph examinations are inadmissible into evidence."); *United States v. Skeens*, 494 F.2d 1050, 1053 (D.C. Cir. 1974) (noting the inadmissibility of polygraph tests in criminal trials); *United States v. Laureys*, 103

[13] *See* Federal Bureau of Investigation, *Domestic Investigations and Operations Guide* § 18.7 (Mar. 31, 2020), vault.fbi.gov.

F.Supp.3d 69, 73 (D.D.C. 2015) (court "does not find sufficient reliability in polygraphs to admit test results as evidence in criminal trials").[14]

In short, while the defendant's requested subpoenas fail under *Nixon* on their own terms, they also fail because the facts of this case cannot support a legitimate alternative-perpetrator claim against Kerkhoff.[15]

## II. <u>The Requested Subpoenas Are Not Sought in Good Faith</u>

Courts have made clear that, in addition to *Nixon*'s three elements, "[t]he test for enforcement is whether the subpoena constitutes a good faith effort to obtain identified evidence rather than a general fishing expedition that attempts to use the rule as a discovery device." *United States v. Cuthbertson*, 630 F.2d 139, 144 (3d Cir. 1980) (internal quotation marks omitted); *Fitzsimons*, 342 F.R.D. at 20 (citing *Nixon*, 418 U.S. at 699–700); *Libby*, 432 F.Supp.2d at 31 (same). The government has already made clear its concern here that the requested subpoenas "are

---

[14] It bears emphasizing that Kerkhoff's polygraph examination result does not advance an alternative-perpetrator defense in any manner and should play no role at trial. Neither the result nor the fact of the examination is admissible as substantive evidence. Nor could the defendant subpoena Kerkhoff for trial to impeach her with the polygraph result. It is well established that "[i]mpeachment evidence is to be used solely for the purpose of impeachment, and it may not be 'employed as a mere subterfuge to get before the jury evidence not otherwise admissible.'" *United States v. Johnson*, 802 F.2d 1459 (D.C. Cir. 1986); *see United States v. Giles,* 246 F.3d 966, 974 (7th Cir. 2001) ("[A] party may not call a witness for the sole purpose of impeaching him.").

[15] The subpoenas are also improper because they require production directly to defense counsel. Rule 17(c)(1), however, provides that, when a party is seeking pre-hearing production, that party must have the documents produced to the district court itself. *See* Fed. R. Crim. P. 17(c)(1); *United States v. Hall*, 2021 WL 3419679, at *2 n.2 (W.D. Pa. Aug. 5, 2021) ("As for the actual subpoena, the government is correct that these documents should not be produced directly to defense counsel. … Instead, under Rule 17(c), those documents must be produced to the Court itself."); *United States v. Al-Amin*, 2013 WL 3865079, *4 (E.D. Tenn. July 25, 2013) ("[T]he records must be returned to the Court, not the parties. Since the documents, records, and other objects are not discovery, but rather are intended to be admitted into evidence, it is the Court to which the [documents] must be returned."); *United States v. Santiago-Lugo*, 904 F.Supp. 43, 46 (D.P.R. 1995) ("Nowhere in Fed.R.Crim.P. 17 do we find language allowing the utilization of the court's subpoena power privately, with a secret return directly to an attorney.").

not a good faith effort to obtain relevant and admissible evidence not otherwise procurable; they are a gambit by the defense to fuel baseless conspiracy theories targeting [Kerkhoff], an innocent person." ECF 84-2 at 1. As the government emphasized, the defense's flagrant violation of the protective order to publicly identify Kerkhoff and publicize a misleading account of the FBI's investigation is "further evidence of th[e] bad faith." *Id.*; *see United States v. Carton*, Case No. 17 CR 680 (CM), 2018 WL 5818107, at *4 (S.D.N.Y. Oct. 19, 2018) (denying subpoena where "relevance argument makes plain that this request is a fishing expedition, based on speculation and intended simply to harass" third party).

The reasons for concern continue to mount. On June 15, 2026, three of the defendant's lawyers in this case (Little, Glover, and Lawson) filed motions to enter appearances defending Baker and Hanneman in Kerkhoff's defamation case. ECF Nos. 37–39, *Kerkhoff v. Blaze Media LLC, et al.*, 1:26-cv-01078-RDA-WEF (E.D. Va.). According to representations made by those lawyers and declarations filed by Baker and Hanneman in the defamation case, the lawyers began negotiating with Baker and Hanneman after they were served with the defamation complaint on April 22, and the representation has been "underwrit[ten]" by *The Blaze*. ECF No. 36, 41, 42, *Kerkhoff v. Blaze Media LLC, et al.*, 1:26-cv-01078-RDA-WEF (E.D. Va.). On July 8, 2026, one of the lawyers simultaneously representing both the defendant in this case and Baker and Hanneman in the defamation case (Glover) sent a letter to government counsel requesting the production of various materials concerning Kerkhoff and other topics as part of the criminal discovery process in this case, including requests for discovery expressly premised on the following citation: "Compl. & Demand for Jury Trial, *Kerkhoff v. Blaze Media LLC*, No. 1:26-cv-01078-RDAWEF, ¶¶ 134–137, 191 (E.D. Va. filed Apr. 21, 2026)."

Under these circumstances, the government has deep concerns not only that the requested subpoenas are intended to fuel a baseless conspiracy theory, but also that the defense counsel in this criminal case are using Rule 17(c), and the criminal discovery process, to advance the interests of their defamation clients—the very people who propagated the conspiracy theory in the first place. Moreover, given the history of this case, the government has concerns about defense counsel's ability or willingness to abide by the protective order's requirement that all discovery provided in the criminal case must be used "solely in connection with the defense of this case, and for no other purpose, and in connection with no other proceeding, without further order of this Court." ECF No. 12 at ¶ 1. And this is to say nothing of the obvious potential conflict arising from these lawyers representing, on the one hand, clients for whom the truth of their claim against Kerkhoff is a complete defense to defamation and, on the other, a criminal defendant whose interests may conflict with, or undermine, that position.

The ample grounds to question the good faith of the requested subpoenas in this case confirm the conclusion that the subpoenas should be rejected under *Nixon*.

## **CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny the defendant's renewed motion for Rule 17(c) subpoenas.

Respectfully Submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Charles R. Jones*
CHARLES R. JONES (D.C. Bar No. 1035541)
STUART ALLEN (D.C. Bar No. 1005102)
JOCELYN BALLANTINE (CA Bar No. 208267)
Assistant United States Attorneys
National Security Section
601 D Street, NW
Washington, D.C. 20530