**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:26-cr-00001 (AHA)** |
| | : | |
| **BRIAN J. COLE, JR.,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S BRIEF IN RESPONSE TO COURT'S SEPTEMBER 16, 2026 MINUTE ORDER CONCERNING DEFENSE COUNSEL'S CONFLICT OF INTEREST**

The United States respectfully submits this brief in response to the Court's September 16, 2026, minute order instructing the parties to address, with citations to applicable law, whether defense counsel has a conflict of interest due to their dual representation of the defendant in this criminal case and their representation of defendants in a civil defamation lawsuit pending in the Eastern District of Virginia, the waivability of such conflict, and proposed next steps. For the reasons set forth below, the government asserts that a conflict of interest presently exists under D.C. Rule of Professional Conduct 1.7(b)(4) and proposes that the Court appoint independent, conflict-free counsel to advise the defendant and the Court on the conflict and its waivability under the D.C. Rules of Professional Conduct, consistent with the approach taken in *United States v. Sutton*, No. 21-0598 (PLF), 2021 WL 5998384 (D.D.C. Dec. 7, 2021).

The government's proposal protects the defendant's right to constitutionally effective representation and the integrity of any conviction without prejudicing the defendant at all. If independent, conflict-free counsel assesses that no conflict exists, then the defendant is in no different place than he is today. If independent, conflict-free counsel assesses that there is a conflict, but that it is waivable, and the defendant waives said conflict and the Court accepts the waiver, the defendant is also in no different place than he is today. And if independent, conflict-

free counsel assesses that there is a conflict and it is either not waivable or the defendant declines to waive it, then the defendant will have avoided proceeding in his criminal case represented by lawyers that, under Supreme Court and circuit precedent, are at *legitimate risk of providing presumptively prejudicial ineffective assistance of counsel*. *See, e.g.*, *Culyer v. Sullivan*, 446 U.S. 335, 349–50 (1980); *United States v. Gray-Burriss*, 791 F.3d 50, 62 (D.C. Cir. 2015). At bottom, the government seeks a reasonable prophylactic measure that will benefit the defendant and the integrity of this case regardless of the outcome.

## RELEVANT BACKGROUND

The defendant is charged by indictment with placing pipe bombs outside the headquarters of the Republican National Committee (RNC) and Democratic National Committee (DNC) in Washington, D.C. on January 5, 2021. ECF 39. The FBI's investigation of the defendant yielded evidence that his vehicle entered the area of the DNC and RNC shortly before he planted the pipe bombs; his cellphone interacted on multiple occasions with cell sites near the DNC and RNC at times when surveillance video showed him walking within the relevant cell site's coverage area wearing a mask, hood, and gloves, and carrying a backpack; between 2018 and 2020, he bought various components and ingredients used to make the bombs, including pipes, end caps, wiring, steel wool, and timers; he had bomb components in his closet and car when he was arrested in December 2025; he had, in his home, a thumb drive with deleted copies of the Anarchist Cookbook and a removable computer hard drive containing online searches including "how to make a pipe bomb" and "manifesto template"; and he confessed to the crimes during a videorecorded interview, explaining in detail how and why he did it.

The FBI first identified the defendant as a suspect on or about November 5, 2025. Prior to that, over the course of its nearly five-year investigation, the FBI identified numerous so-called

persons of interest—individuals who may have information about, or a connection to, the crimes. The investigatory interest in these individuals was predicated on a variety of types of information, and investigators took varying investigative actions as a result.

Shauni Kerkhoff is a former U.S. Capitol Police officer who was on duty during the events at the U.S. Capitol on January 6, 2021. As part of her duties, Kerkhoff fired pepper balls at the gathering crowd. Consequently, Kerkhoff testified in multiple trials stemming from the events at the U.S. Capitol and was the first government witness at the first such trial. She left the U.S. Capitol Police in the months after January 6, 2021, and took a position as a CIA campus security officer.

Stephen Baker was, until recently, employed by an online media publication called *The Blaze*. On November 4, 2025, Baker and his reporting partner at *The Blaze*, Joseph Hanneman, published an online article accusing Kerkhoff of using excessive force in responding to the events of January 6, 2021, and suggesting that she left the U.S. Capitol Police under suspicious circumstances "about six months after Jan. 6," "wiped" her social media presence, and went to "work for a three-letter federal intelligence agency."[1] Four days later, on November 8, 2025, Baker and Hanneman published an online article with *The Blaze* claiming that, according to their investigation, "[a] forensic analysis of a female former U.S. Capitol Police officer's gait is a 94% - 98% match to the unique stride of the long-sought Jan. 6 pipe-bomb suspect."[2] The claim was

[1] Joseph M. Hanneman & Steve Baker, *Capitol Police repeatedly used lethal force on protesters early on Jan. 6, video shows*, THE BLAZE (Nov. 4, 2025), https://www.theblaze.com/news/capitol-police-repeatedly-used-lethal-force-on-protesters-early-on-jan-6-video-shows.

[2] Steve Baker & Joseph M. Hanneman, *Former Capitol Police officer a forensic match for Jan. 6 pipe bomber, sources say,* THE BLAZE (Nov. 8, 2025), *available at* https://web.archive.org/web/20251126151917/https://www.theblaze.com/news/former-capitol-police-officer-a-forensic-match-for-jan-6-pipe-bomber-sources-say.

based on an unidentified "software algorithm" and an anonymous "veteran analyst" who "personally pegged the match at closer to 98%." In the article, Baker and Hanneman identified Kerkhoff by name, included extensive personal information about her and her family, embedded multiple professional and personal pictures of her, and again accused her of using excessive force on January 6. Baker and Hanneman also suggested that the FBI had engaged in a grand conspiracy to cover up Kerkhoff's involvement and concluded that identifying Kerkhoff "could start to unravel the carefully crafted, zealously defended Democrat narrative that massive crowds of Trump supporters stormed the Capitol as part of an insurrection to keep Trump in office and deny Joseph R. Biden Jr. the presidency."

Shortly before the November 8 article, the FBI became aware of Baker and Hanneman's claim against Kerkhoff and investigated it. The government recently summarized the FBI's investigative efforts and the results of the investigation and does not repeat that summary here. *See* ECF No. 91 at 4–6. After the defendant's December 2025 arrest, *The Blaze* retracted the article accusing Kerkhoff of being the pipe bomber.[3]

On April 1, 2026, the defendant moved for the issuance and early return of three Rule 17(c) subpoenas *duces tecum* directed to Kerkhoff, Sergeant Dickert of the U.S. Capitol Police, her romantic partner, and a podiatrist who reviewed footage of Kerkhoff and others on a pre-existing contract with the FBI. ECF No. 84 (unsealed version). On April 21, approximately three weeks

---

[3] *See* Laura Wagner, *The Blaze retracts report accusing ex-policewoman of pipe bombing*, WASH. POST (Dec. 5, 2025), https://www.washingtonpost.com/business/2025/12/05/jan-6-pipe-bomb-blaze-retraction/

later, Kerkhoff sued *The Blaze*, Baker, and Hanneman for defamation in federal court in Virginia. *See generally Kerkhoff v. Blaze Media LLC, et al*., 1:26-cv-01078-RDA-WEF (E.D. Va.).[4]

On June 15, 2026, three of the defendant's lawyers in this case (Alex Little, John Glover, and Zachary Lawson, all of the law firm Litson PLLC) filed motions to enter appearances defending Baker and Hanneman in Kerkhoff's defamation case. ECF Nos. 37–39, *Kerkhoff v. Blaze Media LLC, et al*., 1:26-cv-01078-RDA-WEF (E.D. Va.). According to a declaration and exhibits filed by plaintiff's counsel in the defamation case, the defamation defendants were sent letters notifying them of Kerkhoff's anticipated defamation lawsuit on January 16, 2026. ECF Nos. 45, 45-1, 45-2, *Kerkhoff v. Blaze Media LLC, et al*., 1:26-cv-01078-RDA-WEF (E.D. Va.). The defamation defendants were initially represented by the same lawyers representing *The Blaze*, but on April 1, 2026, those lawyers confirmed that they no longer represented Baker and confirmed the same as to Hanneman on April 9. ECF No. 45-3, *Kerkhoff v. Blaze Media LLC, et al*., 1:26-cv-01078-RDA-WEF (E.D. Va.). As noted above, on April 1, defense counsel moved in this case for Rule 17(c) subpoenas *duces tecum* directed to Kerkhoff and others. ECF No. 84. On April 9, Baker confirmed publicly that before the subpoena motion was filed on April 1, defense counsel alerted Baker that defense counsel would be filing something "damning" in this case.[5] According to representations made by defense counsel and declarations filed by Baker and Hanneman in the defamation case, on April 22, defense counsel began negotiating terms with Baker and Hanneman after they were served with the defamation complaint, and the representation has been "underwrit[ten]" by *The Blaze*. ECF Nos. 36, 41, 42, *Kerkhoff v. Blaze Media LLC, et al*., 1:26-

---

[4] The original defamation complaint is available on the docket in this case. *See* ECF No. 69-1.

[5] https://rumble.com/v789rbm-former-blaze-journalist-steve-baker-has-indeed-been-fired-and-no-its-not-gl.html (timestamp 9:47 to 11:05).

cv-01078-RDA-WEF (E.D. Va.). On September 10, Baker stated publicly that "my attorneys, who are also Brian Cole Jr.'s attorneys, they approached Joe and I and said 'we want your case.' We didn't go to them. 'We want your case.'"[6]

All indications are that the defendant intends to continue to pursue the claim that Kerkhoff, a then-serving U.S. Capitol Police officer, was the real perpetrator of the crimes with which he is charged. On July 8, 2026, defense counsel sent a letter to government counsel requesting the production of various materials concerning Kerkhoff and other topics as part of the criminal discovery process in this case, including requests for discovery expressly premised on the following citation: "Compl. & Demand for Jury Trial, *Kerkhoff v. Blaze Media LLC*, No. 1:26-cv-01078-RDAWEF, ¶¶ 134–137, 191 (E.D. Va. filed Apr. 21, 2026)." On August 19, 2026, defense counsel filed a renewed motion for early return of subpoenas directed to Kerkhoff and others. *See* ECF Nos. 88, 88-1–88-3. And on September 4, 2026, defense counsel sent another detailed discovery request to the government concerning Kerkhoff.

## APPLICABLE LAW

The Sixth Amendment protects a criminal defendant's right to be represented by an otherwise qualified attorney he can afford to hire or retain *pro bono*. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). However, a defendant's right to counsel of his choice is not absolute. *Wheat v. United States*, 486 U.S. 153, 159 (1988). "Where a constitutional right to counsel exists, … there is a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). "[T]he trial courts, when alerted by objection from one of the parties, have an independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment." *Wheat*, 486 U.S. at 161 (noting that the

[6] https://x.com/thevivafrei/status/2098163083189305780?s=20 (timestamp 9:30 to 9:52).

"need to investigate potential conflicts arises in part from the legitimate wish of district courts that their judgments remain intact on appeal"). The presumption in favor of a defendant's preferred counsel "may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict," and "[t]he evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." *Id.* at 164.

"Like other agents, lawyers owe their clients a duty of loyalty and a duty of care." *Gov't of Rwanda v. Rwanda Working Grp.*, 227 F.Supp.2d 45, 65 (D.D.C. 2002). An attorney may breach his or her fiduciary duty to the client by "put[ting] himself or herself in a position by which he or she could not give full loyalty to which the client is entitled." *First Am. Corp. v. Al–Nahyan*, 17 F.Supp.2d 10, 27 (D.D.C. 1998). D.C. Rule of Professional Conduct 1.7, which governs conflicts of interest, reflects this principle.[7] Rule 1.7(b)(4) provides that "a lawyer shall not represent a client with respect to a matter if: ... [t]he lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests." D.C. Rule Prof. Conduct 1.7(b)(4); *see also* D.C. Rule Prof. Conduct 1.16(a)(1) (requiring lawyer to withdraw if "[t]he representation will result in violation of the Rules of Professional Conduct").

Rule 1.7(b)(4)'s prohibition is triggered even if the adversity between the client and lawyer is conditional or dependent on future events. Indeed, "[t]he Rule's use of the phrase 'may be' suggests that even a reasonable possibility that a lawyer's professional judgment will be affected

---

[7] The D.C. Rules of Professional Conduct apply here. *See* D.D.C. LCrR 57.26 ("Violations of the Rules of Professional Conduct (as adopted by the District of Columbia Court of Appeals except as otherwise provided by specific Rule of this Court) by attorneys subject to these Rules shall be grounds for discipline, whether or not the act or omission occurred in the course of an attorney-client relationship."); D.C. Bar R. XI (generally providing that all members of the D.C. Bar and those making limited appearances pro hac vice are subject to disciplinary jurisdiction).

is sufficient to create a conflict." *Bayerische Motoren Werke AG v. Arigna Tech. Ltd.*, No.: 23-1190 (RC), 2024 WL 2864225, at *4 (D.D.C. June 6, 2024) (citing *May*, Black's Law Dictionary (11th ed. 2019) (defining the word "may" as "[t]o be a possibility," as in "we may win on appeal.")). This interpretation of the Rule's scope is consistent with its purpose. *See* D.C. R. Prof. Conduct: Scope, cmt. 1 (stating that Rules "should be interpreted with reference to the purposes of legal representation and of the law itself"). "Rule 1.7 is founded upon the principle that a client is entitled to undivided loyalty and zealous legal representation." *In re Evans*, 902 A.2d 56, 65 (D.C. 2006). Rule 1.7(b)(4) "is designed to assure that the attorney pursues the client's objectives as the client views them, unaffected by any personal interest of the attorney in the outcome." *In re Hager*, 812 A.2d 904, 914 (D.C. 2002). In other words, the Rule protects against the "danger" that an "attorney may forego efforts he would ordinarily undertake on behalf of one client, in order that the other client may not thereby be harmed." *Freeman v. United States*, 971 A.2d 188, 194 (D.C. 2009).

Where a conflict of interest exists under Rule 1.7(b)(4), an attorney may nevertheless proceed with the representation if the client "provides informed consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation." D.C. R. Prof. Conduct 1.7(c)(1). Consent as outlined in Rule 1.7(c) allows clients "the opportunity to judge and be satisfied that their attorneys [are] providing them wholehearted and zealous representation." *In re Hager*, 812 A.2d at 913 (internal quotation marks omitted). However, even with the client's consent, representation remains prohibited unless the lawyer "reasonably believes" he or she will be able to provide "competent and diligent representation." D.C. R. Prof. Conduct 1.7(c)(2). As the Rule's comments explain, "it is doubtful that a lawyer could hold such a [reasonable] belief ... where the lawyer's individual

interests make it likely that the lawyer will be adversely situated to the client with respect to the subject-matter of the legal representation." *Id.*, cmt. 30.

## ANALYSIS

Defense counsel's decision to simultaneously represent the defendant in this criminal case and the defendants in the civil defamation lawsuit has created a conflict of interest under the D.C. Rules of Professional Conduct. Defense counsel's professional judgment in this case has been or reasonably may be adversely affected by the interests of the defamation defendants. In these circumstances, the potential consequences of judicial inaction are stark, as a pre-trial conflict would be presumptively prejudicial and ground for reversal on appeal. The Court should appoint independent, conflict-free counsel and proceed consistent with the approach taken in *United States v. Sutton*—a reasonable prophylactic measure that will cost nothing but will serve to protect the defendant's right to constitutionally effective counsel and the integrity of any conviction in this case.

### I. There is a Conflict Under D.C. Rule of Professional Conduct 1.7(b)(4).

Defense counsel's dual representation of the defendant in this case and defendants in the defamation case presents a conflict under Rule 1.7(b)(4) because defense counsel's professional judgment on behalf of the defendant has been or reasonably may be compromised by the interests of their other clients. More to the point, when defense counsel make strategic decisions in this case intended to bolster their chosen alternative-perpetrator defense, there is a reasonable probability that those decisions are made, in whole or in part, to advance the interests of the defamation defendants at the expense of the defendant's interests here.

Take, for example, the motion to dismiss the defamation complaint filed by the defendants in that matter by the Litson attorneys. In their supporting memorandum, defense counsel emphasized that the FBI's investigation of Kerkhoff "proved" that the defamation defendants'

statements were "rooted in legitimate fact." ECF No. 87 at 14, *Kerkhoff v. Blaze Media LLC, et al.*, 1:26-cv-01078-RDA-WEF (E.D. Va.). As they put it, "[a] proposition the nation's premier investigative agency deemed worth" investigating could not be "facially preposterous." *Id.* at 17.[8] By seeking the Court's endorsement in this case of Rule 17(c) subpoenas or a trial defense claiming that Kerkhoff is the real perpetrator, there is a legitimate concern that defense counsel is pursuing, at least in part, another "validation" line of argument to advance the defamation defense—in paraphrase, a proposition that a federal district judge deemed worth entertaining must have a factual basis. *See Wood*, 450 U.S. at 272 (vacating and remanding because Court "cannot be sure whether counsel was influenced in his basic strategic decisions by the interests of" another client, which would violate criminal defendant's right to due process).

Defense counsel have argued that the government's conflict concern is "unfounded" and "a bad-faith allegation" because defense counsel began pursuing Kerkhoff as an alternative perpetrator in this case "months" before they began representing the defamation defendants in June 2026. ECF No. 96 at 16. Even if that is true, the full sequence of events is less reassuring. As outlined above, *see supra* pp. 5–6, the defamation defendants were apparently on notice of Kerkhoff's anticipated defamation lawsuit in January 2026, and Baker has stated publicly that he was in contact with defense counsel before they filed their original motion for subpoenas on April 1, 2026. Moreover, according to Baker, after Kerkhoff filed her defamation lawsuit, defense counsel "approached" the defamation defendants and said, "we want your case." These circumstances complicate, if not undermine, defense counsel's suggestion that they pursued

[8] *See also id.* at 21 (citing the "visible, escalating conduct of the FBI" as corroborating basis for claim); *id.* at 27 (referring to the FBI's investigation as "government validation" of the defamation defendants' claim).

Kerkhoff as an alternative perpetrator long before, and for reasons wholly independent of, securing representation of the defamation defendants.

At bottom, the concern is that defense counsel in this case "may have to choose between" pursuing an alternative perpetrator defense that advances the interests of their defamation clients and "zealously advocating" for the defendant, whose interests may not be served by claiming that a U.S. Capitol Police officer actually committed the crimes with which he is charged. *See Bayerische Motoren Werke AG*, 2024 WL 2864225, at *4. These circumstances are sufficient to trigger Rule 1.7(b)(4), as defense counsel's "professional judgment on behalf of the [defendant] will be or reasonably may be adversely affected by" their duty of loyalty and responsibilities to the defamation defendants. D.C. Rule Prof. Conduct 1.7(b)(4); *see Bayerische Motoren Werke AG*, 2024 WL 2864225, at *4 (finding conflict under Rule 1.7(b)(4) where law firm's "professional judgment on behalf of" client "reasonably may be adversely affected" by firm's "financial interests," which could have become adverse to client). The ethics rules are meant to protect against this kind of scenario and the prospect that defense counsel, in service of another client, have or will "forego efforts" that they would otherwise make on behalf of the defendant. *See Freeman*, 971 A.2d at 194.

## II. The Court Should Appoint Fully Independent Counsel to Advise the Defendant and the Court on the Conflict and Waivability and Proceed Consistent with the Approach Taken in *United States v. Sutton*.

The Court should act now to address the conflict of interest arising from the dual representation and mitigate the risk that it poses to this case. The D.C. Circuit has made clear that "[f]or the very reasons that the ethics rules forbid lawyers to enter into representations that create conflicts of interest or the appearance thereof," a "plausible claim of conflict must be resolved before allegedly conflicted counsel or the court takes further action in the case." *Grimes v. District of Columbia*, 794 F.3d 83, 90 (D.C. Cir. 2015). As an initial matter, the risk is considerable. The

Supreme Court has recognized that when a district court allows a dual representation to proceed, "the defendant may well claim that he did not receive effective assistance." *Wheat*, 486 U.S. at 161; *see also United States v. Register*, 182 F.3d 820, 833 (11th Cir. 1999) ("Had the government decided not to bring this information to the court's attention and had the evidence come to light after the trial, [the defendant] could have argued that the conflict of interest deprived him of his right to conflict-free counsel."). Such claims "are a 'specific genre' of ineffective assistance of counsel claim." *United States v. Wright*, 745 F.3d 1231, 1233 (D.C. Cir. 2014) (quoting *United States v. Bruce*, 89 F.3d 886, 893 (D.C. Cir. 1996)). They face fewer hurdles than a typical ineffective-assistance claim—if a defendant can show on appeal that "a conflict of interest actually affected[[9]] the adequacy of [the attorney's] representation," *Culyer v. Sullivan*, 446 U.S. 335, 349–50 (1980), then "prejudice 'is presumed' and the second prong of *Strickland* does not apply," *United States v. Gray-Burriss*, 791 F.3d 50, 62 (D.C. Cir. 2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 692 (1984)). Indeed, defendants often strive to characterize ineffective-assistance claims as presenting a conflict issue, "thereby supplant[ing] the strict *Strickland* standard with the far more lenient *Culyer* test." *Bruce*, 89 F.3d at 893.

To properly manage this risk, the Court should adopt the approach taken in *United States v. Sutton*, a recent criminal case in this district. In *Sutton*, defense counsel simultaneously represented the defendant and a second person involved in the case whose identity was redacted from the public record. No. 21-0598 (PLF), 2021 WL 5998384, at *1 (D.D.C. Dec. 7, 2021). The government alerted Judge Friedman to the conflict, and defense counsel withdrew from

[9] A defendant may "allege that a conflict of interest 'actually affected' his counsel's performance" by "show[ing] that the attorney was 'forced to make a choice advancing his own interest at the expense of his client's.'" *See United States v. Smoot*, 918 F.3d 163, 169 (D.C. 2019) (quoting *United States v. Gray-Burriss*, 791 F.3d 50, 62–63 (D.C. Cir. 2015) (internal quotation omitted).

representing the second person but continued to represent the defendant. *Id.* After appointing independent conflicts counsel for the second person, the court concluded that, under the circumstances, it was also "appropriate to appoint independent conflicts counsel to advise both Mr. Sutton and the Court concerning the existence and nature of any conflict that Mr. Sutton's counsel might have as a result of their previous representation of [Redacted] and to advise Mr. Sutton concerning his interests and rights." *Id.* (citing comparable appointments of conflicts counsel by other judges in this district). Given concerns about the independence of conflicts counsel retained by the defense, the court added that "both Mr. Sutton and the Court have an interest in receiving the views of a *fully* independent attorney who has expertise in the area of conflicts and ethics." *Id.* (emphasis added). The court thus appointed independent conflicts counsel and directed them to

> specifically evaluate the existence or risk of any "adverse positions," "adversely affected" representation, "adversely affected" professional judgment, or "materially adverse" interests as between Mr. Sutton and [Redacted] as those terms are used in Rule 1.7 and Rule 1.9 of the District of Columbia Rules of Professional Conduct. *See* D.C. RULES OF PROF'L CONDUCT R. 1.7(a), R. 1.7(b)(2)-(4); R. 1.9. [Conflicts counsel] also should advise Mr. Sutton of the risks, if any, that Mr. Sutton may face regarding the potential that defense counsel's "loyalties" may be "divided" based on their prior representation of [Redacted]. *Freeman v. United States*, 971 A.2d 188, 196 (D.C. 2009) (quoting *Pinkney v. United States*, 851 A.2d 479, 487 (D.C. 2004)). If [conflicts counsel] believes that any conflict is waivable, he should advise Mr. Sutton concerning "the consequences of waiver." *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 202 (D.C. Cir. 2013); *see also* D.C. RULES OF PROF'L CONDUCT R. 1.7(c).

*Id.* To facilitate these directives, the court further ordered the government to provide conflicts counsel "with copies of all papers in this case that are relevant to the issue of conflicts" and directed conflicts counsel to meet separately with government counsel, defense counsel, and the defendant before advising the defendant and the court on the conflict and its waivability. *Id.* at *2.

The Court should use Judge Friedman's approach in *Sutton* as a roadmap here. Specifically, the Court should appoint "fully independent" conflicts counsel—*i.e.*, not a current member of the

defense team[10]—to advise the defendant and the Court on the conflict and its waivability under the D.C. Rules of Professional Conduct. The Court should direct the government to share with conflicts counsel those materials necessary for counsel to discharge their responsibilities, and it should direct conflicts counsel to meet separately with government counsel, defense counsel, and the defendant about the conflict before providing advice on the matter. As to the question of waivability, while at the September 10, 2026 status hearing the government indicated its preliminary view that the conflict would be waivable, that determination is for the Court to make. And in making that determination, the Court should be mindful of Rule 17(c)(2)'s requirement that a lawyer's belief that he or she can ethically proceed with a dual representation be "reasonable"—a conclusion that may be "doubtful" where there is a likelihood of adversity concerning the subject matter of the representation. D.C. R. Prof. Conduct 1.7(c)(2) & cmt. 30. Given these nuanced circumstances, the government submits that, as in *Sutton*, the Court would benefit in this case from the guidance of independent conflict counsel on the matter of waivability as well as the conflict itself.

The government has no intention of interfering in the defendant's right to counsel, and its proposal reflects this. At the conclusion of the independent, conflict-free counsel's work, the defendant will either continue with his current representation, confident that he has defense counsel's "undivided loyalty," or he will know that a conflict exists that is precluding the representation to which he is entitled. *See Evans*, 902 A.2d at 65.

[10] While the conflict at issue pertains to only certain members of the defendant's legal team, it can hardly be said that any are "independent" of each other.

## CONCLUSION

For the foregoing reasons, the government respectfully proposes that the Court appoint independent, conflict-free counsel to advise the defendant and the Court on the conflict and its waivability under the D.C. Rules of Professional Conduct, consistent with the approach taken in *Sutton*.

Respectfully Submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Charles R. Jones*
CHARLES R. JONES (D.C. Bar No. 1035541)
STUART D. ALLEN (D.C. Bar No. 1005102)
JOCELYN BALLANTINE (CA Bar No. 208267)
Assistant United States Attorneys
National Security Section
601 D Street, NW
Washington, D.C. 20530