**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:26-cr-00001 |
| | ) | |
| BRIAN COLE, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT BRIAN COLE JR.'S MOTION TO SUPPRESS STATEMENTS AND INCORPORATED MEMORANDUM OF LAW**

J. Alex Little
Zachary C. Lawson
John R. Glover
LITSON PLLC
54 Music Square East, Suite 300
Nashville, TN 37203
(615) 985-8205
alex@litson.co
zack@litson.co
jr@litson.co

John M. Shoreman
DC Bar #407626
Mario B. Williams
Ga. Bar No. 235254 (*Pro Hac Vice*)
HUMANITY DIGNITY AND RIGHTS LLC
3480 Peachtree Road, NE
Atlanta, Georgia 30326
jms@mcfaddenshoreman.com
mwilliams@hdrattorneys.com

*Counsel for Brian Cole Jr.*

Defendant Brian Cole Jr. respectfully moves to suppress all statements[1] that he made during his December 4, 2025 custodial interrogation at the FBI's Washington Field Office. A transcript of the video-recorded interrogation is attached as Exhibit A and cited as "Tr." Mr. Cole also will manually file the video of the interrogation as Exhibit B.

## INTRODUCTION

On the morning of December 4, 2025, Brian Cole woke up early like always and walked out of his house to buy food at a 7-Eleven. He found FBI agents pointing guns at him. (Tr. at 11.) Roughly three hours into the interrogation that followed—isolated in an interview room, wrapped in a blanket, fighting the urge to vomit, and "stimming" the same sentences to himself again and again—he agreed with two agents insisting that the figure in some surveillance video was him. The government

[1] Suppression of Mr. Cole's entire interrogation is appropriate. To be sure, some of what Mr. Cole said in the interview's opening minutes was innocuous. But voluntariness is not determined question by question. Instead, the Court "examine[s] the entire record" and weighs the interrogation as a whole. *Davis v. North Carolina*, 384 U.S. 737, 741–42 (1966); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). And when that examination reveals coercion, courts routinely suppress the interrogation's entire product rather than attempt to fix the precise moment at which the suspect's will gave way. *See, e.g.*, *United States v. Karake*, 443 F. Supp. 2d 8, 14 (D.D.C. 2006) (suppressing every statement the defendants made "to both the Rwandan and American interrogators" as "the product of coercion and therefore inadmissible"); *United States v. Preston*, 751 F.3d 1008, 1027–29 (9th Cir. 2014) (en banc) (holding the confession involuntary in its entirety based on the cumulative effect of the techniques deployed); *United States v. Tingle*, 658 F.2d 1332, 1336–37 (9th Cir. 1981) (suppressing statements produced by threats the agents introduced only after the interview was underway). Once involuntary, a statement is unusable for any purpose. *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) ("[A]ny criminal trial use against a defendant of his involuntary statement is a denial of due process of law.").

will call that a voluntary confession. The video and transcript record something else. They show the methodical dismantling of a man whose autism spectrum disorder left him unable to withstand the psychologically coercive tactics deployed against him, and who told the agents so, in real time, while they pressed him, told him his professions of innocence were criminal, and threatened to "drag" his family through the same experience Mr. Cole had gone through that morning—the morning that started at gunpoint. As the Supreme Court has long recognized, in weighing whether the government can carry its burden in showing statements are voluntary, courts must consider whether their admission would be "compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means[.]" *Miller v. Fenton*, 474 U.S. 104, 116 (1985). Here, it would not.

Voluntariness turns on two questions: whether the agents' conduct was objectively coercive, and whether that conduct in fact overbore this defendant's will. *United States v. Redrick*, 48 F. Supp. 3d 91, 107 (D.D.C. 2014); *see also Colorado v. Connelly*, 479 U.S. 157, 164 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The answer to the first question fills 90 pages of transcript. The agents told Mr. Cole their evidence was "overwhelming" and that his pleas "can't convince us" of his innocence; they told him his maintaining his innocence was "another crime"; they told him that unless he agreed with their narrative, every member of his family would be hauled to Washington for FBI interviews; they promised that a confession would be reported to their "bosses" and would "help you down the line"; and they assured him, over and over, that what he was accused of was "one dumb mistake" on a night

when "no one got hurt"—something the three of them, in that room, could simply "put behind us." Each is a recognized consideration in the voluntariness analysis, and the agents used them in combination. The agents used all of them simultaneously. Dr. Richard A. Leo—who has consulted on 2,500 disputed-confession cases, testified as an expert 435 times, and been cited favorably by the United States Supreme Court—reviewed the recording and transcript and reached the conclusion the transcript compels: "the interrogation was psychologically coercive." (Exhibit C, Report of Richard A. Leo, Ph.D., J.D. (Sept. 24, 2026) ("Leo Rep.") §§ I–II, VIII(4).)

The answer to the second question was on display in the interrogation room. Mr. Cole is autistic. A licensed neuropsychologist diagnosed him with Autism Spectrum Disorder, Level 1 (Requiring Support). (Dkt. 52-1.) But the agents did not need the diagnosis, because Mr. Cole narrated his own unraveling as it happened: he organizes his life around routine and avoids "anything that deviates" from it; he is "super introversive" and has "trouble even maintaining a conversation like this"; he could not "process" what was happening; his mind had gone "blank." (Tr. at 61–63, 91.) The agents' response to each disclosure was to escalate. What those tactics finally produced was not a voluntary decision, but a collapse.

Suppression is required on a second, independent ground. After Mr. Cole's initial admission, the agents kept him from the magistrate judge—sitting minutes away—solely to continue the interrogation, extracting a written "waiver" of prompt presentment moments after declaring the case "over" from a man who asked, pen in hand, "These are my rights, even if I signed it, right?" (Tr. at 101.) The hours of

detailed questioning that followed fall outside the six-hour safe harbor of 18 U.S.C. § 3501(c), and the delay served no purpose Rule 5(a) recognizes. Under *Corley v. United States*, 556 U.S. 303 (2009), and the *McNabb-Mallory* rule, those statements must be suppressed no matter how the Court resolves the voluntariness question.

## FACTUAL BACKGROUND

### A. Armed Agents Seize Mr. Cole at Dawn, and He Waives His Rights Within Minutes of Being Told Why He Is in Custody.

Before December 4, 2025, Brian Cole had never been arrested. He is a high school graduate with autism who has worked in his family's bail-bonding business since he was 14, entering bonds on a laptop in the company's Northern Virginia office, where his sister is his boss and his grandmother manages the office. He had lived in the same Woodbridge, Virginia home with his parents for 21 years. He has no criminal history of any kind. (Dkt. 23 at 12; Dkt. 28 at 12.) The interrogation described below was his first encounter with law enforcement.

It began at gunpoint. As Mr. Cole described it to the agents minutes later: "I wake up one minute, I'm going to 7-Eleven to get myself some food, and all of a sudden I have a bunch of FBI agents just pointing, pointing guns at me." (Tr. at 11.) The agents themselves acknowledged the shock of an armed arrest "especially early in the morning." (*Id.*) Agents transported Mr. Cole to the Washington Field Office, processed him, and placed him alone in an interview room with Special Agents "Nick" and "Kristen." He did not know why he had been arrested; he told the agents he had "been waiting for someone to tell [him]" the reason. (Tr. at 12.)

Before any advice of rights, the agents began shaping the choice they wanted Mr. Cole to make. They told him "you being forthright with us . . . will really benefit you in the long run" and framed the day as an opportunity to "get this situation resolved." (Tr. at 6–7.) They also told him what the day held: "later on this afternoon we'll likely be in front of a judge." (Tr. at 5–6.) Only then did they read the *Miranda* warnings. Mr. Cole—who had just told the agents, "this is a lot to process" and needed water and a pause before the warnings could even be read—signed the advice-of-rights form at 9:21 a.m. (Tr. at 7–10.)

**B. Mr. Cole Denies the Accusation, Again and Again, While Describing His Own Unraveling to the Agents in Real Time.**

When the agents finally told Mr. Cole that they were accusing him of placing the January 5, 2021, pipe bombs, his reaction was immediate and unrelenting distress. "Woah, wait a minute. Wait a minute. . . . This, this is a misunderstanding. Please tell me. Please tell me. Please, please, please tell me." (Tr. at 54.) Within a page he repeated "please tell me this is a misunderstanding" five more times, begged "can you give me a minute to process this?", and dissolved into "oh, my God" repeated five times, one after the other. (Tr. at 55–57.) When an agent told him, "You're okay," Mr. Cole answered: "It's not okay." (Tr. at 57.)

The pattern never broke. Over the hours that followed, Mr. Cole underscored his deteriorating mental state to the agents dozens of times: "I don't know what to do now. I don't know what to say. I don't know what to do." (Tr. at 58.) "I'm trying [to] process this." (Tr. at 61.) "I'm just out of my depth with this." (Tr. at 72.) "I'm doing my best to keep myself together." (*Id.*) His body registered the same distress: a knot

"in the pit of my stomach" (Tr. at 53); chills that led agents to wrap him in a blanket (Tr. at 61); a gag mid-sentence that prompted the agents to joke about fetching a wastebasket "just in case" (Tr. at 75); and, by the end, "a giant pain in my stomach." (Tr. at 87.) Mr. Cole was deteriorating.

Despite this, he *vehemently denied* the accusation—not once or twice, but relentlessly, in a repetitive cadence: "It has to be a mistake" repeated seven times in a single answer (Tr. at 72–73); "I didn't place the devices. I did not place the devices. I did not place them. . . . I'm maintaining my innocence." (Tr. at 73.) "I didn't. I didn't. I didn't. I didn't." (Tr. at 76.) "I didn't, I didn't place the bombs." (Tr. at 77.) "How am I supposed to explain that I'm innocent?"—four times, verbatim, in a single breath. (Tr. at 74.)

Mr. Cole also told the agents, in plain terms, that they were dealing with someone with cognitive limitations. He described a life built around sameness: "I just do my best to keep my life as simple as possible. . . . [A]nything that deviates from routine, [I] stay away from." (Tr. at 61–62.) "I prefer average. It's simple. And it keeps me . . . out of this situation." (Tr. at 62–63.) And he explicitly alerted the agents to how his autism is an acute impairment in situations like the one in that room: "I'm super introversive. . . . I don't talk to anyone. . . . I have trouble even maintaining a conversation like this." (Tr. at 63.) These were not excuses. They were clinical markers, announced to the agents while the interrogation was underway.

### C. The Agents Escalate to Certainty, Threats, and Promises.

The agents met Mr. Cole's denials and distress with escalation. They asserted infallible certainty and told him denial was futile:

> "You can't convince us that you didn't do it. We have video. We have your car. We have you buying all these different pieces to make devices. You can't convince us that you didn't do it. You can tell us why."

(Tr. at 73.) "The evidence we have is overwhelming." (Tr. at 74.) "[E]veryone in the room knows the same thing. . . . [W]e know you did it. You know you did it." (Tr. at 72.) "What you're saying is just not consistent. It's not true. It's not true. And you know that." (Tr. at 88.) They told him maintaining his innocence was "a losing battle" and that they did not "need a story" or "an explanation"—only a confession. (Tr. at 89.) When Mr. Cole persisted, an agent warned him that maintaining his innocence *was itself* criminal: "lying to federal agents is breaking the law. That's another crime . . . So more lies just makes it worse, okay? . . . No, look at me. Do you understand that?" (Tr. at 92.)

They minimized the offense while presenting confession as Mr. Cole's only exit. From the first minutes: "The devices themselves didn't go off. Okay? No one got hurt. . . . Let's just put this behind us." (Tr. at 57.) Later: "They didn't go off. No one was hurt. It's okay." (Tr. at 70.) They minimized the conduct, softening it as "one dumb mistake," a single night when he "got out of [his] routine," and promised: "I don't want this one night to haunt you for the rest of your life, Brian. I want . . . to come to a resolution today." (Tr. at 83–84, 99.) They invoked the press: "this story is going to

create a lot of media attention . . . they are going to say you are a bad guy. . . . And the media is going to spin it one way. We want your words." (Tr. at 82–83.)

Then the agents turned to his family. Mr. Cole had already told the agents his greatest fear was how his family would learn of his arrest (Tr. at 11), and he would later ask, "How are they going to react to this?" (Tr. at 98.)

The agents made his family the price of denial:

> "So every one of those family members are going to have to come into DC to be interviewed, every one of them, because that one night you went off script."

(Tr. at 90.) And the reward for confession: "if you do tell us the truth, Brian, a lot of things change . . . . We can pull back and, you know, maybe not bring everyone that you know down to DC to interview them." (*Id.*) "If you do tell us the truth, we can tell our bosses and the people that are involved in this case that he was straightforward with us on day one. So hopefully that will help you down the line when you have to deal with the consequences of this action. All of those things, all of those things will help you and help your family." (*Id.*)

**D. Mr. Cole Breaks.**

The record of Mr. Cole's last hour of resistance is difficult to read. He asked for a break "just to process all of this." (Tr. at 86.) Alone in the interrogation room, shivering while wrapped in the blanket, he chanted to himself: "I didn't, I didn't, I didn't, I didn't, I didn't. . . . [E]ven a small chance . . . . Even a small, tiny chance. Smallest, tiniest chances. . . . Do whatever you can to clear your name. You can get out of this." (Tr. at 86–87.) This was "stimming"—the self-regulating repetition characteristic of

an autistic person in acute physical and emotional distress[2]—captured on the government's own recording. When the agents returned, Mr. Cole reported "a giant pain in my stomach." The response: "I know. Are you ready? Are you ready to explain?" (Tr. at 87.)

Minutes later, the agents asked whether he wanted the interrogation to end. His answer revealed a mind that had stopped functioning: "I don't know what to do anymore. I just—everything is just, everything is just blank. Being told, being told all of this, it's just a little too much to process. I'm sorry." (Tr. at 91.) Rather than honor that answer, the agents pressed on. They cued a surveillance video and asked Mr. Cole to identify the man in it. He denied any familiarity with what he saw—twice. "Do you recognize that person?" "No." "Have you watched this video before?" "No." (Tr. at 92.) Only then did the agents remind him what a denial would cost: "lying to federal agents is breaking the law. That's another crime. . . . So more lies just makes it worse, okay? . . . No, look at me. Do you understand that?" (*Id.*) Seconds later, repeating the question drew the opposite answer. "So, is this individual you?" (Pause.) "Yes." (Tr. at 93.) The confession was not the product of the video; Mr. Cole had just denied recognizing himself in it. It was the product of the threat—the agents

---

[2] "Stimming," or self-stimulatory behavior, refers to the repetitive movements, sounds, or verbalizations that autistic individuals use to regulate emotion, sensory input, and stress. Nat'l Autistic Soc'y, *Repeated Movements and Behaviour ("Stimming")*, https://www.autism.org.uk/advice-and-guidance/about-autism/repeated-movements-and-behaviour-stimming (last visited Sept. 29, 2026); *see also* Steven K. Kapp et al., *'People Should Be Allowed to Do What They Like': Autistic Adults' Views and Experiences of Stimming*, 23 Autism 1782 (2019).

turned "No" into "Yes" by telling him that "No" was itself a crime. The agents' reaction confirmed what the entire morning had been engineered to produce:

> "It's over. Take a breath. Take a breath. It's over. Let your mind breathe, okay? . . . Cry, do whatever you have. It's over. It's over, okay? We can resolve this case."

(Tr. at 93.) They told him he had "done a brave thing," and—in the same breath—renewed the family leverage and told Mr. Cole that they would be forced to haul his family into similar confession rooms unless he admitted that the man in the surveillance footage was him. If he would "walk us through every detail of that night with the truth, we can get your family—we might not have to bring them all down into DC. . . . [W]e might *not* have to drag them all here." (Tr. at 93–94 (emphasis added).) Mr. Cole, meanwhile, had begun repeating the agents' own script back to them: "you just decided to do something stupid." "One stupid night." (Tr. at 94.)

### E. The Agents Obtain a Presentment "Waiver" from Mr. Cole Right After Telling Him, "It's Over."

Having broken Mr. Cole, the agents did not take him to the courthouse they led him to envision that morning. Instead, they pressured him to continue the interrogation by presenting him with two loaded options: "Option A," sitting with the agents "for the remainder of the afternoon"; or "Option B," being taken "to the judge . . . this afternoon for your initial appearance." (Tr. at 94–95.) The agents' framing made the choice for him. The courthouse meant a proceeding "generally open to the public," but staying meant "we don't have to go to the courthouse today . . . that at least will give you some time to prepare yourself." (Tr. at 95.) Mr. Cole asked for "some

time to process." (*Id.*) When the agents returned and asked how he was doing, he answered only with: "No." (Tr. at 97.)

The agents pressed on, twisting the very traits Mr. Cole had disclosed to them: "you said it yourself, you don't like to dwell on the past. . . . [Y]ou're a . . . here and now person . . . . Let's just move forward." (Tr. at 100.) They then produced a written waiver of prompt presentment, describing it this way: "This form is saying that you, Brian, are waiving your initial appearance this afternoon . . . . [Y]ou're waiving that right and you're going to stay here and talk to us." (Tr. at 101.) Mr. Cole's one question revealed his complete lack of understanding that he was forgoing his right to prompt presentment: "These are my rights, even if I signed it, right?" (*Id.*) "Yep," the agents answered, and he signed at approximately 12:13 p.m. (Tr. at 101–03.)

The interrogation then ran, as promised, "for a few more hours." (Tr. at 99.) In the 55 transcript pages that follow the waiver, the agents themselves supplied both the heart of the narrative and many of its details—where he parked, what he carried, where he sat, what he set the timer to—and Mr. Cole confirmed, adopted, or briefly elaborated. (*E.g.*, Tr. at 108–13.) His first post-waiver account of the night itself described the same dissociation he had been reporting all morning: "something snapped in me, I guess. . . . [E]verything after that was just blank. Genuinely." (Tr. at 103.) The agents closed the loop themselves: "So those are the facts. That's the truth." (Tr. at 116–17.) Mr. Cole was not presented to a magistrate judge until December 5, 2025. (Dkt. 28 at 5.)

### F. Mr. Cole Is Diagnosed with Autism Spectrum Disorder.

On December 16 and 19, 2025, at the request of defense counsel, Dr. David Black, a licensed neuropsychologist, conducted a two-day evaluation of Mr. Cole and diagnosed him with Autism Spectrum Disorder, Level 1 (Requiring Support). (Dkt. 52-1.) The diagnosis surprised no one who had watched the December 4 recording; it confirmed what Mr. Cole had told the agents about himself while they questioned him. This Court's detention ruling already acknowledges that Mr. Cole "is diagnosed with autism spectrum disorder and obsessive-compulsive disorder." (Dkt. 28 at 12.) That much is beyond dispute here.

Mr. Cole also retained Dr. Richard A. Leo, the Hamill Family Professor of Law and Psychology at the University of San Francisco, to review the December 4 interrogation. Dr. Leo has studied police interrogation and false confessions for more than two decades; has consulted on 2,500 cases involving disputed interrogations or confessions; has testified as an expert 435 times in state, federal, and military courts; and has had his scholarship "cited by appellate courts, including the United States Supreme Court on multiple occasions." (Exhibit C, Leo Rep. § I.) He reviewed the audio recording and transcript of the interrogation, the Indictment, and the government's detention memorandum. (*Id.* § II.)

His conclusions are unequivocal.[3] Dr. Leo opines that Mr. Cole's interrogation contained the coercive techniques that scholars agree are most likely to result in false

[3] As requested *infra*, Mr. Cole respectfully requests an evidentiary hearing on this motion, at which Dr. Leo and any other witness can elaborate on and explain their opinions in detail. Mr. Cole also intends to call as witnesses the FBI agents who

confessions. (*Id.* § VIII(4).) What the agents conducted was "a police interrogation, not a mere police interview"—one that was "guilt-presumptive, accusatory, [and] involved the use of multiple and repetitive interrogation techniques that rely on pressure and persuasion." (*Id.* § VIII(1).) The three processes that scholars identify in Reid-based interrogation[4]—"isolation, confrontation and minimization"—were "[a]ll three . . . present." (*Id.*) And the agents' methods "appear to have caused Mr. Cole, who was in mental and physical distress throughout much of the December 4, 2025 interrogation, to perceive that he was not able to put an end to the interrogation" without supplying an admission, "even as he repeatedly denied the Agents' accusations and insisted that he was innocent." (*Id.* § VIII(4).)

## LEGAL STANDARD

A statement made to law enforcement is admissible only if it was "the product of an essentially free and unconstrained choice by its maker." *Schneckloth*, 412 U.S.

---

interrogated Mr. Cole. Among other things, what these agents knew about Mr. Cole's mental faculties before December 4, 2025 is directly at issue.

4 "Reid" refers to the Reid Technique, the interrogation method set out in the training manual Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, *Criminal Interrogation and Confessions* (5th ed. 2013), first published by Inbau and Reid in 1962 and taught by John E. Reid & Associates to hundreds of thousands of American law enforcement officers. The method presumes the suspect's guilt by design and is deployed only after the interrogator assumes that the suspect is lying. It prescribes a nine-step, accusatory process in which the suspect is isolated, confronted with the interrogator's asserted certainty of his guilt, cut off from denials, and offered "themes" that minimize the moral seriousness of the offense so that admission appears the easier path. False-confession scholars have long identified these features—isolation, confrontation, minimization, and the Reid technique specifically—as principal risk factors for eliciting confessions from innocent suspects. *See* Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 Law & Hum. Behav. 3 (2010).

at 225. The "ultimate question is whether [the defendant's] 'will' was 'overborne and his capacity for self-determination critically impaired' as a result of the agents' conduct." *United States v. Hallford*, 816 F.3d 850, 857–59 (D.C. Cir. 2016) (quoting *Schneckloth*, 412 U.S. at 225). Coercive police activity is a necessary predicate to finding statements were *involuntary*, *Connelly*, 479 U.S. at 167, and once it is present the Court must weigh "both the characteristics of the accused and the details of the interrogation," including the defendant's mental condition, intelligence, and prior experience with law enforcement, and the length and intensity of the questioning. *Schneckloth*, 412 U.S. at 226; *United States v. Reed*, 522 F.3d 354, 359 (D.C. Cir. 2008). The government bears the burden of proving voluntariness—of both a *Miranda* waiver and the statements themselves—by a preponderance of the evidence. *Connelly*, 479 U.S. at 168; *United States v. Karake*, 443 F. Supp. 2d 8, 51 (D.D.C. 2006). Where the same coercion is alleged to have produced both the waiver and the confession, the two inquiries collapse into one. *United States v. Clarke*, 611 F. Supp. 2d 12, 27 (D.D.C. 2009).

Separately, Federal Rule of Criminal Procedure 5(a) requires that an arrestee be taken before a magistrate judge "without unnecessary delay." Under the *McNabb-Mallory* rule, as preserved by 18 U.S.C. § 3501(c), a confession made more than six hours after arrest and before presentment must be suppressed if the delay was unreasonable or unnecessary, "regardless of whether [the confession] is otherwise voluntary." *Corley v. United States*, 556 U.S. 303, 312 (2009); *see United States v. Abu*

*Khatallah*, 275 F. Supp. 3d 32, 45–46 (D.D.C. 2017) (describing the two-step framework of *McNabb-Mallory*).

## ARGUMENT

### I. MR. COLE'S STATEMENTS WERE INVOLUNTARY UNDER THE TOTALITY OF THE CIRCUMSTANCES, AND THE GOVERNMENT CANNOT CARRY ITS BURDEN TO SHOW OTHERWISE

#### A. The Agents' Conduct Was Objectively Coercive.

This is a case in which the agents stacked *four* recognized forms of coercion on top of one another and directed them at a single, visibly deteriorating man. Those four tactics were (1) threats to prosecute Mr. Cole's denial, (2) using Mr. Cole's family as leverage, (3) promising him concrete benefits for confessing, and (4) minimizing the offense to make admission feel consequence-free. Dr. Leo, after reviewing the recording, catalogued these techniques used by the agents and concluded that the interrogation "contained examples of psychologically coercive interrogation techniques, methods and strategies that have been demonstrated to sometimes cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators." (Exhibit C, Leo Rep. § III ¶ 3.) All of this must be measured against the backdrop of Mr. Cole's autism and constrained mental faculties. *United States v. Hall*, 969 F.2d 1102, 1108 n.6 (D.C. Cir. 1992) (courts must consider the "subjective characteristics" of the defendant when assessing voluntariness). Under the totality of the circumstances, *Connelly*'s threshold requirement of coercive police activity, 479 U.S. at 167, is satisfied several times over.

*First*, the agents systematically eliminated every answer but confession. They told Mr. Cole that he "[c]an't convince us that you didn't do it" (Tr. at 73), that the

evidence against him was "overwhelming" (Tr. at 74), and that maintaining his innocence was "a losing battle" for which they did not "need a story"—only an admission (Tr. at 89). Assertions of infallible certainty and one-sided presentations of the evidence bear directly on voluntariness. *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (police misrepresentations "relevant" to voluntariness); *accord Lynumn v. Illinois*, 372 U.S. 528, 534 (1963). When officers falsely foreclose every response but one, the suspect "is compelled by logic to 'confess'" the answer left to him. *Aleman v. Vill. of Hanover Park*, 662 F.3d 897, 906–07 (7th Cir. 2011) (Posner, J.). That is the first stage of the Reid method as Dr. Leo describes it: the interrogator "confront[s] the suspect with incontrovertible evidence of his guilt, whether real or non-existent," until the suspect "comes to view his situation as hopeless and to perceive that resisting the interrogator's demands is futile." (Exhibit C, Leo Rep. § V.) The agents ran that stage by the book. They "expressed unwavering confidence in their belief" that Mr. Cole was guilty, "attacked and undermined his denials," and "repeatedly told him that evidence established his guilt"—techniques that, in Dr. Leo's assessment, "could have made him feel hopelessly trapped if he did not stop denying their accusations." (*Id*. § VIII(1).)

Having eliminated denial as a factual possibility, the agents went further and portrayed it as yet another crime. They told a man in the act of asserting his innocence that "lying to federal agents is breaking the law. That's another crime." (Tr. at 92.) This perverts federal law. *See Brogan v. United States*, 522 U.S. 398, 409, 416 (1998) (Ginsburg, J., concurring in the judgment) (warning that criminalizing

claims of innocence would "arm[] Government agents with authority not simply to apprehend lawbreakers, but to generate felonies," letting an interrogator "create a crime by surprising the suspect, asking about those acts, and receiving a false denial"). Trickery—like telling a defendant maintaining his innocence is a crime—also is prohibited when "it deprives the suspect of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Soffar v. Cockrell*, 300 F.3d 588, 596 (5th Cir. 2002) (internal quotation marks omitted) (quoting *Moran v. Burbine*, 475 U.S. 412, 424 (1986)). Chief among the recognized categories are "lies about a defendant's legal rights," including the false suggestion that a suspect "must answer our questions." *United States v. Graham*, No. 3:13-cr-11-TCB, 2014 WL 2922388, at *9 (N.D. Ga. June 27, 2014).

The agents made clear to Mr. Cole that any continued denial would *itself* be criminally prosecuted. His only lawful option was agreement—which was no option at all. Dr. Leo reads the exchange the same way: "the Agents implicitly threatened Mr. Cole when they asked him if he understood that lying to federal agents is a crime (after they had accused him repeatedly of lying to them every time he denied their accusations)." (Exhibit C, Leo Rep. § VIII(3).) And the timing removes any doubt about its effect. The agents delivered the warning in the seconds between Mr. Cole's denial that he recognized the man in the video and his admission that it was him, converting his "No" into a "Yes" on the single dispositive question in the case. (Tr. at 92–93.)

*Second*, the agents improperly used Mr. Cole's family as leverage. They knew his deepest anxiety because he had voiced it from the opening minutes of the interview (Tr. at 11 (Mr. Cole asking "how [was he] going to tell" his "family" he had been "arrested by the FBI")), and they converted it into a penalty for silence and a reward for confession: deny, and "every one of those family members are going to have to come into DC to be interviewed, every one of them" (Tr. at 90); confess, and "we can pull back" and "might not have to drag them all here" (Tr. at 90, 94). Dr. Leo singled out this exchange. The assurance that Mr. Cole's "family would not have to be dragged down to Washington, D.C. and be interviewed—but only if he agreed to their accusations" was a "clearly implied, if not explicit," promise of leniency; its mirror image—that otherwise "his family would have to be dragged down to Washington, D.C. and be interviewed"—was a "clearly implied, if not explicit, threat[] of harsher treatment/punishment in the absence of compliance and confession." (Leo Rep. § VIII(3).) The two cannot be pried apart: "Every threat implies a promise (if one complies to avoid the threat) and every promise implies a threat (if one fails to comply with the promise)." (*Id.*)

Courts generally agree that threats to arrest family members, absent probable cause to do so, can render statements involuntary. *United States v. Bernett*, 495 F.2d 943, 968 (D.C. Cir. 1974) (Wilkey, J., concurring) (collecting authority suppressing a statement where an agent "threatened to send the suspect's whole family to jail"); *Rogers v. Richmond*, 365 U.S. 534 (1961) (rejecting a voluntariness analysis focused on the probable truth of the confession where police had pretended to order the arrest

of the suspect's wife); *United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993) (finding statements involuntary where the police threatened to arrest the suspect's family without probable cause); *United States v. Ortiz*, 943 F. Supp. 2d 447, 456–57 (S.D.N.Y. 2013) (suppressing statements where police threatened to arrest the suspect's elderly aunt without probable cause); *United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981) (suppressing statements where agents warned a defendant she might not see her young child "for a while," that she had "a lot at stake," referring specifically to her child, and told her that if she failed to cooperate he would inform the prosecutor that she was "stubborn or hard-headed").

*Third*, the agents promised concrete benefits. A confession would be reported to "our bosses" as cooperation "on day one"; it would "help you down the line when you have to deal with the consequences"; it would let the agents "tell the story the right way" before the media branded him "a bad guy." (Tr. at 82–83, 90.) In this Circuit, "any direct or implied promises, however slight," bear on voluntariness and can alone require judicial inquiry into a confession. *United States v. Powe*, 591 F.2d 833, 840 (D.C. Cir. 1978) (citation omitted). The social science is, if anything, less forgiving than the case law. "There may be no psychological interrogation technique more potent than the use of threats and promises." (Leo Rep. § VIII(3).) They "are inherently coercive because they exert substantial pressure on a suspect to comply and thus can easily overbear the will or ability of a suspect to resist an interrogator's demands or requests." (*Id.*) Avoiding them is "among the most fundamental

prohibitions in American police interrogation, second only to the prohibition against using physical violence on suspects to elicit confessions." (*Id.* § VIII(4).)

Dr. Leo identifies nine such promises and threats in this transcript—beginning before the Miranda warnings were read, with the assurance that "being forthright with us . . . will really benefit you in the long run," and ending with the offer to spare Mr. Cole's family. (*Id.* § VIII(3) (collecting Tr. at 6, 74, 76, 84, 85, 90, 92, 94).) And promises of precisely this character—informal help, favorable framing to decision-makers, softened consequences—have rendered confessions involuntary outright. *Sharp v. Rohling*, 793 F.3d 1216, 1230–35, 1240–41 (10th Cir. 2015) (granting habeas relief where detective promised "leniency" and the possibility of "no jail" and offered to help find housing for the suspect's family); *United States v. Lall*, 607 F.3d 1277, 1285–87 (11th Cir. 2010) (statement involuntary where officer assured an uncounseled suspect that his statements would not be used to charge him); *United States v. Lopez*, 437 F.3d 1059, 1066 (10th Cir. 2006) (statements were involuntary due to implied promise of a dramatically reduced sentence, paired with misrepresentations about the strength of the evidence).

To be sure, an officer may tell a suspect, truthfully, that his cooperation will be made known to the prosecutor, and such a statement will not by itself render a confession involuntary. *Cf. United States v. Robinson*, 698 F.2d 448, 455 (D.C. Cir. 1983). But that latitude extends only to accurate information and does not license promises delivered through deception. When an officer couples the prospect of cooperation with misrepresentations—about the evidence, the law, or the

consequences of speaking—the resulting statement is coerced. *United States v. Young*, 964 F.3d 938, 943–44 (10th Cir. 2020) (though a promise "to make a defendant's cooperation known to prosecutors will not produce a coerced confession," the agent crossed the line by misrepresenting the law and falsely claiming to have consulted the judge handling the case) (citation omitted); *United States v. Anderson*, 929 F.2d 96, 101 (2d Cir. 1991) (distinguishing permissible cooperation talk, where "everything the agents said . . . was true," from statements that "misled [the suspect] in order to get his confession"); *see also Frazier v. Cupp*, 394 U.S. at 739 (police misrepresentations bear on voluntariness). That is this case. These agents did not deliver accurate information. They embedded their promises in a presentation that was false at every load-bearing point: "overwhelming" evidence they declined to describe and the fiction that confessing would spare his family from custodial interrogations. And they made those promises to an autistic man whom they had watched, for hours, lose the capacity to evaluate anything at all. A promise "however slight" carries different weight when the person receiving it will agree to anything that ends the interaction. *Powe*, 591 F.2d at 840 (citation omitted); *cf. Sharp*, 793 F.3d at 1230–35 (promises assessed against the suspect's desperate circumstances). These promises were not slight to someone of Mr. Cole's mental faculties, and they were not honest information. They were the only path out of the room that the agents left open for Mr. Cole.

*Fourth*, the agents used a textbook minimization script. The offense was "one dumb mistake"; "no one got hurt"; it was "one night" off "routine" that the three of

them could "put behind us" and "resolve . . . today." (Tr. at 57, 70, 83–84, 99.) Minimization is precisely the technique that offers a suspect a psychological off-ramp while concealing the legal cliff on the other side[5]—and when it is aimed at a person whose overriding need is to escape an unbearable interaction, it does not merely invite confession; it manufactures one. *Cf. Missouri v. Seibert*, 542 U.S. 600, 616–17 (2004) (courts scrutinize interrogation strategies designed to undermine the protections the warnings promise). Minimization is not benign rapport-building; it is the implied promise the law has long recognized—and, as Dr. Leo explains, the flip side of a threat. Minimization and maximization "are, in effect, two sides of the same coin and thus work together: if the suspect confesses to the minimized scenario (implying reduced culpability and/or reduced punishment in exchange for compliance and confession), the suspect avoids the maximized scenario (implying increased culpability and/or punishment in the absence of compliance and confession)." (Leo Rep. § VIII(2).) Here the agents "tried to minimize Mr. Cole's blameworthiness by suggesting that he merely made a mistake, that he is not a bad guy, and that they would not judge him," while warning that "the only way to avoid having others spin conspiracy theories about him was by agreeing to the Agents' accusations." (*Id.* (citing Tr. at 55, 63, 70–71, 83).) "The clear implication . . . was that Mr. Cole would be perceived as less culpable if he agreed with the Agents' accusations, and that,

[5] Saul M. Kassin, *False Confessions: Causes, Consequences, and Implications for Reform*, 1 Pol'y Insights from the Behav. & Brain Scis. 112, 113–14 (2014) (Mr. Cole is attaching as a collective exhibit a courtesy copy of the medical and scientific scholarship cited herein as Exhibit D).

conversely, he would be viewed as more culpable – potentially far more culpable – if he did not." (*Id.*) The interrogators' own training manual has said as much since 1942: every edition of the Reid manual has implored interrogators not to use methods "apt to make an innocent person confess to a crime he did not commit," such as "the use of force, threats, [or] promises of leniency." (*Id.* § VII.) *See Lopez*, 437 F.3d at 1065 (confession involuntary where agents minimized the offense as a "mistake," promised leniency, and coupled that minimization with misrepresentations about the strength of the evidence).

The Court does not need to weigh these tactics one by one, because the agents did not use them one by one. Their certainty foreclosed Mr. Cole's persistent denials; they told him the denials themselves were a crime; they told him his family would be brought into custody unless he complied; they promised him things would be better for him if he confessed; and they minimized what confessing would mean. While each of these standing alone might pass muster, their sum, here, produced involuntary statements that must be suppressed. *Schneckloth*, 412 U.S. at 226. Police interrogation, Dr. Leo explains, "is a cumulative, structured, and time-sequenced process," in which interrogators "draw on these techniques repeatedly and/or in succession, building on their earlier accusations, challenges and representations at each step." (Leo Rep. § V.) And once threats and promises enter the room, they do not stay in their lane: "Promises and threats are psychologically coercive and thus taint the rest of an interrogation." (*Id.* § VIII(4).)

### B. The Agents Were Aware of Mr. Cole's Cognitive Impairment.

Coercion and vulnerability are not separate inquiries here; they are the same one. Once coercive conduct is shown, the defendant's "mental condition" becomes a central "factor in the 'voluntariness calculus.'" *Reed*, 522 F.3d at 359 (quoting *Connelly*, 479 U.S. at 164). A confession is involuntary where the defendant's "mental condition at the time was such that the confession most probably was not the product of any meaningful act of volition." *United States v. Smith*, 638 F.2d 131, 133 (9th Cir. 1981) (quoting *United States v. Silva*, 418 F.2d 328, 330 (2d Cir. 1969)). The test is not whether these tactics would overbear a hypothetical, undifferentiated suspect. It is whether they overbore Mr. Cole. *Schneckloth*, 412 U.S. at 226.

The fact that the agents might not have known that Mr. Cole was autistic when they walked into the room does not change anything. *Connelly* itself supplies the reasoning. In holding that coercive police activity is a necessary predicate to involuntariness, the Court described *Blackburn v. Alabama* as a case where "the police learned during the interrogation" that the suspect had a history of mental problems and then "exploited this weakness with coercive tactics." *Connelly*, 479 U.S. at 165 (discussing *Blackburn v. Alabama*, 361 U.S. 199, 207–08 (1960)). The coercive act *Connelly* condemns is the exploitation of a vulnerability the police perceive—not the possession of knowledge before the encounter begins. *See United States v. Parker*, 116 F. Supp. 3d 159, 174 (W.D.N.Y. 2015) ("[T]he police must somehow overreach by exploiting a weakness or condition known to exist," and where a mental impairment "should have reasonably been apparent to . . . interrogators, . . . a lesser quantum of coercion [may] render the confession involuntary[.]"). Awareness that develops mid-

interrogation, followed by tactics that press the perceived weakness, is precisely what rendered the *Blackburn* confession involuntary.

This Circuit reads *Connelly* the same way. In *Hallford*, the district court held that *Connelly* forecloses suppression only where officers are "completely unaware of the defendant's condition," because in that circumstance "the police have not engaged in any 'coercive' activity." *United States v. Hallford*, 280 F. Supp. 3d 170, 187 (D.D.C. 2017). The negative implication is critical here: where officers *are* aware of a suspect's vulnerability—whenever that awareness arises—and press forward with coercive tactics anyway, the resulting confession may be involuntary. The D.C. Circuit confirmed as much, measuring the interrogation's "inherently coercive pressures" against what the agents knew of the suspect's mental state. *United States v. Hallford*, 816 F.3d 850, 858–60 (D.C. Cir. 2016). The Ninth Circuit, sitting en banc, has held the same on facts materially identical to these: officers who realized mid-interrogation that a suspect had an "intellectual impairment [that] made him more susceptible to the interrogative pressure" and continued deploying manipulative techniques obtained an involuntary confession, because "it simply takes less" to override the will of a suspect whose capacity for rational choice is limited. *United States v. Preston*, 751 F.3d 1008, 1023–28 (9th Cir. 2014) (en banc).

The agents cannot insulate Mr. Cole's statements by professing ignorance at the threshold. Here, the agents did not need a full medical history reflecting Mr. Cole's mental impairment. Mr. Cole told them—in the interrogation's first hour and repeatedly thereafter—that he structures his entire life to avoid "anything that

deviates from routine," that he is "super introversive," and that he had "trouble even maintaining a conversation like this." (Tr. at 61–63.) They watched him gag, shiver under a blanket, chant denials in ritual repetition, and report stomach pain and a "blank" mind. Having received that notice, the agents did not slow down. They escalated, and they even weaponized the disclosures—turning "you don't like to dwell on the past" and "you're a here and now person" into reasons to keep talking. (Tr. at 100.) Dr. Leo found that Mr. Cole "was hyperventilating at times during the interrogation because he was in such distress," and that he "was especially vulnerable to the Agents' psychological coercion" because he told them he was scared, freaking out, trying to keep himself together, and on the verge of throwing up. (Leo Rep. § VIII(4).) He concluded, like the Ninth Circuit did in *Preston*, that "[i]t would have taken a lot less psychological pressure to coerce someone in Mr. Cole's state of mind to make and/or agree to an involuntary, false, and/or unreliable statement, admission and/or confession." (*Id.*)

The vulnerability the agents observed is well documented in the scientific literature. Autistic individuals are disproportionately likely to give "compliant false confessions"—confessions made "to escape the stress of interrogation"—because the techniques of custodial questioning render them "more compliant with police requests, suggestible to police-generated narratives, and less able to communicate exculpatory information."[6] High levels of suggestibility and compliance are common

---

[6] Lauren Rogal, *Protecting Persons with Mental Disabilities from Making False Confessions: The Americans with Disabilities Act as a Safeguard*, 47 N.M. L. Rev. 64, 66–69 (2017).

traits among autistic individuals in general.[7] An interrogation is, by design, a catastrophic disruption of routine that "can produce significant distress" in an autistic person, and the outward signs of that distress—flat affect, atypical eye contact, delayed or repetitive responses—are routinely misread as indicators of deception or guilt.[8] Controlled research confirms that innocent autistic suspects provide fewer exculpating details and display higher baseline anxiety than neurotypical suspects, so that a truthful autistic denial structurally resembles a lie.[9] And the Reid-style sequence the agents used here—isolation, repeated assertions of absolute certainty, then minimization offering a psychological escape—is the configuration the literature identifies as most dangerous for exactly this population.[10] *Preston*, 751 F.3d at 1024 (recognizing that the Reid manual is premised on the idea that "no innocent suspect, *with normal intelligence and mental capacity*, would acknowledge committing a crime merely because the investigation contrasted a less desirable circumstance to a more desirable one and encouraged the suspect to accept it. . .").

---

7 Alice S. North, Ailsa J. Russell & Gisli H. Gudjonsson, *High Functioning Autism Spectrum Disorders: An Investigation of Psychological Vulnerabilities During Interrogative Interview*, 19 J. Forensic Psychiatry & Psych. 323 (2008).

8 C.S. Allely, *Autism Spectrum Disorders in the Criminal Justice System: Police Interviewing, the Courtroom and the Prison Environment*, Recent Advances in Autism 1, 4–5 (2015).

9 Ralph Bagnall *et al.*, *Police Suspect Interviews with Autistic Adults: The Impact of Truth Telling Versus Deception on Testimony*, 14 Frontiers in Psychology 1117415, 6–10 (2023).

10 Rogal, *supra* note 6, at 66, 69; Kassin, *supra* note 5, at 113–14; Allely, supra note 8, at 2, 5.

The case law tracks the science and does not confine itself to any one form of impairment. A suspect's "mental state is relevant to the extent it made him more susceptible to mentally coercive police tactics." *Smith v. Duckworth*, 910 F.2d 1492, 1497 (7th Cir. 1990) (internal quotation marks omitted). Prolonged interrogation of a mentally vulnerable suspect has produced suppression again and again. *Davis v. North Carolina*, 384 U.S. 737, 752 (1966); *United States v. Blocker*, 354 F. Supp. 1195, 1199–1200 (D.D.C. 1973) (suppression where interrogation tactics combined with the defendant's "apparent mental deficiency"). And in the decades since *Connelly*, courts of appeals have repeatedly held confessions involuntary where the precise tactics employed against Mr. Cole—rejected denials, professed certainty, supplied facts, and minimization—were aimed at a suspect whose cognitive limitations the officers could see. *Preston*, 751 F.3d at 1027–28 (confession of intellectually disabled eighteen-year-old involuntary where officers rejected his denials of guilt, instructed him on the responses they would accept, and fed him the details of the crime to which they wanted him to confess; "[e]ven if we would reach a different conclusion regarding someone of normal intelligence," those methods "produced an involuntary confession" in *this* defendant); *A.M. v. Butler*, 360 F.3d 787, 800–01 (7th Cir. 2004) (confession of a minor with cognitive impairment rendered involuntary after being questioned for hours without parent or counsel); *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 952–53 (8th Cir. 2001) (confession involuntary where officers exaggerated claims of evidence and made false promises of leniency to a suspect they knew was mentally disabled); *see also Bailey v. Commonwealth*, 194 S.W.3d 296 (Ky. 2006) (suppressing confession

where officers who knew the suspect was mentally impaired but repeatedly accused him of lying until he confessed largely by "parroting suggestions" the interrogator had offered; where incapacity "is known to interrogating officers, a 'lesser quantum of coercion' is necessary to call a confession into question"); *People v. McIntyre*, 789 P.2d 1108 (Colo. 1990) (affirming suppression where detective, "aware of [the suspect's] fragile mental and emotional condition, exploited [his] weaknesses to obtain the confession"). The agents here did not have to infer Mr. Cole's susceptibility. He narrated it to them, in the first person, from the interrogation's first hour.

Nor does the principle distinguish between the mind and the body. Where a suspect's physical condition—illness, exhaustion, intoxication—erodes his capacity for conscious choice, the resulting statement is equally involuntary. *United States v. Taylor*, 745 F.3d 15, 24–26 (2d Cir. 2014) (confessions given across two days involuntary where defendant, impaired by Xanax ingestion, drifted in and out of consciousness); *Pea v. United States*, 397 F.2d 627, 635 (D.C. Cir. 1967) (confession involuntary where suspect had physical trauma and was intoxicated); *Mincey v. Arizona*, 437 U.S. 385, 398–401 (1978) (statements of wounded defendant, questioned in intensive care while barely able to respond, involuntary). Here, the transcript records the same erosion in real time. Mr. Cole gagged; he shivered under a blanket the agents supplied; he reported stomach pain the agents acknowledged and talked past; and he described a mind gone "blank." (Tr. at 61, 75, 87, 91.) The questioning did not stop. Whether the capacity for choice is dismantled by a drug, a wound, a sleepless night, or a defendant's "autistic shutdown" under sensory and social

overload, the constitutional consequence is the same.[11] In situations involving uncomfortable interactions, individuals with autism experience far higher levels of physiological distress than other people.[12]

### C. The Record Shows That Mr. Cole's Will Was Overborne.

The government may point to the common courtesies it offered Mr. Cole: the water, the blanket, the offers of Cheetos and chicken wings, the agents' refrains that "you're in control, Brian" and "if you want any breaks . . . we stop." (Tr. at 3, 61, 96, 99–100.) But *Miranda* itself catalogued this technique—the interrogator as false friend—as a hallmark of psychological coercion, not an antidote to it. *Miranda v. Arizona*, 384 U.S. 436, 448–55 (1966). So does the modern literature. Dr. Leo notes that the agents "repeatedly told Mr. Cole that they were not accusing him of anything" (Tr. at 7, 60, 84)—even as they accused him of planting two pipe bombs—which, "especially in the context of the above promises and threats, implied that he would receive leniency if he cooperated because he was not being accused." (Exhibit C, Leo Rep. § VIII(3).) His label for the technique: "an implied promise of more favorable treatment via gaslighting." (*Id.*) And the transcript exposes the assurances as empty. Mr. Cole was told he was "in control" of an interview in which every denial

---

11 *Autistic Meltdowns, Shutdowns & Burnout*, Seattle Children's: The Autism Blog, https://www.seattlechildrens.org/clinics/autism-center/the-autism-blog/autistic-meltdowns-shutdowns-burnout/ (last visited Sept. 29, 2026).

12 Keren MacLennan, Sarah O'Brien & Teresa Tavassoli, *In Our Own Words: The Complex Sensory Experiences of Autistic Adults*, 52 J. Autism & Dev. Disorders 3061 (2022) (explaining that autistic individuals can "often experience sensory input more intensely compared to others, and may find it painful, dysregulating, or overwhelming.").

was answered with "you can't convince us," every request to be believed was met with "that's a losing battle," and the one time the agents asked whether he wanted to stop, they immediately narrated the consequences of stopping—the agents walking out to report a liar, the family summoned to Washington—before cueing the video. (Tr. at 89–92.) Control that cannot be exercised is not control. It is set dressing.

What the recording actually shows, hour by hour, is the collapse of will that the case law describes. A man who answers "No" when asked if he is doing okay—and is questioned anyway. (Tr. at 97.) A man whose response to the ultimate question—do you want this to end?—is "everything is just blank. . . . [I]t's just a little too much to process. I'm sorry." (Tr. at 91.) A man who spends his one unaccompanied break not resting but rhythmically chanting—"Smallest, tiniest chances"—in the self-soothing loop of an autistic person past his capacity. (Tr. at 86–87.)

Once Mr. Cole capitulated, he adopted the *agents'* narrative, rather than supply his own: the agents supply "one dumb mistake," and he echoes "One stupid night"; the agents supply the route, the bench, the timer, and he answers in fragments and "mm-hmms." (Tr. at 94, 99, 111–13.) Even his affirmative statement—"everything after that was just blank" (Tr. at 103)—describes dissociation, not recollection. That sequence is the third of what Dr. Leo calls the "three sequential police errors" that produce false but detailed confessions: contamination. Properly trained interrogators "will not ask leading or suggestive questions and will not educate the suspect about details . . . of the alleged crime," because "[t]ruthful confessions and statements are typically corroborated by solid physical evidence and

independent knowledge of underlying case facts that have not been suggested to the suspect; false confessions and false statements are not." (Exhibit C, Leo Rep. § VII.) The post-admission narrative here was the agents' narrative, confirmed in monosyllables.

To be sure, the interrogation was not marked by violence, and the agents' tone stayed even. But *Schneckloth* does not grade on politeness, and the will of a man like Mr. Cole is not overborne with raised voices. It is overborne by (1) certainty he could not argue with, (2) threats to the people he could not bear to hurt, (3) promises he could not evaluate, and (4) a disability that converted the agents' pressure into an unendurable need to escape physical discomfort. On this record, the government cannot carry its burden of proving that Mr. Cole's admissions were "the product of an essentially free and unconstrained choice." *Schneckloth*, 412 U.S. at 225. Every statement from the December 4 interrogation must be suppressed.

## II. MR. COLE'S POST-WAIVER STATEMENTS SHOULD BE SUPPRESSED BECAUSE THEY WERE OBTAINED IN VIOLATION OF RULE 5(a) AND *MCNABB-MALLORY*

Even if the Court concluded that some portion of the morning's statements was voluntary, the detailed confession the agents extracted that afternoon is inadmissible on separate grounds. Rule 5(a) commands presentment "without unnecessary delay," and statements made beyond six hours "[are] to be suppressed" if the delay in presentment was unreasonable or unnecessary. *Corley v. United States*, 556 U.S. 303, 322 (2009); *Mallory v. United States*, 354 U.S. 449, 455–56 (1957); *United States v. Abu Khatallah*, 275 F. Supp. 3d 32, 45–46 (D.D.C. 2017). Both steps condemn what happened here with Mr. Cole.

**A. The Post-Waiver Confession Fell Outside the Six-Hour Safe Harbor.**

The timeline of events is not in dispute. The agents arrested Mr. Cole at gunpoint at 6:58 a.m. *See* Exhibit E. Section 3501(c)'s safe harbor therefore closed at 12:58 p.m. By 9:21 a.m., Mr. Cole had been seized, transported from Woodbridge, processed, and Mirandized. The written presentment waiver was signed at approximately 12:13 p.m.—with 45 minutes left on the clock—and the interrogation then ran, as the agents had promised, "for a few more hours." (Tr. at 99, 102–103.) *Fifty-five* transcript pages of questioning followed, in which the agents walked Mr. Cole step-by-step through the government's narrative of January 5, 2021. (Tr. at 103–58.) Nearly all of that narrative was extracted after 12:58 p.m., outside the safe harbor. In fact, Mr. Cole was not presented until the next day. (Dkt. 28 at 5.)

Nor can the government justify the delay—and under *Corley*, unjustified delay past the six-hour mark ends the inquiry. The magistrate judge was sitting blocks away. The agents themselves told Mr. Cole at 9:00 a.m. that "later on this afternoon we'll likely be in front of a judge" (Tr. at 5–6), and at day's end the trip was "a 5 minute ride" (Tr. at 159). This was not a delay for transportation, booking, or the unavailability of a judicial officer. The agents promised Mr. Cole that, if he signed the document they placed in front of him, "you're going to stay here and talk to us." (Tr. at 101.) Delay for the purpose of interrogation is "the epitome of 'unnecessary delay.'" *Corley*, 556 U.S. at 308; *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 61 (1991) (Scalia, J., dissenting) ("It was clear" at common law "that the only element bearing upon the reasonableness of delay was not such circumstances as the pressing need to

conduct further investigation, but the arresting officer's ability, once the prisoner had been secured, to reach a magistrate").

Delay for the sole purpose of continuing an interrogation—which is what happened here—is the original sin the presentment rule prevents. *Mallory* condemned precisely this practice. 354 U.S. at 455–56 (arrestee may not be held "for the purpose of extracting a confession" before presentment). The Supreme Court has never wavered on the point. Where the delay's purpose, "as stated by the officers themselves, was only to furnish an opportunity for further interrogation," the resulting confession is inadmissible "without regard to whether [it was] 'voluntary.'" *Upshaw v. United States*, 335 U.S. 410, 412–14 (1948). And delay "is unreasonable and unnecessary when it is 'of a nature to give opportunity for the extraction of a confession.'" *United States v. Jacques*, 744 F.3d 804, 814 (1st Cir. 2014) (quoting *Mallory*, 354 U.S. at 455). The agents here stated the purpose themselves, on the recording: sign, and "you're going to stay here and talk to us." (Tr. at 101.)

### B. The Purported Presentment Waiver Cannot Save the Delay, Because It Was Neither Knowing Nor Voluntary.

Mr. Cole expects that the government's answer to all of this will be that he signed a piece of paper. But a waiver of prompt presentment, like any waiver of a federal right, is valid only if knowing and voluntary—and the government's burden here is at its heaviest. A confession obtained in exclusive police custody "can stand if, but only if, the accused affirmatively and understandingly waives his rights, and the Government bears 'a heavy burden'" of proving that he did. *Frazier v. United States*, 419 F.2d 1161, 1166 (D.C. Cir. 1969). The warning "must be given with proper

solicitude for actual understanding," and "the ultimate question is whether the waiver is voluntary in the full sense of the word." *Id.* at 1166 n.24. The burden is weighty because "a waiver made in the coercive atmosphere of police custody is less likely to be voluntary than one made before a commissioner." *Id.* The agents obtained this form more than five hours into custody, long after interrogating Mr. Cole past his breaking point, for the announced purpose of interrogating him further. The circumstances defeat both requirements.

*First*, Mr. Cole's presentment waiver was not knowing. The agents downplayed and misrepresented the form as an administrative formality for continuing a conversation Mr. Cole felt he could not escape—"you're going to stay here and talk to us. Does that make sense?" (Tr. at 101). And they even sweetened it as a favor: signing would spare him from public humiliation in court that day and give Mr. Cole "time to prepare [him]self." (Tr. at 95.) Mr. Cole's sole question revealed how little he understood what he was signing: "These are my rights, *even if I signed it*, right?" (*Id.* (emphasis added).) "Yep," the agents answered. (Tr. at 101–03.) That exchange is dispositive. A knowing waiver requires the suspect to grasp one thing above all—that signing surrenders the right. Mr. Cole believed the opposite: that he kept his rights "even if" he signed. A man who believes he retains the right he is signing away has waived nothing. Courts have held as much. In *Outlaw v. United States*, 806 A.2d 1192 (D.C. 2002), the suspect signed a waiver form that "could have been an accurate delineation of his rights" but "was not"; because officers had described the hearing he was surrendering inaccurately and ambiguously, his "waiver was based on materially

inaccurate information, and therefore, was not effective." *Id*. at 1198. Advice of rights is judged "as a totality" for whether it "reasonably convey[ed]" the right, and framing that tells the suspect "there was no point" in invoking it defeats the waiver. *Green v. United States*, 315 A.3d 680, 685, 689 (D.C. 2024). And the D.C. Circuit has refused to credit even a signed express waiver where the record suggested the defendant labored under a "common misapprehension" about its consequence, which raised "a serious question as to whether he intelligently waived his right." *Frazier*, 419 F.2d at 1168. Mr. Cole communicated his misunderstanding, and the agents did not attempt to correct it. They allowed his misunderstanding to continue.

*Second*, Mr. Cole's presentment waiver was not voluntary. The form was placed before Mr. Cole minutes after the agents declared "It's over," told him to cry and breathe, praised his "brave thing," and re-tied the potential of his family being "drag[ged]" to FBI headquarters to his continued cooperation.[13] (Tr. at 93–94.) The

[13] Mr. Cole anticipates that the government will split hairs here and point to the fact that its agents never said they would "arrest" his family. But magic words are not what matter. Having had guns pointed at him just hours earlier, Mr. Cole knew he was under arrest when he heard agents threaten to "drag" his family down to rooms just like the one in which he sat. Mr. Cole reasonably understood that the agents were threatening to do to his family exactly what had been done to him that morning while he was on his walk. After all, the "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994); *Kaupp v. Texas*, 538 U.S. 626, 629–31 (2003) (per curiam) ("[I]nvoluntary transport to a police station for questioning is sufficiently like arrest to invoke the traditional rule that arrests may constitutionally be made only on probable cause.") (cleaned up). There was no probable cause to arrest Mr. Cole's family members, but that is what Mr. Cole understood the agents were threatening to do. Mr. Cole "had no reason not to believe that the [agents] had ample power to carry out their threats." *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963).

law does not presume such a waiver voluntary; it presumes the opposite. When consent to continued questioning is obtained "during a period of unnecessary delay within the meaning of Rule 5," courts "look with great suspicion" on it, and "there is a presumption of involuntariness which the Government must rebut . . . with 'clear and positive' evidence." *Greenwell v. United States*, 336 F.2d 962, 967–68 (D.C. Cir. 1964). The Greenwell court doubted "whether, absent the opportunity for independent legal advice, there can ever be said to be a truly voluntary and intelligent waiver of the right to prompt presentment." *Id.* at 968. Mr. Cole had no such advice.

Mid-interrogation presentment waivers, where courts have accepted them, presuppose a properly advised suspect making an affirmative choice with a functioning will. *See United States v. Cooper*, 85 F. Supp. 2d 1, 21–23 (D.D.C. 2000). *Cooper* proves the point by contrast: that suspect was accurately advised of the presentment requirement, was "eager to talk," and was composed and cooperative from the start. *Id.* at 18.[14] Mr. Cole, on the other hand, was misadvised, had just finished telling these agents his mind was "blank," and had reported physical pain the agents ignored and talked past. Mr. Cole's purported waiver was extracted at the bottom of the very collapse described in Part I and can only be described as the fruit of that collapse, not an intervening act of free will. *Cf. Karake*, 443 F. Supp. 2d at 87–

---

[14] *Cooper* is also weaker authority for the government than it first appears. The court there held that because the defendant was held on state charges, "without a federal charge there can be no obligation for prompt presentation to a magistrate under § 3501(c)" at all, *id.* at 28—so its discussion of the consent form was never a holding that a federal presentment waiver was valid. Mr. Cole, by contrast, was under federal arrest from 6:58 a.m.

91 (statements following coerced admissions suppressed where taint never dissipated).

Nor can the government argue that a signature, whenever obtained, launders whatever follows it. The First Circuit rejected exactly that theory because it "would drain the right of prompt presentment of any substance," allowing agents to "interrogate a defendant for six hours and then, instead of bringing him before a magistrate, detain him for hours or days longer in the hopes that he will eventually choose to waive presentment and continue the interrogation." *Jacques*, 744 F.3d at 814–15 n.3. That is not a hypothetical here. The agents said this is what they were doing. (Tr. at 99, 101.) The dispositive question for a post-six-hour confession is "the cause of any delay," not the paperwork, and "delay for the purpose of interrogation is the epitome of 'unnecessary delay' and is inherently unreasonable." *Abu Khatallah*, 275 F. Supp. 3d at 53. *Abu Khatallah* upheld a delay caused by overseas capture and maritime transport. Here, the delay was caused by two agents who just wanted "a few more hours" to interrogate Mr. Cole, and nothing more. (Tr. at 99.)

Every statement Mr. Cole made outside the safe harbor and before his December 5 presentment—including the entire post-waiver narrative (Tr. at 103–58) and the waiver form itself—must be suppressed.

## III. THE COURT SHOULD HOLD AN EVIDENTIARY HEARING

A defendant is entitled to an evidentiary hearing on his motion to suppress "only upon factual allegations which, if established, would warrant relief." *United States v. Law*, 528 F.3d 888, 903–04 (D.C. Cir. 2008). This motion amply clears that

bar. The allegations here are that agents stacked four coercive tactics on a suspect whose disability they watched unfold in real time and then detained him past the six-hour safe harbor for the announced purpose of continued interrogation. If established, these facts would require suppression. And most of them already are established, by a video recording and transcript whose contents the government cannot dispute.

At the hearing, Mr. Cole will offer testimony concerning autism spectrum disorder and of Dr. Leo, who anticipates testifying "both generally and specifically": to the social science of interrogation, psychological coercion, and false confessions, and to the "specific interrogation techniques and practices used during the interrogation of Mr. Cole on December 4, 2025, why they are significant in light of social science research, and . . . how they increase the risk of eliciting false and/or unreliable statements." (Exhibit C, Leo Rep. § III ¶ 5.) Courts have "repeatedly accepted" such testimony because its subject is "beyond common knowledge" and "highly counter-intuitive." (*Id.* § IV); *see also Preston*, 751 F.3d at 1021 (discussing the "psychological evidence introduced at the suppression hearing"); *United States v. Hall*, 93 F.3d 1337, 1345 (7th Cir. 1996) (reversing exclusion of false-confession expert; "[p]roperly conducted social science research often shows that commonly held beliefs are in error"); *Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 2436316 (N.D. Ill. June 5, 2017) (admitting Dr. Leo over *Daubert* challenge because "the field of police interrogation practices, psychological coercion, and false confessions is sufficiently developed in its methods to constitute a reliable body of specialized

knowledge under Rule 702"); *Corley v. United States*, 556 U.S. 303, 321 (2009) (citing Dr. Leo's false confessions work with approval).

## CONCLUSION

The Court should find that neither the statements Mr. Cole made during the December 4, 2025 interrogation nor his purported waiver of prompt presentment was voluntary and should suppress all such statements. The government cannot carry its burden in showing either. The Court also should set this motion for an evidentiary hearing before any determination.

Dated: September 29, 2026

Respectfully submitted,

*/s/ John R. Glover*
J. Alex Little
Zachary C. Lawson
John R. Glover
LITSON PLLC
54 Music Square East, Suite 300
Nashville, TN 37203
Telephone: 615-985-8205
alex@litson.co
zack@litson.co
jr@litson.co

John M. Shoreman
DC Bar #407626
Mario B. Williams
Ga. Bar No. 235254 (*Pro Hac Vice*)
HUMANITY DIGNITY AND RIGHTS LLC
3480 Peachtree Road, NE
Atlanta, Georgia 30326
Tel: 470-257-2485
jms@mcfaddenshoreman.com
mwilliams@hdrattorneys.com

*Counsel for Brian Cole Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of September, 2026, I served a copy of the foregoing on all attorneys of record via the Court's electronic filing system.

*/s/ John R. Glover*
John R. Glover