**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:26-cr-00001 (AHA)** |
| | : | |
| **BRIAN J. COLE, JR.,** | : | |
| | : | |
| **Defendant.** | : | |

**MOTION TO COMPEL PRODUCTION OF POST-ARREST DIAGNOSIS INFORMATION OR TO EXCLUDE EVIDENCE AT SUPPRESSION STAGE**

The United States respectfully moves the Court to order the defendant to produce records and other materials underlying his newly diagnosed Autism Spectrum Disorder (ASD). The defendant has moved to suppress his confession to law enforcement as a 30-year-old adult based on an ASD diagnosis made, for the first time in the defendant's life, six weeks after his arrest in this case. The defendant has, to date, refused to disclose any information supporting this recent diagnosis or the unidentified "constrained mental faculties" that he claims are associated with it. Such information is necessary to understand and assess whether and how the post-arrest diagnosis is relevant to suppression. ASD includes a wide array of neurologic diversity and symptoms, and the diagnosis of autism rests on inherently subjective clinical assessments of potential deficits and impairments across a range of communication and social interaction. The defendant has chosen to put his post-arrest diagnosis and the characteristics of that diagnosis squarely at issue in seeking suppression. As a result, the defendant should be required to provide the records and other materials underlying the diagnosis so that the government and the Court may understand and assess its relevance *vel non* to suppression and ensure that any factual findings on this topic are more than conclusory assertions. Absent this tailored production of information, the Court should exclude the post-arrest diagnosis from the suppression record.

## **RELEVANT BACKGROUND**

The defendant is charged by indictment with placing pipe bombs outside the headquarters of the Republican National Committee (RNC) and Democratic National Committee (DNC) in Washington, D.C. on January 5, 2021. ECF No. 106. The defendant was arrested for these crimes outside of his home in Woodbridge, Virginia in the morning on December 4, 2025. During a custodial interview the same morning, the defendant initially denied planting the bombs and offered a false cover story before eventually confessing and explaining in detail how and why he committed the charged offenses.

At the time of his arrest, the defendant was 30 years old, employed, held a driver's license, and had a registered firearm. According to Prince William County records, the defendant attended C.D. Hylton High School as a full-time student and graduated in 2013. The defendant's school records reflect no medical diagnoses, no cognitive or other disabilities, no developmental deficits, and no specialized or individualized programming. A health information form submitted in 2004 indicated only that the defendant had a speech issue, wore glasses, and had seasonal allergies.

On December 17, 2025, the defendant requested and obtained an order permitting two mental health professionals retained by the defense, Dr. Clifford Sussman and Dr. David Black, to evaluate him at the Rappahannock Regional Jail. ECF Nos. 13, 14. On December 30, 2025, the defendant submitted an opposition to pretrial detention, representing for the first time that he had "been diagnosed with Autism Spectrum Disorder, Level 1 and with obsessive compulsive disorder." ECF No. 23 at 3. On January 2, 2026, the magistrate judge then presiding over the case issued an order detaining the defendant pending trial and noting that "the defense reports that Mr. Cole is diagnosed with autism spectrum disorder and obsessive-compulsive disorder." ECF No. 28 at 12. The defendant moved this Court to revoke his pretrial detention on January 16, 2026, repeating that he had "been diagnosed with Autism Spectrum Disorder, Level 1, and obsessive

compulsive disorder ('OCD')." ECF No. 48 at 4. On January 23, 2026, the government opposed the revocation motion, explaining, *inter alia*, that "the defendant has not proffered any information in support of the representation that he 'has been diagnosed with Autism Spectrum Disorder, Level 1, and obsessive compulsive disorder ('OCD')" and that it is "unclear to the government what symptoms the defendant experiences in connection with these purported diagnoses." ECF No. 50 at 38 n.16.

Four days later, on January 27—the day before the Court was scheduled to consider the defendant's pretrial detention—the defendant submitted a letter signed by Dr. Black stating that he had evaluated the defendant over two days, on December 16 and 19, 2025,[1] and "[b]ased on that evaluation [he] diagnosed [the defendant] with Autism Spectrum Disorder, Level 1 (Requiring Support) and Obsessive Compulsive Disorder." ECF No. 52-1. The only additional statement in Dr. Black's letter was a suggestion that the Court not draw an incriminating inference from the defendant's repetitive wiping of his cellphone—which Dr. Black incorrectly indicated was limited to "junk files"—because such conduct "is consistent with" his OCD diagnosis. *Id.* In fact, a forensic review of the cellphone's contents showed that between December 2020 and December 2025, the device recorded 943 events identified as a "factory reset" or "wipe," including a "wipe" event approximately three hours before the defendant's arrest on December 4, 2025.

During a detention hearing on January 28, the government again questioned the recent diagnoses, explaining that the claim of ASD was undermined by the defendant's video-recorded custodial interview, which showed "a 30-year-old man who went into an FBI interview after being arrested and proceeded to give them a carefully planned cover story explaining the evidence that

[1] Dr. Black's reference to evaluating the defendant on December 16 appears to be inaccurate, as the defendant's motion for an order permitting the evaluations was filed on December 17 and sought evaluations on December 18 and 19. ECF No. 13.

placed him in Washington, DC on the evening of January 5th of 2021." Hr'g Tr. (Jan. 28, 2026) at 53. The government stated that the interview showed that the defendant "does not have any appreciable deficit" and, absent a "specific proffer from the defense," the Court should not rely on the post-arrest ASD diagnosis. *Id.* at 53–54. The government also expressed concern about Dr. Black's apparent willingness to offer an opinion based on information that appeared to minimize the defendant's conduct, emphasizing that there was "no proffer that the defendant suffers from any other symptoms of OCD except for wiping his cell phone to explain the otherwise obviously incriminating nature of that kind of conduct." *Id.* at 52. Counsel for the defendant responded that the defense would provide additional information about the diagnosis if it "were relevant to this hearing." *Id.* at 55.

On September 29, 2026, the defendant moved to suppress his confession. ECF No. 102. The motion to suppress is premised in significant part on Dr. Black's post-arrest diagnosis of the defendant with Level 1 ASD. *Id.* at 3, 12. The motion, *inter alia*, claims that the defendant's "autism spectrum disorder left him unable to withstand the psychologically coercive tactics deployed against him," *id.* at 2; states definitively that the defendant's repeating of phrases "was 'stimming'—the self-regulating repetition characteristic of an autistic person in acute physical and emotional distress," *id.* at 8–9; claims that the Court "must … measure[]" the allegedly coercive interview "against the backdrop of Mr. Cole's autism and constrained mental faculties," *id.* at 15; relies on and submits various sources of literature to suggest that the defendant "falsely" confessed, *id.* at 26–27; ECF No. 102-3; and characterizes the defendant's statements as the product of an "'autistic shutdown' under sensory and social overload," ECF No. 102 at 29–30.

Notwithstanding the fact that his diagnosis was made only after he was arrested, the defendant represents in his motion to suppress that his autism and its characteristics are "beyond

dispute here." ECF No. 102 at 12. In support, the defendant represents to this Court that the magistrate judge's "detention ruling already acknowledges that Mr. Cole 'is diagnosed with autism spectrum disorder and obsessive-compulsive disorder.'" *Id.* (citing ECF No. 28 at 12). The defendant misleadingly omits that the magistrate judge's ruling merely stated that "*the defense reports* that Mr. Cole is diagnosed" with ASD and OCD. ECF No. 28 at 12 (emphasis added); *see* ECF No. 102 at 12. In characterizing his ASD as "beyond dispute," the defendant also fails to mention that the government has repeatedly questioned it, as described above.

According to the motion to suppress, during a hearing on the motion, the defense "will offer testimony concerning autism spectrum disorder." ECF No. 102 at 39. The motion does not clarify the source of any such testimony or whether, or how, it will include evidence of the recent ASD diagnosis that underlies the motion. *Id.* To date, the government has not received any information supporting the defendant's ASD diagnosis, the basis for that diagnosis, the characteristics of the condition, or any reports or opinions generated following the "two-day evaluation of Mr. Cole" on which the defendant has asked the Court to rely. *Id.* at 12. The government has been provided only the four-sentence letter signed by Dr. Black, which neither substantiates the ASD diagnosis nor provides any explanation of its presentation in the defendant. Indeed, the only specific information in Dr. Black's letter about the ASD diagnosis—that it is Level 1, the mildest form of autism—has been contradicted by the defendant's own lawyer, who represented that the defendant is as "an individual who has extreme autism." Hr'g Tr. (Jan. 28, 2026) at 20.

On October 7, 2026, the government sent a letter to the defense explaining that "[b]ecause the defense has put a medical diagnosis of the defendant at issue and is relying on Dr. Black's diagnosis in support of suppression," the government requests the disclosure of: (1) "[a]ll

documents, reports, records, or other materials or information relied upon by Dr. Black in diagnosing the defendant with Level 1 ASD"; (2) "[a]ll records of the evaluations of the defendant on December 16 and 19, 2025, including notes taken by Dr. Black and any other recordings or documents reflecting the evaluations"; and (3) "[a] log itemizing the entire contents of Dr. Black's file and identifying any materials not provided with sufficient detail for the government to assess each item's relevance and potential discoverability and raise any challenges with the Court." The defense has informed the government that it does not intend to provide the requested materials and will provide only *Jencks* statements for its as-yet-undisclosed suppression witnesses.

## **ARGUMENT**

The defendant asks this Court to suppress his confession based on the impact of purported facts—his post-arrest ASD diagnosis and associated, yet unidentified, "constrained mental faculties," ECF No. 102 at 15—on the voluntariness of his statements. However, the defendant apparently does not intend to provide the government with any of the information necessary to understand and assess whether and how his recent diagnosis is relevant to suppression. ASD includes a wide range of neurologic diversity and symptoms, and the diagnosis of autism rests on inherently subjective clinical judgments using various diagnostic measures to determine whether deficits exist across a range of communication and social interaction and whether those deficits cause functional impairment. The defendant, by moving to suppress his statements based on the effect of his post-arrest ASD diagnosis on the voluntariness of his confession, has put the nature and characteristics of that diagnosis squarely at issue. The government seeks an order compelling the defense to produce records and other materials underlying the recent diagnosis so that its reliability may be tested and its relevance *vel non* to suppression understood and assessed, and to ensure that any factual findings related to the diagnosis are more than conclusory assertions made on a deficient record. Absent a limited and tailored production of information to permit the

government to review and assess the accuracy of this diagnosis, and the characteristics attendant thereto, the Court should exclude the post-arrest ASD diagnosis from the suppression record.

**I. The Court Would Clearly Err by Resting Any Factual Findings on Dr. Black's Unsupported and Conclusory Opinions.**

At the outset, the Court cannot base factual findings—particularly findings central to a request for suppression, a remedy of "last resort"[2]—on a conclusory and unsubstantiated record. Indeed, the D.C. Circuit has held that "conclusory factual finding[s]" are "clearly erroneous." *See, e.g.*, *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 828 (D.C. Cir. 2025). Nor will the Circuit "accept findings that are utterly deficient in other ways." *United States v. Microsoft Corp*., 253 F.3d 34, 118 (D.C. Cir. 2001); *see Ayala v. Kijakazi*, 620 F.Supp.3d 6, 31 (S.D.N.Y. 2022) (remanding where factfinder provided only a "highly conclusory" assessment of medical opinions and "offer[ed] no insight into how well either doctor supported and explained their opinion" (cleaned up)).

These principles do not relax when applied in the pretrial suppression setting. Although "the rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence," *United States v. Matlock*, 415 U.S. 164, 172–73 (1974), "this does not mean that there are no standards whatsoever," *United States v. Golden*, 418 F.Supp.3d 416, 422 (D. Minn. 2019). "The evidence on which the Court relies in ruling on a suppression motion must still be sufficiently reliable and probative." *Golden*, 418 F.Supp.3d at 422. As the Sixth Circuit has explained, "[e]ven at a suppression hearing ... a trial court's findings must be supported by competent and credible evidence," and the court must decide "what weight to afford [an] expert's testimony." *United States v. Stepp*, 680 F.3d 651, 668–

[2] *Davis v. United States*, 564 U.S. 229, 237 (2011) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

69 (6th Cir. 2012) (internal quotation omitted); *see also United States v. Kellogg*, 202 Fed.Appx. 96, 102 (6th Cir. 2006) ("a district court would clearly err if its decision were based solely on evidence that was not competent and credible" (internal quotation omitted)); *United States v. Schaefer*, 87 F.3d 562, 570 (1st Cir. 1996) ("a judge presiding at a suppression hearing may receive and consider any relevant evidence … that bear[s] indicia of reliability"); *Odom v. Frank*, 3 F.3d 839, 849 (5th Cir. 1993) (holding that a court's finding based on speculation contained in witnesses' statements was clear error).

The current basis for the defendant's post-arrest ASD diagnosis—Dr. Black's four-sentence letter—is plainly and "utterly deficient" to support competent factual findings.

## II. The Court Should Not Rest Factual Findings on an Unsubstantiated Diagnosis that is Based on Specialized Knowledge Beyond that of a Layperson and is Inherently Subjective and Variable.

The consequences of a deficient record are amplified in this case, as medical or mental health diagnoses, and the nature and characteristics of diagnosed conditions, are not ordinary facts proven by ordinary evidence. "[M]edical opinions regarding diagnoses" are inherently the purview of expert witnesses with "'scientific, technical, or other specialized knowledge' that lay witnesses do not possess." *Johnson v. Obaisi*, No. 16 cv 4046, 2020 WL 433872, at *4 (N.D. Ill. Jan. 28, 2020); *see also, e.g.*, *Self v. Bates*, No. 23-cv-374-wmc, 2025 WL 1330124, at *3 (W.D. Wis. May 7, 2025) ("a medical diagnosis or treatment involving a complex mental health issue … requires expert testimony"); *Furdge v. Wedig*, No. 20-cv-846-jdp, 2022 WL 782419, at *2 (W.D. Wis. Mar. 15, 2022) ("[a] medical diagnosis generally requires expert testimony"); *Martin v. United States*, No. 2:14–cv–02214–TLN–KJN, 2017 WL 2881103, at *4 (E.D. Cal. July 6, 2017) ("Courts have found the diagnosis of an ailment requires expert testimony."). Similarly, medical records reflecting diagnoses typically require accompanying expert testimony. *See, e.g.*, *Nagle v.*

*Gusman*, No. CV 12-1910, 2016 WL 560688, at *5 (E.D. La. Feb. 12, 2016) ("The average juror does not have the specialized knowledge or experience necessary to understand or interpret a patient's medical records." (citing *Greeno v. Daley*, 414 F.3d 645, 658 (7th Cir. 2005) (noting that understanding medical records and patient treatment likely requires expert testimony)); *Fowler v. Carrollton Pub. Library*, 799 F.2d 976, 982 (5th Cir. 1986) (holding that district court erred in admitting medical records "with no accompanying expert explanation of their significance")). Thus, without knowing and assessing the basis for Dr. Black's opinions, neither the government nor the Court is equipped even to begin to consider their reliability, much less whether and how they relate to suppression.

Even among medical or mental health diagnoses, ASD poses a particular challenge for the Court's fact-finding responsibilities. There are no "conclusive genetic or medical test[s]" that provide "a definitive diagnosis of autism, even in older individuals." Chiugo Okoye et al., *Early Diagnosis of Autism Spectrum Disorder: A Review and Analysis of the Risks and Benefits*, 15 Cureus, no. 8, 2023, at e43226, https://pmc.ncbi.nlm.nih.gov/articles/PMC10491411/. "All assessments are subjective, and the reliance on behavioral observations and subjective judgments during assessments can introduce variability and subjectivity into the diagnostic process." *Id.* Compounding the issue of clinical subjectivity, "autism spectrum disorder includes a wide range of neurologic diversity [and] symptoms." Andrea Westby & Mikaela Coburn-Pierce, *Autism Spectrum Disorder in Primary Care*, 112 Am. Fam. Physician 301 (2025), https://www.aafp.org/afp/2025/0900/autism-spectrum-disorder. To diagnose autism spectrum disorder, the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-5) "require[s] deficits in three areas of communication and social interaction across multiple settings, with at least two restricted or repetitive behaviors, not explained by

another condition, and causing functional impairment." *Id.* And, generally, "[d]iagnosis should include a multidisciplinary team and a multidimensional assessment." *Id.*

Moreover, "[d]iagnosing adults with autism spectrum disorder (ASD) is difficult," and "research has suggested that the few [diagnostic] measures that exist for autistic adults may not be very effective for accurate diagnoses." Caitlin M. Conner, Ryan D. Cramer & John J. McGonigle, *Examining the Diagnostic Validity of Autism Measures Among Adults in an Outpatient Clinic Sample*, 1 Autism Adulthood 60 (2019), https://pubmed.ncbi.nlm.nih.gov/36600688/. Indeed, one study concluded that "two commonly used autism screening surveys—the Autism Spectrum Quotient (AQ) and the Ritvo Autism Asperger's Diagnostic Scale-Revised (RAADS-R)" as well as the common "semistructured diagnostic interview called the Autism Diagnostic Observation Schedule (ADOS)," were not "very accurate on their own." *Id.*

In short, the nature of an ASD diagnosis and the condition's characteristics are such that they cannot be understood, analyzed, or tested without knowing how the diagnosis was reached. Where, as here, there is no information about the subjective judgments underlying the recent diagnosis, no information about the nature and extent of the requisite deficits and impairments observed, and no information about the diagnostic measures employed, their accuracy, or their reliability, the government—and, critically, any expert it chooses to retain—cannot engage meaningfully in the adversarial process, and the Court cannot trust the competency of the evidence on which it is asked to rely.

## III. There Are Nontrivial Concerns About the Reliability of Dr. Black's Opinions Considering the Circumstances of this Case.

The present dearth of support for Dr. Black's opinions alone justifies the tailored relief that the government seeks—*i.e.*, an order compelling disclosure of the basis for the post-arrest ASD

diagnosis or excluding such evidence. However, the concerns here are not limited to the absence of evidentiary foundation. Dr. Black's opinions are marred by indicia of unreliability.

To begin, "[a]utism is a lifelong neurodevelopmental condition." Andrea Westby & Mikaela Coburn-Pierce, *Autism Spectrum Disorder in Primary Care*, 112 Am. Fam. Physician 301 (2025), https://www.aafp.org/afp/2025/0900/autism-spectrum-disorder. Under the DSM-5 criteria, autism "symptoms must be present in the early developmental period," although they may not fully manifest until later. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 50 (5th ed. 2013). In this case, the defendant's school records from childhood through his high school graduation lack any indication of autism-related symptoms, much less a diagnosis, and the defense has not suggested that medical or mental health records exist showing otherwise. Indeed, it was only after the 30-year-old defendant was arrested and charged in this case, and after he confessed to law enforcement, that his counsel retained Dr. Black, who evaluated the defendant and diagnosed him with Level 1 ASD. Under these circumstances, any factfinder should naturally and reasonably question why the defendant has only now been diagnosed with a lifelong condition that, definitionally, is present from childhood and seek to understand the basis for the adult diagnosis and the characteristics of the condition.

Adding to this concern is the fact that Dr. Black's letter was signed and submitted the day before the Court was scheduled to address the defendant's detention status in this case, even though the evaluations had taken place more than a month earlier. This context raises questions about Dr. Black's decision to submit an additional opinion suggesting that the defendant's repetitive wiping of his cellphone was innocuous because it was "consistent with" OCD—a suggestion premised on Dr. Black's representation that the defendant deleted "junk files" from his phone when, in fact, the defendant factory reset his phone on a near daily basis. Before the Court is asked

to rely on Dr. Black's diagnosis, it should be able to assess whether, and to what extent, Dr. Black's opinions were motivated and shaped by accurate or inaccurate underlying information.

**IV. The Relief Sought is Appropriately Tailored and Legally Supported.**

The government's requested relief is tailored to ensure that any evidence of the defendant's post-arrest ASD diagnosis is competent, or else that it be excluded from consideration at the suppression stage. The government is not seeking early expert witness disclosures for Dr. Black under Federal Rule of Criminal Procedure 16(b)(1)(C), which the parties have agreed must be provided by December 4, 2026. The government is also not seeking early notice under Rule 12.2, which by rule must be provided on or before the agreed upon pretrial motions deadline of November 20, 2026. Nor is the government making a *Daubert* challenge to Dr. Black's opinions at this stage. The government is simply seeking the materials underlying the post-arrest ASD diagnosis for the purpose of understanding whether and how the diagnosis is relevant to the issues raised in the suppression motion, and to ensure that the Court's findings related to the diagnosis are more than conclusory assertions on a deficient record.

In *United States v. Theodorou*, the district court considered a remarkably similar set of circumstances, and its decision is instructive here. No. 3:22 CR 274, 2023 WL 7386421 (N.D. Ohio Nov. 8, 2023). There, the defendant moved to suppress his statements to law enforcement based on the defendant's claimed "unique susceptibility to coercive interrogation tactics." *Id.* at *1. This "unique susceptibility" was premised on expert reports from three practitioners. *Id.* Unlike this case, the defense in *Theodorou* disclosed the expert reports to the government in moving to suppress the statements. *Id.* One such report stated that the defendant in his law enforcement interactions "endorsed symptoms of marginal reality testing," explained the expert's diagnostic testing and the results of that testing, and discussed in detail the presentation of the

defendant's psychological symptoms and how those symptoms bore on the voluntariness of his statements. *Id.* at *1–2. The expert report further identified the records and other materials on which the expert had relied in forming his opinions, including recordings of the defendant's statements and various medical and clinical records. *Id.* at *2.

Even with a detailed expert report, the government moved to compel the defense to disclose the records on which the expert had relied, along with a list of items in the expert's case file and *in camera* review of any such items that might be relevant to the motion to suppress. *Id.* at *3. The government argued that "this information is necessary to respond to [the defendant's] motion to suppress," and the court agreed. *Id.* The court explained that although neither Rule 12.2 nor Rule 16(b)(1)(C) formally entitled the government "to the information it seeks at this stage, … the Government raises reasonable concerns regarding [the defendant's] statements and expert reports." *Id.* The court ordered the defendant to provide the government with the underlying medical and clinical reports on which the expert had relied, along with "a list itemizing the entire contents of [the expert's] file," and for any items in the file not produced, "a privilege log containing sufficient detail for the Government to determine that item's relevance and potential discoverability." *Id.* The court also permitted the government, after receiving the records and the log, "to challenge the discoverability of any material withheld" by "request[ing] *in camera* review." *Id.* at *4.

The basis for the government's request in this case is substantially more compelling than in *Theodorou*. Here, the defendant has not provided an expert report supporting Dr. Black's recent diagnosis—indeed, the defense has disclosed *nothing* substantiating Dr. Black's opinions and appears to have no intent to do so. Without judicial intervention, neither the government nor the Court will know what records or other materials Dr. Black relied upon, which diagnostic tests or measures he employed, the nature of the requisite deficits and impairments he observed, or whether

and to what extent any symptoms of the defendant's ASD diagnosis are relevant to the question of voluntariness. If "the Government raise[d] reasonable concerns" in *Theodorou*, *id.* at *3, it has raised incontrovertible concerns here. The Court should, at a minimum, take the same steps taken by the *Theodorou* court to ensure that any factual findings in this case rest on a competent evidentiary record.

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court order the defendant to produce the materials requested herein or exclude any evidence of the defendant's post-arrest ASD diagnosis at the suppression stage.

Respectfully Submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Charles R. Jones*
CHARLES R. JONES (D.C. Bar No. 1035541)
STUART D. ALLEN (D.C. Bar No. 1005102)
JOCELYN BALLANTINE (CA Bar No. 208267)
Assistant United States Attorneys
National Security Section
601 D Street, NW
Washington, D.C. 20530