**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:26-cr-00001-AHA** |
| | : | |
| **BRIAN J. COLE, JR.,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL THE GOVERNMENT TO ELECT BETWEEN COUNTS ONE AND TWO

The United States respectfully opposes defendant Brian J. Cole, Jr.'s motion to compel the government to elect between Counts One and Two of the Third Superseding Indictment. ECF No. 110 (hereinafter, "Def.'s Mot."). Counts One and Two charge separate violations of 18 U.S.C. § 844(d) predicated on the defendant's construction and transportation of two pipe bombs from Virginia to Washington, D.C. intending to plant one bomb at each of two distinct targets—namely, the national headquarters of the Republican National Committee and of the Democratic National Committee. The defendant claims that the government has improperly charged just one crime in two separate counts in violation of the multiplicity doctrine. However, the text of § 844(d) and the statute's legislative history emphatically establish that Congress, in prohibiting the interstate transportation of explosives, intended to punish separately each bomb transported across state lines—especially where, as here, the bombs were transported into a city with the intent to attack separate and distinct targets. Moreover, the defendant fails to articulate why this Court should depart from the D.C. Circuit's general view that multiplicity challenges should be addressed after a jury has returned verdicts on all counts. The Court should deny the motion on the merits. Alternatively, the Court should permit all counts to go to the jury and address the defendant's multiplicity claim after verdicts are returned.

## RELEVANT BACKGROUND

The defendant is charged by indictment with planting pipe bombs outside the headquarters of the Republican National Committee (RNC) and Democratic National Committee (DNC) in downtown Washington, D.C. on January 5, 2021. ECF No. 106. The FBI's investigation of the defendant yielded evidence that his vehicle entered the area of the DNC and RNC shortly before he planted the pipe bombs; his cellphone interacted on multiple occasions with cell sites near the DNC and RNC at times when surveillance video showed him walking within the relevant cell site's coverage area wearing a mask, hood, and gloves, and carrying a backpack; between 2018 and 2020, he bought various components and ingredients used to make the bombs, including pipes, end caps, wiring, steel wool, and timers; he had bomb components in his closet and car when he was arrested in December 2025; he had, in his home, a thumb drive with deleted copies of the Anarchist Cookbook and a removable computer hard drive containing online searches including "how to make a pipe bomb" and "manifesto template"; and he confessed to the crimes during a videorecorded interview, explaining in detail how and why he did it. The defendant's confession included details about his construction of the bombs and his transportation of the devices in his car from Virginia to Washington, D.C. on the evening of January 5, 2021; his motive to attack the RNC and DNC headquarters as distinct targets; and his research of the RNC and DNC on Google Maps in advance of walking the area and planting one bomb at each of the two locations.

## APPLICABLE LAW

The term "multiplicity" refers to "'charg[ing] the same offense in more than one count' of a single indictment." *United States v. Cooper*, 886 F.3d 146, 153 (D.C. Cir. 2018) (quoting *United States v. Weathers*, 186 F.3d 948, 951 (D.C. Cir. 1999)). "In examining claims of multiplicitous indictments, th[e] court first determines what offense Congress made 'the unit of prosecution.'"

*United States v. Doost*, 3 F.4th 432, 438 (D.C. Cir. 2021) (quoting *Bell v. United States*, 349 U.S. 81, 83 (1955)). In so doing, the court assesses "whether there is a sufficient factual basis to treat each count as separate" and "whether Congress intended to punish separately each of the alleged violations." *United States v. Smith*, 919 F.3d 1, 15 (1st Cir. 2019) (quoting *United States v. Gordon*, 875 F.3d 26, 32 (1st Cir. 2017)).

"Courts must 'interpret statutes, no matter the context, based on the traditional tools of statutory construction.'" *Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943, 947 (D.C. Cir. 2024) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024)). To do so, the court should "begin with the text" and "look to the ordinary meaning of its key terms." *Id.* at 948 (first quoting *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018); then quoting *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024)). In addition to the text, the court "must employ all the tools of statutory interpretation," including the statute's "structure, purpose, and legislative history." *Loving v. I.R.S.*, 742 F.3d 1013, 1016 (D.C. Cir. 2014) (quoting *Pharm. Res. & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001)).

## **ARGUMENT**

The defendant built and transported across state lines two distinct bombs intended for two distinct targets in the Nation's capital. In 1970, when Congress enacted 18 U.S.C. § 844 to address the plague of bombings that were then visiting American cities, it did not give a bulk discount to those defendants who transported multiple bombs in a single trip. Rather, Congress crafted a statute that prohibits the interstate transportation of "any explosive" where the explosive is transported with knowledge or intent that it will be used to harm people or property. And Congress did so not to curb the scourge of explosives generally, but specifically to address the documented and disturbing number of individual bombings and attempted bombings that had recently been

committed in American cities. The statute's text and purpose make plain that in enacting § 844(d), Congress intended to punish separately each bomb transported across state lines—especially where, as here, the defendant transported his bombs into a city with the intent to attack separate and distinct targets. Counts One and Two are thus properly charged. However, even if the defendant's multiplicity challenge had merit, the Court should not resolve it now. The D.C. Circuit has made clear that multiplicity claims generally should be addressed after a jury has returned verdicts on all counts. This is especially true in a case like this one, where the defendant will not be prejudiced at trial by the allegedly multiplicitous counts—the evidence will be the same regardless, there will be no false impression that the defendant has committed additional crimes, and the jury already will be asked to return verdicts on separate counts for each of the two bombs under multiple other statutes. The Court should deny the motion on the merits. Alternatively, the Court should permit all counts to go to the jury and address the defendant's multiplicity claim after verdicts are returned.

## I. Counts One and Two Are Properly Charged as Separate Counts

### a. The Text and Purpose of 18 U.S.C. § 844(d) Strongly Support Charging Separate Counts for Each Pipe Bomb.

Under 18 U.S.C. § 844(d), Congress authorized the criminal prosecution of "[w]hoever transports or receives, in interstate or foreign commerce any explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property." Stated simply, the statute criminalizes the transportation or receipt of "any explosive" if the person knows or intends "that it" (the explosive) will be used to harm people or property.

Congress's use of the singular pronoun "it" is central to determining the unit of prosecution under § 844(d). *See It*, Collins Eng. Dict., collinsdictionary.com (last visited Oct. 27, 2026)

(identifying the word "it" as a third person singular pronoun). The word "it" refers "to an object, animal, or other thing that has already been mentioned." *Id.* As used in § 844(d), "it" plainly refers back to the "explosive" mentioned earlier in the provision. Congress's decision to use the categorical phrase "any explosive" followed by a "singular" pronoun referring to the category "suggests Congress's intent to designate as the unit of prosecution each individual [explosive], rather than the actions of … transporting, … or receiving any number of [explosives]." *United States v. Casillas-Montero*, 152 F.4th 306, 319 (1st Cir. 2025) (addressing federal dogfighting statute and holding that use of "any animal" followed by "the animal" indicates that "each individual animal," rather than "the actions of" selling, buying, or transporting "any animal," was the intended unit of prosecution).

"To be sure, Congress's use of the singular is not dispositive [of] the question." *Id.* The court must also look to context, and "the context supports the government's reading." *Id.* "For instance, other sections of the same statute employ the singular." *Id.* Section 844(g), for example, prohibits possessing "an explosive" in an airport or federal government facility. 18 U.S.C. § 844(g). Section 844(h) prohibits using or carrying "an explosive" to commit, or during the commission of, another felony. *Id.* § 844(h). And § 844(i), with which the defendant is also charged here in two separate counts, prohibits using "an explosive" to "maliciously damage[] or destroy[]" certain property. *Id.* § 844(i).

Whatever doubt might be left from the textual analysis is resolved by the legislative history. Section 844 was enacted as "part of Title XI of the Organized Crime Control Act of 1970." *United States v. Rosenberg*, 806 F.2d 1169, 1178 (3d Cir. 1986). "The impetus for Title XI was the recurring bombs and bomb threats during that period." *Id.* Indeed, the Congressional record is replete with evidence that Congress, in enacting Title XI, was fixated on addressing the

extraordinary number of discrete bombings and attempted or threatened bombings in American cities that had recently become a cause for national concern. As the House Report states:

> Bombings and the threat of bombings have become an ugly, recurrent incident of life in cities and on campuses throughout our nations. The absence of any effective state or local controls clearly attest to the urgent need to enact strengthened federal regulation of explosives.
>
> Title XI, added by the Committed to S. 30, responds to a widespread national concern that existing federal and state sanctions and prohibitions over the use, possession, and transportation of explosives are inadequate. The provisions of Title XI are derived from legislative proposals submitted by the Administration (H.R. 16699, introduced March 26, 1970; H.R. 18573, introduced July 21, 1970) and by the Chairman of this Committee (H.R. 17154, introduced April 23, 1970). These and related measures were the subject of 5 days of public hearings on July 15, 16, 22, 29, and 30, 1970 ('Explosives Control Act,' Hearings Before Subcommittee No. 5, House Committee on the Judiciary, 91st Congress, Second Session, Serial No. 29). In the course of these hearings testimony was received from representatives of the Department of Justice, the Department of the Treasury, the Department of the Interior, Members of Congress, industry representatives and representatives of various organizations concerned with firearms regulation.
>
> Among other matters, the hearing record discloses that between January 1, 1969, and April 15, 1970 (approximately 15 1/2 months) law enforcement officials reported a total of 4,330 bombings, 1,475 attempted bombings, and 35,129 threatened bombings. The Department of the Treasury Spokesman indicated that in this period such bombing outrages were responsible for the death of 40 persons and approximately $22 million of property damage.
>
> ***
>
> Title XI combines the regulatory approach to the distribution and storage of explosives with strengthened and expanded criminal prohibitions that apply to the intentional misuse of explosives. Its purpose is to protect interstate and foreign commerce against interference and interruption by reducing the hazards to persons and property arising from explosives misuse and unsafe or insecure storage. […]
>
> ***
>
> In addition, in view of the growing and widespread number of bombing outrages, the Committee has recommended expanded federal investigative and prosecutive authority. […]

H.R. Rep. No. 91-1549, at 4013 (1970).

The legislative history makes clear that, consistent with the statute's text, Congress's "central aim" in enacting § 844(d) and the rest of § 844 was not, as the defendant claims (at 5–6), the mere act of transporting or receiving explosives but rather the *number* of individual explosives transported or received in conjunction with their known or intended use. In other words, Congress intended to punish the transportation and receipt of *each* explosive that contributed to the "ugly, recurrent incident of life in cities" then occurring, which had, in little over one year, produced "a total of 4,330 bombings, 1,475 attempted bombings, and 35,129 threatened bombings," along with "the death of 40 persons and approximately $22 million of property damage." H.R. Rep. No. 91-1549, at 4013; *see Casillas-Montero*, 152 F.4th at 320 (statement of policy in federal dogfighting statute "evinces Congress's central aim: the humane care and treatment of animals," and as "each animal experiences suffering individually, … prosecuting separately each instance of possession of a dog for dogfighting purposes hews closely to the statute's text, including its explicit purpose"); *Gordon*, 875 F.3d at 34 ("A unit of prosecution focused on the murder-for-hire plot seems more in keeping with this legislative history than one focused on the use of the facilities of interstate commerce.").

Thus, as applied to this case, the "unit of prosecution" analysis is straightforward. The defendant has been charged with transporting two distinct bombs across state lines intending to use those bombs to attack two distinct targets in downtown Washington, D.C. Counts One and Two, charging a violation of § 844(d) for each of these individual bombs, are supported by a sufficient factual basis and fit comfortably within the ambit of Congress's intent to reduce the number of bombings in American cities by punishing each transported explosive—especially where, as here, the evidence establishes that the intended use of the bombs extended to separate targets.

The defendant "ignores these text-based indicators. In fact, he scarcely mentions the statutory text." *Casillas-Montero*, 152 F.4th at 320. The defendant also does not mention the relevant statutory purpose and legislative history, which weigh heavily against his multiplicity claim. Indeed, the defendant asks the Court to interpret a statute in his favor without offering even a cursory view of the statute's proper construction in light of its text and legislative history. The defendant instead analogizes to other cases broadly involving different, and statutorily distinct, "possession-based firearms and explosives offenses," Def.'s Mot. at 6, and he posits "an alternative unit of prosecution under section [844(d)]: the action. In his view, section [844(d)] criminalizes the act of … transporting … or receiving *any* number of [explosives]." *Casillas-Montero*, 152 F.4th at 320 (emphasis in original). But while "the government's interpretation faithfully adheres to the text and [legislative] purpose of the statute," the defendant's "incomplete text-based argument does not move the needle," "[n]or does his invocation" of distinguishable precedent addressing dissimilar statutes "or the Supreme Court's decision in *Bell*." *Id.*

According to the defendant's motion, the D.C. Circuit has held flatly that "where Congress uses indefinite words like 'any' or 'a' to describe the object of the offense, the unit of prosecution is ambiguous, and lenity applies." Def.'s Mot. at 6. Were this claim true, the multiplicity doctrine would have a far more expansive application than the case law reflects, as Congress very often uses "any" or "a" to introduce the object of a criminal offense. *See, e.g.*, James J. Brudney & Ethan J. Leib, *"Any"*, 49 BYU L. Rev. 465, 466 (2023) ("Anyone who knows anything about statutory interpretation opinions at the Supreme Court knows that many of them seem to turn on the word 'any.'"). The defendant's claim, however, is incorrect, and the basis for it folds under scrutiny.

The defendant relies on *United States v. Cunningham*, involving multiple felon-in-possession charges for individual firearms brought under 18 U.S.C. § 922(g), which criminalizes the possession by a convicted felon of "any firearm or ammunition." 145 F.3d 1385 (D.C. Cir. 1998). *Cunningham* is a merger case. *Id.* at 1398–99. The D.C. Circuit held that "unless the weapons are stored or acquired at different times or places," the word "any" is ambiguous, "as possession of *any* firearm permits both the conclusion that only one offense has been committed and the conclusion that two separate crimes have occurred." *Id.* at 1399 (quoting in parenthetical *United States v. Valentine*, 706 F.2d 282, 294 (10th Cir. 1983)). Given this ambiguity, and the fact that "the jury was never instructed to find that the weapons were separately acquired or stored," the court held that the multiple § 922(g) convictions "must merge into one" for sentencing. *Id.*

*Cunningham* did not address a multiplicity claim, much less hold, as the defendant represents, that "where Congress uses indefinite words like 'any' or 'a' to describe the object of the offense, the unit of prosecution is ambiguous, and lenity applies." Def.'s Mot. at 6. *Cunningham* does, however, stand for the proposition that where Congress generally prohibits the simple possession of "any" object and says no more, the unit of prosecution may be ambiguous. *Cunningham* did not address a statute like 18 U.S.C. § 844(d), in which Congress first identified an action (transportation) as to "any" object (explosive) then identified a singular version of the object and specifically prohibited taking the action with the object for a specific purpose (to do harm to people or property). Thus, *Cunningham*, properly understood, is at best inapposite here.

The defendant's other authority, *United States v. Johnson*, affirmatively undermines his multiplicity claim. 4 F.4th 116 (D.C. Cir. 2021).[1] In *Johnson*, the D.C. Circuit considered multiple

[1] The defendant also cites *Rayborn v. United States*, 234 F.2d 368 (6th Cir. 1956). Def.'s Mot. at 5. That case, like *Cunningham* and the Supreme Court's decision in *Bell v. United States*, 349 U.S. 81 (1955), addressed statutes criminalizing simply the possession or transportation of

counts brought under D.C. Code § 22-3154(a), which authorizes criminal prosecution of a "person who manufactures or possesses a weapon of mass destruction" as defined under the statute. D.C. Code § 22-3154(a). The issue before the *Johnson* court, similar to the question presented here, was whether "the unit of prosecution under that statute is possession," in which case the multiple counts were multiplicitous, or whether "the unit of prosecution is the weapon," which would support the charging of multiple counts for multiple weapons. *Id.* at 120. As the D.C. Circuit explained, two distinct lines of precedent could apply depending on the statute's text and purpose. On the one hand, statutes prohibiting the possession of "a" weapon or contraband—*e.g.*, "carrying a pistol"[2] or other "dangerous weapon"[3] or "possess[ing] with intent to manufacture or distribute, a controlled substance"[4]—could not support "multiple convictions in circumstances involving simultaneous possession of two prohibited items in the same place." *Id.* at 121.

However, where the statute prohibits not simply the possession of the object—*e.g.*, "possess[ing] or control[ing] any firearm"—but possession without "hold[ing] a valid registration certificate for *the firearm*," a "different conclusion" should be reached. *Id.* (emphasis added) (citing *Hammond v. United States*, 77 A.3d 964 (D.C. 2013) (addressing D.C. Code § 7-2502.01)). In *Hammond*, the D.C. Court of Appeals emphasized that the text of D.C. Code § 7-2502.01 "referred to the prohibited items (unregistered firearms) with a definite article—i.e., 'the firearm'"

---

"any firearm" (in *Bell*, the transportation of "any woman or girl") without an additional singular reference to the object of the offense. *Rayborn*, 234 F.2d at 369 n.2-3.

[2] *Johnson*, 4 F.th at 121 (citing *Cormier v. United States*, 137 A.2d 212 (D.C. 1957) (addressing D.C. Code §§ 22-3204)).

[3] *Id.* (citing *Bean v. United States*, 576 A.2d 187 (D.C. 1990) (addressing D.C. Code §§ 22-3204)).

[4] *Id.* (citing *Briscoe v. United States*, 528 A.2d 1243 (D.C. 1987) (addressing D.C. Code §§ 33-541(a)(1), (2)(D)).

and not "the indefinite article 'a'." *Id.* at 122 (quoting *Hammond*, 77 A.3d at 967). "And that textual difference embodies a fundamental difference in the statutory purpose: the object of the statute in *Hammond* was to enable identifying, tracking, and 'collect[ing] information on each firearm possessed in the District of Columbia,' which meant that 'the unit of prosecution must be each individual non-registered firearm in order to give effect to the legislature's intent.'" *Id.* (quoting *Hammond*, 77 A.3d at 968). Turning to the statute at issue in *Johnson*, the D.C. Circuit explained that there was "no comparable indication … of a distinct legislative purpose connected to each possessed item." *Id.* The statute simply treated the covered weapons "as a class" and lacked any textual or historical indication that the law was intended to punish "each distinct weapon." *Id.* at 122–23.

Here, § 844(d) is like the statute at issue in *Hammond* (and the statute at issue in *Casillas-Montero*, discussed above). Congress used the phrase "any explosive" then followed the phrase with the singular pronoun "it," referring back to the prohibited item in the same way that Congress employed the definite article "the" in *Hammond* and *Casillas-Montero*. This textual analysis is confirmed by the statute's legislative history, which demonstrates that § 844(d) was intended to punish "each distinct" explosive transported across state lines with intent to do harm, and certainly where the evidence established that the defendant's intent applied to separate identified targets. The statute's text and legislative history firmly refute the defendant's multiplicity challenge.[5]

[5] For these reasons, "after considering [the] text, structure, history, and purpose" of the statute, there is no "grievous ambiguity or uncertainty." *See Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation omitted) (quoting *Muscarello v. United States*, 524 U.S. 125 (1998)). The rule of lenity therefore does not apply. *Contra* Def.'s Mot. at 6.

**b. Prior Indictments in this Case and a Charging Decision in an Unrelated Case Are Irrelevant to the Multiplicity Analysis.**

Rather than interpret the text and purpose of 18 U.S.C. § 844(d), the defendant makes an estoppel-type argument—that because the government in earlier indictments in this case charged the two bombs in a single § 844(d) count, it is somehow precluded from proceeding on separate counts as charged in the Third Superseding Indictment. Def.'s Mot. at 7 (arguing that the government's "charging history" in this case supports multiplicity). The defendant does not mention that the Third Superseding Indictment followed his duplicity challenge to the Second Superseding Indictment, in which he claimed that "charg[ing] the attempted destruction of two separate buildings as one offense" should require dismissal of the D.C. Code terrorism offense, which at the time charged both bombs in a single count. ECF No. 95. In any event, there is no authority for the proposition that to resolve a multiplicity challenge to the operative indictment, a court should look to charging decisions as reflected in prior indictments in the same case.

The defendant also suggests that because the government in one case in the Southern District of New York charged a single violation of § 844(d) based on two explosive devices, it must exercise its discretion in the same manner here. Def.'s Mot. at 7. Again, the defendant offers no authority for this suggestion, and the government is aware of none. The charging decision in a separate, unrelated case, like the prior indictments in this case, simply do not assist the Court in resolving the question of statutory construction presented by the defendant's multiplicity claim.

## II. <u>If the Court Does Not Deny the Multiplicity Claim on the Merits Before Trial, it Should Address the Claim After Verdicts Are Returned</u>

The defendant asks the Court to "order the government, within 30 days of its order, to elect whether it will proceed on Count One or Count Two, with the other count dismissed." Def.'s Mot. at 9. The basis for this extraordinary pretrial remedy is that, on two occasions, other members of

this district court have required pretrial election. Def.'s Mot. at 8 (citing *United States v. Phillips*, 962 F.Supp. 200, 201–02 (D.D.C. 1997) and *United States v. Clarridge*, 811 F. Supp. 697, 705–06, 714 (D.D.C. 1992)). Those cases, however, involved concerns that allegedly multiplicitous counts that could "falsely suggest to a jury that a defendant has committed not one but several crimes." *Phillips*, 962 F.Supp. at 202; *Clarridge*, 811 F.Supp. at 702 (highlighting risk of creating impression of more criminal activity than in fact occurred). In such circumstances, the courts found sufficient basis to depart from the D.C. Circuit's general view, unmentioned in the defendant's motion, that "multiplicity claims are better sorted out post-trial." *United States v. Hubbell,* 177 F.3d 11, 14 (D.C. Cir. 1999); *see United States v. Clark*, 184 F.3d 858, 872 (D.C. Cir. 1999) ("Upon finding that a defendant has been convicted of two charges for a single offense, the usual remedy is to hold that the convictions have merged and order that one be vacated."); *United States v. Joyner*, No. 23-309 (RC), 2026 WL 1622706, at *8 (D.D.C. June 5, 2026) ("[J]ust because multiplicity in the indictment is a defect that a defendant is obligated to challenge before trial under Rule 12(b)(3) does not mean that the trial court is required to correct that defect before trial."); *United States v. Sanford, Ltd*., 859 F.Supp.2d 102, 121 (D.D.C. 2012) ("Multiplicitous counts may be remedied after trial, during sentencing since the primary evil of multiplicity is double punishment for the same offense.").

The defendant makes no effort to explain why the prejudice identified in *Phillips* or *Clarridge* would manifest in this case. This is for good reason, as any jury in this case will hear all the evidence supporting the transportation of both pipe bombs and the intended targets for each regardless of the multiplicity challenge. The jury will also be asked to return verdicts on multiple statutory violations that, like Counts One and Two, are charged separately for each of the individual bombs. *See* Third Superseding Indictment, ECF No. 106 (charging multiple violations of 18 U.S.C

§ 844(i) (Counts Three and Four), 18 U.S.C. 2332a(a)(2) (Counts Five and Six), and D.C. Code §§ 22-3153(l) (Counts Seven and Eight)). In other words, "the risk of prejudice is minimal" because "both § [844(d)] counts arise from the same alleged conduct," "the Government represents that the evidence it intends to introduce to prove" each count "will be the same," and "[a]llowing the Government to proceed on both counts will therefore not expose jurors to more evidence of [the defendant's] alleged criminal activity than the alternative." *Joyner*, No. 23-309 (RC), 2026 WL 1622706, at *8. In these circumstances, courts permit the counts to go to the jury and address any multiplicity claim after verdicts are returned. *See, e.g.*, *id.*; *Clark,* 184 F.3d at 872 ("detect[ing] no prejudice" in allowing multiplicitous counts to be tried where the evidence "was identical"); *Sanford*, 859 F.Supp.2d at 124 ("The defendants have not demonstrated that they would suffer any prejudice from allowing the government to proceed on the allegedly multiplicitous counts, particularly since the defendants assert that the charges encompass the same underlying facts and conduct."); *United States v. Wheeler*, No. 11–151(ESH), 2012 WL 1865506, at *2 (D.D.C. May 22, 2012) (permitting alleged multiplicitous counts to go to jury because "the charges are based on the same sets of facts, [and] allowing all of the counts to go to the jury poses less risk of prejudice to defendant"); *United States v. Cook*, No. 07-192(ESH), 2007 WL 3020081, at *1 (D.D.C. Oct. 11, 2007) (finding "no prejudice to defendant in allowing all of the counts to go to the jury, as both sides agree that the pairs of counts are based on exactly the same facts"); *see also United States v. Smalls*, No. CR 06-2403 RB, 2008 WL 11362040, at *2 (D.N.M. Apr. 2, 2008) ("There is … no prejudice to a defendant in allowing all of the counts to go to the jury when the evidence for the counts is identical.").

At bottom, "[t]he danger of a multiplicitous indictment is that defendant will be given multiple sentences for the same offense, thus violating the Double Jeopardy Clause of the

Constitution. This harm, if it exists in this case, can be remedied after trial should the jury return a verdict on all counts." *Cook*, No. 07-192(ESH), 2007 WL 3020081, at *1.

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny the defendant's motion to compel the government to elect between Counts One and Two.

Respectfully Submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Charles R. Jones*
CHARLES R. JONES (D.C. Bar No. 1035541)
STUART ALLEN (D.C. Bar No. 1005102)
JOCELYN BALLANTINE (CA Bar No. 208267)
Assistant United States Attorneys
National Security Section
601 D Street, NW
Washington, D.C. 20530